**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **RESTAURANT LAW CENTER, and NATIONAL RESTAURANT ASSOCIATION,**<br><br>　　　　　　　　　**Plaintiffs,**<br><br>**v.**<br><br>**CITY OF NEW YORK, and LORELEI SALAS, in her official capacity as Commissioner of the NEW YORK CITY DEPARTMENT OF CONSUMER AFFAIRS,**<br><br>　　　　　　　　　**Defendants.** | **Civil Action No. _____** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, the Restaurant Law Center ("RLC") and the National Restaurant Association ("NRA") (collectively, "Plaintiffs"), by and through its undersigned attorneys, seeks declaratory and injunctive relief against Defendants the City of New York ("City") and Lorelei Salas, in her official capacity as Commissioner of the New York City Department of Consumer Affairs ("DCA Commissioner Salas") (collectively, "Defendants"), and hereby alleges as follows:

### PRELIMINARY STATEMENT

1.　　As part of a years-long effort to unionize fast food employees, the Service Employees International Union ("SEIU") has successfully lobbied Defendants to conscript employers in the SEIU's organizing and dues-raising efforts.  Specifically, under a new law to take effect on November 26, 2017, Defendants now require fast food employers, *and only fast food employers*, to calculate, deduct, collect, administer, and remit employee deductions to political and ideological groups that employers may choose to oppose, and should not be forced

to support.  New York City Administrative Code ("NYCC") § 20-1301, *et seq.* (the "Deduction Bill").[1]  As the City's own Councilmembers put it, this new law "seeks to lend a [*sic*], and provide a voice for those who are not currently organized within the labor movement," creating a "new form of worker organizing."  Statement of I. Daneek Miller, Chairperson of Committee on Civil Service and Labor, in Hearing Transcript 5/22/17, PDF at 4, http://legistar.council.nyc.gov/View.ashx?M=F&ID=5279161&GUID=3DB7BE35-3089-49C2-A7D1-9AA94823CEC7; Statement of Council Member Brad S. Lander, in Hearing Transcript 5/22/17, *supra*, PDF at 13-14.

2.      By enacting, threatening enforcement of, and enforcing the Deduction Bill, acting under color of local law, Defendants have deprived Plaintiffs and Plaintiffs' members of their rights under federal law, including the U.S. Constitution.

3.      Defendants intend these results.  Specifically, the Deduction Bill forces fast food employers to fund organizations affiliated with a movement that is, itself, designed and formed to disrupt the fast food industry in an effort to force fast food employers to voluntarily recognize the SEIU or its affiliates, messages which Plaintiffs' members may not wish to endorse.

4.      While Plaintiffs' members have no issue with (and indeed share the goal of) many minimum labor standards and protections, the SEIU is improperly attempting to use the Defendants—through their enforcement of the Deduction Bill—to fund and advocate for the SEIU's private attack on the fast food industry, and it is that agenda with which the Plaintiffs' members disagree.

5.      As an initial matter, the First Amendment entitles employers not to assist with "provid[ing] a voice" for movements with which those employers may disagree.  The First Amendment similarly entitles employers not to endorse these movements—or any cause at all—

_____

[1] A copy of the Deduction Bill is attached to this complaint as Exhibit A.

by associating with them, much less to subsidize them by bearing administrative, labor, and legal expenses in the course of that compelled assistance.  The Deduction Bill violates each of these guarantees.  First, it compels employers' speech by forcing unwilling employers to donate employees' wages to ideological and political organizations with whom those employers may and do disagree.  Second, it likewise compels employers' association with and endorsement of those groups and their messages, as employers will fund—and will be perceived as funding—their apparent ideological and political agenda.  Finally, the Bill requires employers to subsidize employees' speech, as it necessarily imposes numerous administrative, labor, and legal costs which will not be (and in some cases *cannot* be) reimbursed.  And these violations are not an incidental effect of the Bill:  they are the point—to advance the explicitly stated and deliberately opposed agenda of groups that the City knows employers may and do not want to advance.  The First Amendment prohibits both Defendants' speech-compelling ends as well as its forced-endorsement and speech-subsidizing means.

6.     Federal labor law, moreover, preempts the Deduction Bill.  The Deduction Bill purports to grant Defendants the authority to decide what is and is not a "labor organization" under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ("NLRA"), and legislates obligations that the NLRA intended to leave unregulated.  Additionally, it requires covered employers to pay funds without regard to the restrictions of the Labor Management Relations Act, 29 U.S.C. § 186 *et seq*. ("LMRA"), exposing employers to federal criminal liability and an impossible choice between compliance with federal or local law.

7.     Accordingly, the Deduction Bill compels employers' speech, association with others' speech, and subsidies for speech under threat of stiff penalties.  If employers comply, they involuntarily communicate, endorse, and subsidize messages and groups with which they

disagree and risk eventual federal criminal sanctions under the LMRA.   Indeed, even an employer *complying* with the Deduction Bill must shoulder the risk that the City has deemed a group not a labor organization for *City* purposes that is a labor organization for *federal* purposes. If an employer refuses to comply, it will immediately risk liability for statutory penalties of up to $1,000 per violation, NYCC § 20-1307(b)(2)(b), as well as civil suits for actual and punitive damages.   NYCC § 20-1308(a).   The City may not put employers in this position—much less as part of an effort to "pressure [employers] toward a national bargaining table" with unions.   Eric Morath, *Q&A: SEIU President on Lessons for Labor in 'Fight for $15'*, WALL STREET JOURNAL (May 23, 2017).   Plaintiffs therefore respectfully request that this Court declare that the Deduction Bill runs afoul of both the First Amendment and federal labor law and enjoin the Deduction Bill's implementation or enforcement.

## PARTIES

8.     Plaintiff Restaurant Law Center ("RLC") is a public policy organization affiliated with Plaintiff National Restaurant Association ("NRA"), the largest foodservice trade association in the world.   The NRA was created in 1919 and launched the RLC, its affiliate, in 2015, and Plaintiffs are headquartered at 2055 L St. NW, Suite 700, Washington, DC 20036.   The RLC routinely advocates on matters of labor relations policy and represents the interests of its members in labor relations matters before the courts.   NRA members have locations that operate within New York City, and the NRA has members that would be subject to the Deduction Bill. The NRA's members include "fast food employers" that employ "fast food employees" at a "fast food establishment" within the definitions of the Deduction Bill.   NYCC §§ 20-1301.

9.     Defendant City of New York is a municipality organized and existing under the laws of New York State.   It is authorized by law to create and maintain its Department of Consumer Affairs ("DCA") and is responsible for the DCA's rules, actions, and policies.

4

10.     Defendant Lorelei Salas, sued here in her official capacity, is the Commissioner of the New York City Department of Consumer Affairs, within which the Office of Labor Policy and Standards is organized.  The Office of Labor Policy and Standards (the "Office"), which Commissioner Salas also oversees, is the entity empowered to enforce the Deduction Bill, to determine what entities qualify for registration under the Deduction Bill, to determine which entities are labor organizations excluded from the Deduction Bill, and to promulgate rules interpreting and implementing the Deduction Bill.   NYCC §§ 20-1301, 20-1303, 20-1310. Commissioner Salas served in that capacity at the time the DCA issued proposed rules implementing the Deduction Bill.

### JURISDICTION AND VENUE

11.     This action, under both the Federal Civil Rights Act of 1871, 42 U.S.C. § 1983, and this Court's power to enjoin state (or local) regulations preempted by federal law, *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1384 (2015), seeks to prevent Defendants from further implementing or enforcing the Deduction Bill due to its irreconcilable conflict with the First Amendment and applicable federal labor laws.

12.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1367(a).

13.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57.

14.     A live, justiciable controversy exists between the parties regarding the implementation and enforcement of the Deduction Bill.  Several of the NRA's members have begun implementing internal procedures in order to comply with the Deduction Bill; meanwhile, those members do not wish to assist with the SEIU's efforts or other similar ideological or political campaigns to which they are personally or professionally opposed.  These members

have sought Plaintiffs' assistance in designing a strategy to attempt to negate the unwanted political or ideological effects of their actions as well as counseling regarding the Deduction Bill's requirements.

15.     As a consequence, Plaintiffs have been required to divert resources from their core missions—advocating for the foodservice industry, providing tools and systems to help members improve operating results, and providing access to information regarding best business practices to its members.  Plaintiffs would prefer to assist members in expanding and growing their enterprises and to promote pro-growth policies and balanced federal regulations. Nonetheless, Plaintiffs have had to spend time and money to counsel members regarding their rights and federal-law obligations regarding the Deduction Bill, the First Amendment, and federal labor law.  This "diver[sion of] resources from" Plaintiffs' "current activities" is also "an injury that has been repeatedly held to be independently sufficient to confer" standing on Plaintiffs.  *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017).  Plaintiffs and its members have suffered these concrete harms, and with the Deduction Bill's effective date later this month, this Court has jurisdiction to adjudicate this dispute under Article III.

16.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

## FACTUAL ALLEGATIONS

### The City Enacts the Deduction Bill to Assist the SEIU in Organizing Employers in the Fast Food Industry

17.     It is public knowledge that the SEIU has pursued a nearly-five-year campaign, called the "Fight for $15," to organize and raise dues from employees in the fast food sector.

18.     The SEIU is one of the largest unions in both the City and the Nation.   It represents service workers in the United States, with a significant portion of its expenditures over the past few years focused on organizing and obtaining new members in the fast food industry.

19.     As part of its mission, the SEIU advances certain political and ideological goals that it views as beneficial to its membership.   It contributes significantly to political campaigns in both time and money, supporting certain political candidates, platforms, and messages, while attempting to defeat others.   In 2016 alone, the SEIU's national headquarters publicly reported spending over $61 million on political activities and lobbying.   *See* SEIU International's Form LM-2, Labor Organization Annual Report.

20.     Contributions to the SEIU are used in part to fund political and ideological messaging, including through methods such as political organizing, direct political speech, supporting specific electoral candidates, public demonstrations, and public-relations campaigns.

21.     The SEIU instituted and heavily funds the "Fight for $15" campaign.   Eric Morath, *Labor Spends Millions To Boost Wages For Workers Who Don't Yet Pay Dues*, WALL STREET JOURNAL (May 23, 2015).   The SEIU expects the Fight for $15 campaign to "eventually lead to unionized workers," which supports their organizational "effort to boost union membership." *Id.*   The "stated goal of Fight for $15 protestors is '$15 [per hour] and a union.'" *Id.*

22.     The SEIU's ideological and political speech, such as the "Fight for $15" effort, and SEIU-driven union organizing efforts in the fast food industry are inextricably linked, with SEIU President Mary Kay Henry announcing that given a public-relations "breakthrough on $15, it's just a matter of time that we break through on a union."   Morath, *Q&A*, *supra*.

23.     The SEIU fundamentally advances its goals through the collection and expenditure of money for political and ideological advocacy.

24.     Per SEIU President Henry, this campaign exists to apply "pressure toward a national bargaining table with [fast food companies.]" *Id.*

25.     The SEIU has also lobbied the City to advance its unionization efforts.  These efforts included the Deduction Bill, commonly referred to as the "**Fast Food Worker Empowerment Bill**."  *See, e.g.,* Statement of Council Member Julissa Ferreras-Copland, in Hearing Transcript 3/3/17, PDF at 14, http://legistar.council.nyc.gov/View.ashx?M=F&ID=5089847&GUID=8D40BD48-CEAA-4E79-B0F0-B5167595C052.

26.     The SEIU recognized that the various provisions included in this law would encourage fast-food unionization.  To this end, when discussing the Deduction Bill, Hector Figueroa, President of SEIU Local 32BJ, declared that: "[t]he Fast Food Workers Empowerment [B]ill specifically would be the first of its kind and [would] present a new model for workers to pool resources together and build collective power to be able to learn and educate themselves and other coworkers of their rights under the law to be able to support issues that affect them[.]"  Testimony of Hector Figueroa before the New York City Council, in Hearing Transcript 3/3/17, *supra*, PDF at 81.

27.     Figueroa's statements recognize the necessary relationship between the SEIU's fundraising efforts, its organizing goals, and its ability to communicate ideological and political messages.  The Bill was designed to streamline the former in order to advance the latter two:  it was a "new model for workers to pool resources together," *i.e.* money, in order to "build collective power," including through political advocacy.

28.     The City agreed, with Deputy Commissioner Liz Vladeck of the City's Office of Labor Policy and Standards—the Office authorized to administer and regulate under the Deduction Bill—stating that: "[t]he Administration largely agrees with the goals of this bill. Fast food workers have been engaging in powerful collective efforts to drive change in their industry and beyond for several years, and they have achieved critical victories" in advancing "our national conversation about labor issues."   Testimony of Deputy Commissioner Liz Vladeck, Office of Labor Policy and Standards, New York City Department of Consumer Affairs, before the New York City Council, in Hearing Transcript 3/3/17, *supra*, PDF at 28.

29.     The Deduction Bill accordingly compels employers to assist the SEIU's fundraising efforts in order to advance the SEIU's private financial and political agenda, under penalty of law imposed by the City.  The City and DCA act as an enforcement mechanism for the SEIU's self-interested objectives, including the organization's political goals.

**The Deduction Bill Obligates Employers to Communicate, Assist In Communicating, Endorse, and Subsidize Employees' Communication of Political and Ideological Messages**

30.     The Deduction Bill applies only to "fast food establishments" that are part of a chain, and that are one of 30 or more establishments nationally, including either an integrated enterprise, or an establishment operated pursuant to a franchise where the franchisor and the franchisees of such franchisor own or operate 30 or more such establishments in the aggregate. NYCC § 20-1301.

31.     Under the Deduction Bill, a fast food employee, defined as "any employee employed or permitted to work at or for a fast food establishment that is located within the city, by any employer, where such job duties include at least one of the following: customer service, cooking, food or drink preparation, delivery, security, stocking supplies or equipment, cleaning or routine maintenance," NYCC § 20-1301, may authorize a portion of their wages to be donated

to City-approved "not-for-profit" organizations, and that employee's employer is legally obligated to deduct, collect, and remit those wages to the designated, City-approved not-for-profit. That process happens in several steps.

32.     The Deduction Bill requires a not-for-profit organization to register with the City before it may accept deductions pursuant to the bill. NYCC § 20-1303(a).

33.     The not-for-profit must provide its name, a physical address, email and telephone information, and a "contact." NYCC § 20-1303(a)(1). It must also provide proof that it is organized as a not-for-profit entity under the laws of its state of incorporation and tax filings for the past three years, which the Deduction Bill takes as conclusive of its nature as a legitimate not-for-profit entity. NYCC § 20-1303. The entity must then gather 500 fast food employee authorizations to deduct wages for donations to that not-for-profit—though the employees need not be employed by the same employer—and provide proof of corresponding disclosures to the fast food employee by the not-for-profit regarding its name, mission, finances, governance, and a statement that labor organizations may not seek donations under the Deduction Bill. NYCC §§ 20-1303(a)(3)-(4), 1304. It must also submit its last three years of tax filings. NYCC § 20-1303(a)(5).

34.     Once a not-for-profit has provided the above documentation, the Office issues it a registration letter confirming its enrollment under the Deduction Bill. NYCC § 20-1303(b).

35.     Not-for-profits are eligible to seek registration under the Deduction Bill, save "labor organizations." NYCC § 20-1310. For private employers, the Deduction Bill defines "labor organization" two ways: first, by reference to New York Labor Law Section 701, and second, as any organization qualifying under 29 U.S.C. § 152(5)—defined as:

> any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in

part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

36.     The Deduction Bill directs Commissioner Salas, through the Office, to "promulgate rules necessary to ensure that" the Deduction Bill "will be applied in a manner consistent with federal or state labor law."  NYCC § 20-1310(c).

37.     DCA issued its proposed rules on October 16, 2017.  The proposed rules stated that "[t]he office shall not register and shall revoke any previously issued registrations of not-for-profits that collect authorization cards or other documents related to membership in a labor organization or with respect to a showing of interest or vote for certification, decertification, or deauthorization of a labor organization, upon receiving proof that the not-for-profit is engaging in such activities."  NYCC § 15-09(c).[2]

38.     Thus, the Deduction Bill authorizes the City of New York and/or its agency to determine whether a not-for-profit organization seeking a registration letter is a "labor organization" under the NLRA.  NYCC § 20-1303(b).

39.     A fast food employee may then designate deductions to a registered not-for-profit by providing his or her employer with a written authorization and a copy of the registration letter.  NYCC § 20-1302(a).  The authorization must include the employee's name and physical address, the amount to be donated, the name and contact information of the not-for-profit, a contact through which the employee can revoke authorization, and a statement that the employee understands that donations are both voluntary and revocable through written revocation provided to the not-for-profit.  *Id.*

40.     A deduction request triggers a variety of employer obligations under the Deduction Bill:

---

[2] A copy of the proposed rules is attached as Exhibit B.

a. The employer must calculate and deduct the authorized contribution from the employee's wages and remit them to the designated not-for-profit no later than 15 days following the authorization. NYCC § 20-1302(e).

b. It must remit the funds in the method the organization requests, noting the deduction in a manner required by state law. *Id.*

c. An employer must also provide copies of the employee's authorization to both the not-for-profit and the employee within five business days of receiving it, NYCC § 20-1302(d), and must give its employees notice of both employees' rights and employers' obligations under the Deduction Bill. NYCC § 20-1302(h).

d. The employer must continue calculating, deducting, and remitting donations until the employee revokes the authorization through a letter to the not-for-profit. NYCC § 20-1302(c).

e. Finally, a fast food employer must keep records of authorizations, revocations, deductions, and remittances made per the Deduction Bill; as well as copies of authorization forms; and proof that the employer provided employees with information required by the Deduction Bill. NYCC § 20-1305.

f. An employer is entitled to limited compensation for "the costs associated with deduction and remittance," but nothing else. NYCC § 20-1302(g).

41. The Deduction Bill imposes both civil liability and administrative penalties for an employer's violations. Both not-for-profits and employees, as well as duly authorized employee representatives, may complain to the Office regarding alleged violations of the Deduction Bill. The Office, in turn, may issue a variety of penalties as a consequence, including: (1) the authorized deductions and remittances; (2) the greater of the statutory interest rate or 6% on

those withheld amounts; (3) an additional statutory penalty of up to $500 per violation (or $1,000 per violation in certain cases); and (4) reinstatement, back pay, and similar relief for retaliation claims.   NYCC § 20-1307.   An employee may also independently vindicate his complaint through a private right of action "for damages, including punitive damages, and for injunctive relief and other such remedies as may be appropriate."  NYCC § 20-1308.

42.    The Deduction Bill further prohibits any acts by an employer that are "reasonably likely to deter [an] employee from exercising or attempting to exercise any right protected under this chapter," regardless of the employer's knowledge or intent.  The prohibition specifically bars the employer from "informing another employer that a fast food employee has engaged in activities" protected by the Deduction Bill.  NYCC § 20-1306.

**The SEIU and City Acknowledge that the Deduction Bill Both Advances and Was Designed to Advance Political and Ideological Messages and Goals**

43.    The SEIU and City identified the Deduction Bill as a key instrument to fund the "Fight for $15."

44.    And both the SEIU and Defendants recognize that these donations will be used to advance explicitly ideological ends.  For example, Kyle Bragg, Secretary of Local 32BJ, noted that the Deduction Bill "will make it easier for workers to form their own not-for-profit that can bring about the changes they need in their communities.  This organization will be able to advocate for . . . other issues that these workers face in their neighborhoods and communities." Testimony of Kyle Bragg, in Hearing Transcript 3/3/17, *supra*, PDF at 77.

45.    Both the SEIU and Defendants understood as well that the Deduction Bill would give employees an opportunity to work collectively to advance the SEIU's own political and ideological interests.  Hector Figueroa, President of SEIU Local 32BJ, described the Deduction Bill as providing donating employees with "a way for the workers to . . . band together and use

their . . . resources to create efforts that advance their interests[.]"   Testimony of Hector

Figueroa, in Hearing Transcript 3/3/17, *supra*, PDF at 101.

46.   A group called "Fast Food Justice" is already working toward registering as a

qualifying not-for-profit, including posting disclosures required by the Bill.  *See Disclosures*,

FAST FOOD JUSTICE, https://www.fastfoodjustice.org/disclosures (last visited Nov. 21, 2017).

47.   The relationship between the SEIU and Fast Food Justice is transparent:

a.   Fast Food Justice shares its mailing address with SEIU Local 32BJ on its

IRS not-for-profit forms;

b.   During the organization's 2017 tax year, Fast Food Justice received all but

a few dollars of its total revenue from the SEIU.  The organization reported $335,003 total

revenue, and SEIU Local 32BJ donated $335,000 of that revenue to the organization, with

the remaining $3 from investment income. *See Form 990*, FAST FOOD JUSTICE,

https://www.fastfoodjustice.org/ffj-final990.pdf (last visited Nov. 21, 2017); and many of

Fast Food Justice's leadership have received compensation from the SEIU in the last two

years.  *See*   "IRS Tax-Exempt Application," NEW YORK STATE CHARITIES,

https://www.charitiesnys.com/RegistrySearch/show_details.jsp?id={A0556358-0000-C413-

BA7C-4B851A560A60}.

c.   For example, Fast Food Justice's Executive Director, Autumn Weintraub,

is paid by the SEIU for her work for Fast Food Justice.  Fast Food Justice's Form 990 states:

"Autumn Weintraub…received total compensation…from SEIU for services provided to the

filing organization as its executive director."  Similarly, Kevin Doyle, a member of Fast Food

Justice's Board of Directors, is a consultant for SEIU.  *See* "IRS Tax-Exempt Application,"

*supra*.

**Fast Food Employers Must Now Counteract Unwanted**
**Political and Ideological Messaging and a Federal/Local-Law Dilemma**

48.     The NRA's members are opposed to the SEIU's efforts to pressure them into facilitating and funding union-organizing and fundraising efforts from its employees where the Union is neither the recognized, nor elected, representative of such employees.

49.     Nonetheless, these fast food employers have been forced to prepare to implement the new law, including creating mechanisms to compute, deduct, track, and remit donations, to maintain records as required by the Deduction Bill, and to prepare to defend against litigation arising under the Deduction Bill.

50.     The NRA's members must seek to offset the effects of the expected organizational efforts that result due to the Deduction Bill's requirements.   Because the Deduction Bill obligates fast food employers to assist employees with making ideological and political donations to designated not-for-profit groups, employers opposing these goals must expend extra effort in at least three ways.   First, these employers must now devote additional resources to fighting the SEIU's campaign against the fast-food industry, which employers and the SEIU alike expect will be significantly enhanced by donations collected under the Deduction Bill.   Second, fast food employers must spend time and money demonstrating to employees and the public that they do not support the SEIU's goals or methods, including SEIU's use of brand attacks to force employers to agree to recognize the SEIU as bargaining representative for employees who are intentionally deprived by the SEIU of expressing their intentions in a secret-ballot election supervised by the federal agency charged with ensuring fair and pressure-free elections.   Third, fast food employers must now devote significantly greater resources to interpreting federal labor law regarding new organizations constituted to take advantage of the

15

Deduction Bill.  Though the Deduction Bill defines "labor organization" by referencing federal labor law, no such controlling guidance exists as to, for example, Fast Food Justice.

51.     The Deduction Bill also forces the NRA's members to choose between federal or local law.  They must either comply with the Deduction Bill, risking violating federal labor law should the NLRB disagree with the City's conclusion as to an organization's "labor organization" status, or otherwise refuse, exposing themselves to civil suits and significant administrative penalties.

52.     Plaintiffs also spend significant resources hearing complaints from, and addressing the concerns of, its members regarding the Deduction Bill.  They have communicated with individual members regarding their concerns as to the Deduction Bill's obligations, and have redirected time, staff, and legal expertise in part to assist members in navigating the potential federal-law implications of the Deduction Bill.  These efforts have consequently slowed Plaintiffs' ability to pursue other projects, such as educational sessions on other laws and opportunities to express Plaintiffs' perspectives on other topics.  In short, Plaintiffs have limited resources, portions of which have been spent educating members about this law.

## <u>COUNT ONE</u>
### (42 U.S.C. § 1983 / Violation of the First Amendment of the United States Constitution)

53.     Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 52 of this complaint, as though fully set forth below.

54.     The First Amendment to the United States Constitution, incorporated against the States through the Fourteenth Amendment to the United States Constitution, provides: "Congress shall make no law . . . abridging the freedom of speech."

55.     The Deduction Bill compels fast-food employers' speech by forcing them to transmit donations to political and ideological groups with whom those employers disagree.

Because the underlying donations are, or are treated like, speech, the City cannot compel employers to essentially repeat the donors' underlying messages in the guise of administrative convenience.  One of the First Amendment's most fundamental guarantees is the right *not* to speak—not to have one's voice commandeered in the service of others.  The Deduction Bill necessarily—deliberately—violates that guarantee.

56.     The Deduction Bill also requires the NRA's fast-food employer members to associate with groups and endorse messages that they wish neither to associate with nor endorse. Just as fast-food employers enjoy a First Amendment right not to speak or repeat unwanted messages, they enjoy a concomitant right not to associate themselves with or to endorse groups or messages with whom employers disagree.

57.     The Deduction Bill necessarily implicates fast food employers in messages that they do not wish to transmit.  Once the City approves a given not-for-profit, employers must submit to employees' speech demands under the employers' name, publicly transmitting money to causes with which fast food employers wish not to be associated.

58.     This unwanted transmission associates fast food employers with a disagreeable message.  Employers have a First Amendment right to refuse that association or endorsement, and through the Bill, the City will punish that refusal.  It cannot.

59.     The Deduction Bill also obligates the NRA's members to shoulder administrative, legal, and other expenses related to employees' donations to not-for-profit organizations such as Fast Food Justice.  The Deduction Bill transfers these expenses, properly borne either by employees (the speakers) or ideological and political groups (the recipients) to employers instead, obligating fast food employers to pay costs in order to make it easier for employees to speak, through their donations to not-for-profit organizations.

17

60.     Fast food employers do not wish to pay these costs.  And regardless of the not-for-profit involved, fast food employers should not be forced to assist with speech with which they disagree—or, at minimum, speech that they have not initiated and approved.

61.     The Deduction Bill does not provide a reimbursement mechanism for many of these administrative and legal costs—and what it provides is constitutionally insufficient in any event.   Any amount of unreimbursed cost is an unwanted compulsion to assist fast-food employee speech.

62.     While the NRA's members have no issue with (and indeed share the goal of) many minimum labor standards and protections, this law goes further—it seeks not to directly impose labor standards, but instead to conscript fast-food employers *to advocate for, endorse, and assist in advocating for* these policy changes, including for the SEIU's own advancement. The City may impose a broad swath of policies, but the First Amendment prohibits it from forcing fast-food employers' political agreement with those policies.

63.     In sum, Defendants intend to compel fast food employers into assisting fast food employees' efforts to communicate political and ideological messages with which employers disagree.  The Deduction Bill forces fast food employers to fund organizations affiliated with a movement that is, itself, designed and formed to disrupt the fast food industry in an effort to force fast food employers to voluntarily recognize the SEIU or its affiliates.  Defendants further intend to associate fast food employers with speakers and messages with which employers would prefer not to associate.  The Deduction Bill therefore has the purpose of compelling speech, compelling association with unwanted political and ideological groups, compelling the endorsement of those groups' (and employees') messages, and compelling subsidies for these messages.

64.     The Deduction Bill's provisions obligate fast food employers to facilitate employee speech, to associate themselves with both unwanted speakers and messages, and to subsidize that speech, under both penalty and color of law.

65.     Fast food employers have no adequate remedy at law.

66.     Because the law violates the U.S. Constitution, Defendants and their agencies, officers and employees should be restrained and enjoined from enforcing the Deduction Bill, which should be declared invalid.  *See* 42 U.S.C. § 1983.

**COUNT TWO**
**(42 U.S.C. § 1983, 28 U.S.C. § 2201, *Ex Parte Young***
**Federal Labor Law Preemption)**

67.     Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 66 of this complaint, as though fully set forth below.

68.     The Supremacy Clause of the U.S. Constitution states that the "Laws of the United States . . . shall be the supreme Law of the Land."  U.S. CONST. art. VI.  Federal courts have long recognized a cause of action in equity to prohibit the enforcement of state and local law that runs afoul of the Supremacy Clause.  *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016), *cert. denied sub nom. Town of E. Hampton v. Friends of the E. Hampton Airport, Inc.*, 137 S. Ct. 2295 (2017); *see also* 42 U.S.C. § 1983; *Ex parte Young*, 209 U.S. 123, 155-63 (1908).

69.     The Labor Management Relations Act, 29 U.S.C. § 186 *et seq.* ("LMRA"), provides that it is unlawful for an employer "to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value" to "any representative of any of his employees who are employed in an industry affecting commerce;" or to "any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of

the employees of such employer who are employed in an industry affecting commerce," among other restrictions.  LMRA § 302(a); 29 U.S.C. § 186(a).

70.     The LMRA provides an exception that allows covered employers and labor organizations to enter into agreements for payroll deduction of labor organization dues, fees, or assessments and to apply such agreements in a manner consistent with the LMRA.  LMRA § 302(c)(4); 29 U.S.C. § 186(c)(4).   The LMRA preempts the entire field of such a dues "checkoff."

71.     The prerequisites of LMRA § 302(c)(4) are not met here.

72.     The decision whether an entity is a "representative" or "labor organization" under LMRA § 302(a) is a matter of federal law.

73.     With respect to groups like Fast Food Justice, enforcing the Deduction Bill places employers in a "Catch-22" of violating either federal or local law.

74.     Accordingly, the Deduction Bill is preempted under the LMRA under both field and conflict preemption principles, and is therefore unenforceable.

75.     The decision whether an entity is a "labor organization" under NLRA § 2(5) also is a matter of federal law and within the exclusive jurisdiction of the National Labor Relations Board.  *See, e.g.*, NLRA § 8(a)(2); 29 U.S.C. § 158(a)(2).

76.     Because the Deduction Bill attempts to vest this authority with Defendants acting under color of law, it infringes on activity that the NLRA protects or prohibits or arguably protects or prohibits, as well as on the exclusive jurisdiction of the National Labor Relations Board.  As such, the Bill is preempted under *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959), and is therefore unenforceable.  Indeed, the SEIU and Fast Food Justice, at the very least an arguable labor organization itself, have already taken concrete steps towards their

stated goal of forcing employers under the Deduction Law to make payments to their fast food industry organizing efforts.

77.     The Deduction Bill also illustrates precisely the kind of local interference in labor-management relations that the NLRA forbids, rather than leaving such arrangements to negotiations and the free play of economic forces.

78.     Therefore, the Deduction Bill is also preempted by the NLRA because the Deduction Bill violates the right to be free from local interference with federal rights under the NLRA, and is therefore unenforceable.  *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp't Relations Comm'n*, 427 U.S. 132, 140 (1976).

79.     Because the law is unenforceable, Defendants and their agencies, officers and employees should be restrained and enjoined from enforcing the Deduction Bill, which should be declared invalid.

## COSTS AND ATTORNEYS' FEES

80.     Pursuant to 42 U.S.C. § 1988, Plaintiffs seek an award of its costs, including reasonable attorneys' fees, incurred in the litigation of this case.

## REQUEST FOR RELIEF

81.     Plaintiffs pray for a permanent injunction, declaratory relief that the Deduction Bill is invalid, unenforceable, unlawful, and that this Court enters a judgment declaring that the Deduction Bill:  (1) violates Plaintiffs' and the members' First Amendment free speech rights by compelling fast-food employers to speak; (2) violates Plaintiffs' and the members' First Amendment rights by requiring the endorsement of and association with messages with which those entities disagree; (3) requires fast food employers to subsidize employees' speech; (4) is preempted by the NLRA and/or LMRA by empowering Defendants to determine which entities are "labor organizations;" and (5) is preempted by the NLRA and/or LMRA by compelling fast

food employers to agree to collect and remit fast food employees' donations to third-party organizations.

     82.    Plaintiffs pray for an injunction prohibiting the City, the Commissioner, and their agents from implementing or enforcing the Deduction Bill against the NRA's members.

     83.    Plaintiffs pray for such additional or different relief as the Court deems just and proper, including an award of reasonable attorneys' fees and the costs of this action.

Dated: November 21, 2017           Respectfully submitted,

                                                        /s/ Sam S. Shaulson

Angelo I. Amador* not admitted       Sam S. Shaulson
*pro hac vice*                         sam.shaulson@morganlewis.com
  AAmador@restaurant.org        David I. Miller
RESTAURANT LAW CENTER          david.miller@morganlewis.com
2055 L Street, NW               MORGAN, LEWIS & BOCKIUS LLP
Washington, DC 20036         101 Park Avenue
T. 202.331-5913                New York, NY 10178
                                         T. 212.309.6000
*Of Counsel*                    F. 212.309.6001
*Restaurant Law Center, representing the*
*National Restaurant Association*

                                       Judd E. Stone * not yet admitted *pro hac vice*
                                         judd.stone@morganlewis.com
                                        MORGAN, LEWIS & BOCKIUS LLP
                                         1111 Pennsylvania Avenue, NW
                                         Washington, D.C. 20004
                                         T. 202.739.3000
                                         F. 202.739.3001

                                       Julia S. Sturniolo* not yet admitted *pro hac vice*
                                         julia.sturniolo@morganlewis.com
                                        MORGAN, LEWIS & BOCKIUS LLP
                                         1701 Market Street
                                         Philadelphia, PA 19103
                                         T. 215.963.4782
                                         F. 215.963.5001

                                       *Counsel for Plaintiffs*
                                       *Restaurant Law Center and*
                                       *National Restaurant Association*