**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **RESTAURANT LAW CENTER, and NATIONAL RESTAURANT ASSOCIATION,** | |
| **Plaintiffs,** | |
| **v.** | **CIVIL ACTION NO.: 17-cv-9128-PGG** |
| **CITY OF NEW YORK, and LORELEI SALAS, in her official capacity as Commissioner of the NEW YORK CITY DEPARTMENT OF CONSUMER AFFAIRS,** | |
| **Defendants.** | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Angelo I. Amador* not admitted
*pro hac vice*
  AAmador@restaurant.org
Restaurant Law Center
2055 L Street, NW
Washington, DC 20036
T. 202.331-5913

*Of Counsel*
*Restaurant Law Center, representing the*
*National Restaurant Association*

Judd E. Stone* admitted *pro hac vice*
  judd.stone@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. 202.739.3000
F. 202.739.3001

Sam S. Shaulson
  sam.shaulson@morganlewis.com
David I. Miller
  david.miller@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
T. 212.309.6000
F. 212.309.6001

Julia S. Sturniolo* admitted *pro hac vice*
  julia.sturniolo@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
T. 215.963.5000
F. 215.963.5001

*Counsel for Plaintiffs*
*Restaurant Law Center and*
*National Restaurant Association*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 3

LEGAL STANDARD ............................................................................................. 9

ARGUMENT ......................................................................................................... 9

I. The Fast Food Worker Empowerment Bill Violates The First Amendment ........ 9

 A. The Bill Impermissibly Compels Employers' Speech ........................... 10

 B. The Bill Compels Employers' Association With Organizations And Causes With Which They Disagree ................................................. 13

 C. The Empowerment Bill Forces Employers To Bear Unreimbursed Costs And Make Interest-Free Loans For Reimbursed Costs To Subsidize Employees' Speech ............................................................. 16

 D. The City Cannot Satisfy Strict Scrutiny For The Bill's First Amendment Flaws ................................................................................ 19

II. The Fast Food Worker Empowerment Bill Is Preempted By Federal Law ........ 22

 A. The NLRA Preempts The Bill Because The Bill Requires Defendants To Make A Determination About "Labor Organization" Status ................................................................................................... 23

  1. The NLRB's Exclusive Jurisdiction ........................................... 23

  2. The Bill Infringes Impermissibly On The NLRB's Exclusive Jurisdiction ................................................................. 24

  3. Defendants' Responses Only Confirm The Conflict With Federal Law ................................................................................ 25

 B. The Bill Is Preempted Because It Conflicts With The LMRA And NLRA ................................................................................................... 27

  1. The LMRA And NLRA's Prohibitions ...................................... 28

  2. The Bill's Requirements Are In Conflict With The LMRA And NLRA ................................................................................. 29

  3. Fast Food Justice Exemplifies The Conflict With Federal Law ............................................................................................. 31

 C. The NLRA Preempts The Bill Because The NLRA Intends To Leave The Area Of Dues Checkoff Unregulated (Machinists Preemption) ......................................................................................... 33

CONCLUSION ..................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abood v. Detroit Bd. of Educ.*,
   431 U.S. 209 (1977)................................................................................11, 12, 14

*All. for Open Soc'y Int'l, Inc. v. USAID*,
   651 F.3d 218 (2d Cir. 2011), *aff'd sub nom. Agency for Int'l Dev. v. All. for
   Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ....................................................12, 20

*American Geriatic Enterprises*,
   235 NLRB 1532 (1978) ........................................................................................30

*Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*,
   508 F.3d 94 (2d Cir. 2007)...........................................................................11, 18, 19

*AMSAT Cable Ltd. v. Cablevision of Conn. Ltd. P'ship*,
   6 F.3d 867 (2d Cir. 1993)......................................................................................16

*Ass'n of Car Wash Owners Inc. v. City of New York*,
   No. 15-Civ-8157, 2017 WL 4508489 (S.D.N.Y. June 20, 2017) ...........................35

*Bethlehem Steel Co. v. N.Y. State Labor Relations Bd.*,
   330 U.S. 767 (1947)..............................................................................................31

*Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders &
   Contractors of Mass./R.I., Inc.*,
   507 U.S. 218 (1993)..............................................................................................33

*Bldg. Trades Emp'rs. Educ. Ass'n v. McGowan*,
   311 F.3d 501 (2d Cir. 2002)..................................................................................35

*Brown v. Eli Lilly & Co.*,
   654 F.3d 347 (2d Cir. 2011)....................................................................................9

*Brown v. Entm't Merchs. Ass'n*,
   564 U.S. 786 (2011)..............................................................................................19

*Buckley v. Valeo*,
   424 U.S. 1 (1976)..................................................................................................14

*Burwell v. Hobby Lobby Stores, Inc.*,
   134 S. Ct. 2751 (2014)..........................................................................................21

*Carey v. Brown*,
   447 U.S. 455 (1980)..............................................................................................19

# TABLE OF CONTENTS
(continued)

Page

*Caroll v. Blinken*,
　957 F.2d 991 (2d Cir. 1992)....................................................................16

*Celotex Corp. v. Catrett*,
　477 U.S. 317 (1986)..............................................................................9

*Citizens United v. F.E.C.*,
　558 U.S. 310 (2010)..............................................................................11

*City of Boerne v. Flores*,
　521 U.S. 507 (1997)..............................................................................19

*Coalition for Secular Gov't v. Williams*,
　815 F.3d 1267 (10th Cir. 2016) .............................................................15

*In Re Coinmach Laundry Corp.*,
　337 NLRB 1286 (2002) .........................................................................24

*Conn. Bar Ass'n v. United States*,
　620 F.3d 81 (2d Cir. 2010)....................................................................19

*Dixie Bedding Mfg. Co. v. NLRB*,
　268 F.2d 901 (5th Cir. 1959) .................................................................29

*Electromation, Inc.*,
　309 NLRB 990 (1992), *enf'd*, 35 F.2d 1148 (7th Cir. 1994)...........................27, 32

*Ellis v. Bhd. Of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.*,
　466 U.S. 435 (1984)..............................................................................14

*Empire HealthChoice Assur., Inc. v. McVeigh*,
　396 F.3d 136 (2d Cir. 2005), *aff'd*, 547 U.S. 677 (2006) ........................27

*Evergreen Ass'n, Inc. v. City of New York*,
　740 F.3d 233 (2d Cir. 2014)..........................................................19, 20, 21

*F.C.C. v. Beach Commc'ns, Inc.*,
　508 U.S. 307 (1993)..............................................................................19

*First Nat'l Bank of Boston v. Bellotti*,
　435 U.S. 765 (1978)..............................................................................11

*Galda v. Bloustein*,
　686 F.2d 159 (3d Cir. 1982)...................................................................18

## TABLE OF CONTENTS
(continued)

**Page**

*Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776 (A.F.L.)*,
    346 U.S. 485 (1953) .............................................................................. 23

*Golden State Transit Corp. v. City of Los Angeles*,
    475 U.S. 608 (1986) .................................................................. 33, 34, 35

*H.K. Porter Co. v. NLRB*,
    397 U.S. 99 (1970) .............................................................................. 34

*Harris v. Quinn*,
    134 S. Ct. 2618 (2014) ................................................................... 17, 20

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*,
    515 U.S. 557 (1995) .............................................................................. 13

*Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*,
    506 F. Supp. 147 (N.D.N.Y. 1980), *rev'd on other grounds*, 650 F.2d 430 (2d
    Cir. 1981) ................................................................................................ 13

*Johanns v. Livestock Mktg. Ass'n*,
    544 U.S. 550 (2005) .................................................................. 16, 17, 18

*Knox v. Serv. Emps. Int'l Union*,
    567 U.S. 298 (2012) ...................................................................... 14, 16

*Local 1814, Int'l Longshoreman's Ass'n, AFL-CIO v. Waterfront Comm'n of N.Y.*
    *Harbor*,
    667 F.2d 267 (2d Cir. 1981) ............................................................... 14

*Local No. 207, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*
    *Union v. Perko*,
    373 U.S. 701 (1963) ...................................................................... 23, 27

*Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis.*
    *Emp't Relations Comm'n*,
    427 U.S. 132 (1976) ....................................................... 3, 33, 34, 35

*Longshoremen & Warehousemen Local 6 (Sunset Line & Twine Co.)*,
    79 NLRB 1487 (1948) ........................................................................ 29

*Marine Eng'rs Beneficial Assn. v. Interlake S. S. Co.*,
    370 U.S. 173 (1962) ............................................................... 2, 23, 27

*McCutcheon v. F.E.C.*,
    134 S. Ct. 1434 (2014) ................................................................. 10, 14

iv

**TABLE OF CONTENTS**

(continued)

**Page**

*Meijer Supermarkets, Inc.*,
    142 NLRB 513 (1963) ........................................................................................26

*NAACP v. Alabama*,
    357 U.S. 449 (1958) .........................................................................................10

*NLRB v. Comm. of Interns and Residents*,
    566 F.2d 810 (2d Cir. 1977) ............................................................................31

*NLRB v. J. P. Stevens & Co., Gulistan Div.*,
    538 F.2d 1152 (5th Cir. 1976) .........................................................................34

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
    475 U.S. 1 (1986) .............................................................................15, 20, 21

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011) .........................................................................................22

*Price v. N.Y. State Bd. of Elections*,
    540 F.3d 101 (2d Cir. 2008) ............................................................................19

*In re Renshaw*,
    222 F.3d 82 (2d Cir. 2000) ..............................................................................30

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ...................................................................................10, 14

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) .........................................................................................14

*Roytype, Div. of Litton*,
    199 NLRB 354 (1972) .....................................................................................32

*Rust v. Sullivan*,
    500 U.S. 173 (1991) .........................................................................................21

*San Diego Bldg. Trades Council v. Garmon*,
    359 U.S. 236 (1959) .........................................................................................28

*Scheffer v. CSEA*,
    610 F.3d 782 (2d Cir. 2010) ............................................................................17

*Sherbert v. Verner*,
    374 U.S. 398 (1963) .........................................................................................19

## TABLE OF CONTENTS
(continued)

Page

*Teamsters Local 358 v. Des Moines Register*,
    438 N.W.2d 598 (Iowa 1989) ...................................................................34

*United States v. Lanni*,
    466 F.2d 1102 (3d Cir. 1972).................................................................29

*United States v. McMaster*,
    343 F.2d 176 (6th Cir. 1965) ..................................................................29

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000).................................................................................20

*United States v. Ryan*,
    350 U.S. 299 (1956).................................................................................29

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943).................................................................................11

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972).................................................................................19

*Ysursa v. Pocatello Educ. Ass'n*,
    555 U.S. 353 (2009).................................................................................15

**Statutes**

29 U.S.C. § 152(5) ...............................................................................23, 32

29 U.S.C. § 158(a)(2) ................................................................................30

29 U.S.C. § 158(b)(1)(A)...........................................................................29

29 U.S.C. § 158(d) .....................................................................................34

29 U.S.C. § 186(a) ...............................................................................28, 30

29 U.S.C. § 186(a)(1)..................................................................................33

29 U.S.C. § 186(a)(2)..................................................................................29

29 U.S.C. § 186(c)(4)..................................................................................30

29 U.S.C. § 186(d) ...............................................................................28, 31

NYCC § 20-1301 *et seq.* ...................................................................... *passim*

**TABLE OF CONTENTS**

(continued)

**Page**

**Rules & Regulations**

6 RCNY § 7-101 *et seq.* ........................................................................................................ *passim*

**Other Authorities**

U.S. Attorneys' Manual § 2413 ................................................................................................29

U.S. Const. amend. I ........................................................................................................ *passim*

U.S. Const. art. VI, cl. 2...........................................................................................................22

## PRELIMINARY STATEMENT

New York City's new "Fast Food Worker Empowerment Bill" (the "Bill") is an unusual and legally invalid law.  The Bill requires fast food chain employers—and only such employers—to deduct elected amounts from employees' wages and remit those funds to City-approved not-for-profit entities.  It is not surprising that the Bill only applies to fast food chains because the Bill has nothing to do with facilitating charitable donations generally.  In the words of the labor union that lobbied for the Bill (the Service Employees International Union ("SEIU")), the City Council members who passed the Bill, and the organization the SEIU specifically set up to "build on the success of the Fight for 15 and organize fast food workers" (Fast Food Justice ("FFJ")), the Bill is "first-of-its-kind" legislation to fund a campaign to pressure fast food chains to recognize labor unions nationwide.  The Bill provides a mechanism for the SEIU to avoid following the standard legal requirement to organize and win elections restaurant-by-restaurant under the procedures established by federal law.  Because the Bill infringes on employers' First Amendment rights and is preempted by federal labor law, however, it is invalid and should be enjoined.

The Bill violates fast food employers' First Amendment rights in several ways.  The Bill's central mechanism—obligating employers to collect money from employees' wages and donate it to a not-for-profit organization that employers do not choose—compels employers to engage in a First-Amendment-protected act (the donation) treated by the Supreme Court as speech.  These compelled donations similarly implicate fast food employers' First Amendment associational rights, both because the donations themselves are an exercise of associational rights and because the donation serves to identify publicly the fast food employer with the not-for-profit of an employee's choosing.  Finally, the Bill coerces employers into subsidizing employees' speech, either through unreimbursed costs (an impermissible compelled speech

subsidy) or by forcing employers to bear costs and receive reimbursement later (an impermissible interest-free compelled loan to subsidize speech). Each of these separate violations becomes obvious when made concrete: the City plainly could not force employers to collect donations for, make donations to, or bear costs for donations in support of Planned Parenthood or the National Rifle Association. These constitutional flaws are no less pressing when invoked to serve FFJ or any other not-for-profit.

The Bill also is preempted by federal labor law. As discussed below, both the Labor Management Relations Act ("LMRA") and National Labor Relations Act ("NLRA") prohibit employer payments to "labor organizations," their agents, or representatives of employees. The Bill—which was passed for the express purpose of helping labor organizations and their agents raise funds to unionize the fast food industry—recognizes this concern by purporting to carve-out "labor organizations" from those eligible for payments under the Bill. NYCC § 20-1310. And in doing so, the Bill directs the Department of Consumer Affairs ("DCA")'s Office of Labor Policy and Standards (the "Office") to promulgate rules to administer this "labor organization" carve-out. In fact, the Office has promulgated rules purporting to define what constitutes a "labor organization," and Defendants have admitted that City agencies will determine an entity's "labor organization" status in registering organizations under the Bill and later considering revocations of registration decisions. The problem is that a determination of what constitutes a "labor organization" is exclusively within the jurisdiction of the National Labor Relations Board ("NLRB"). *Marine Eng'rs Beneficial Assn. v. Interlake S. S. Co.* ("*MEBA*")*, 370 U.S. 173, 178 (1962). The Bill also is preempted because it is in direct conflict with the LMRA and NLRA's prohibitions on employer payments, delivery of funds, or lending to "labor organizations," their agents, or employee representatives. This not only was the stated intent of the Bill, but also the

only organization registered under the Bill, FFJ, was set up, initially funded, and staffed by the

SEIU to receive payments under the Bill.  Finally, the Bill is preempted because it requires an

employer to agree to administer payroll dues deductions when federal labor law requires that

such arrangements be left to labor negotiations and the "free play of economic forces."  *Lodge*

*76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Emp't Relations Comm'n*

("*Machinists*"), 427 U.S. 132, 150-15 (1976).  Accordingly, and as discussed further below, the

law is preempted and thus invalid.

## FACTUAL BACKGROUND

### The Plaintiffs

The National Restaurant Association ("NRA") is the largest food-service trade

association in the world, supporting over 500,000 restaurants in New York, across the country,

and beyond.  (Declaration of Julia Sturniolo ("Sturniolo Decl.") Ex. 14).  Along with the

Restaurant Law Center ("RLC"), an affiliated public-policy organization, the NRA provides

networking, educational, and research opportunities to help restauranteurs succeed.  (Sturniolo

Decl. Ex. 15).

### The SEIU's Campaign In The Fast Food Industry

In recent years, New York City's fast food employers have been the subject of sustained

public relations and political campaigns by the SEIU, dubbed the "Fight for $15."  (Sturniolo

Decl. Ex. 18).  One of the largest unions in the City and the Nation alike, the SEIU represents

service workers across a variety of sectors.  (Sturniolo Decl. Ex. 16).  Over the past five years,

the SEIU has spent millions of dollars attempting to pressure fast food employers to recognize

the SEIU voluntarily, which would obviate the SEIU's need to prevail in a union election.

(Sturniolo Decl. Ex. 18).  As the SEIU's President, Mary Kay Henry, has explained, the

campaign seeks to apply "pressure toward a national bargaining table with [fast food

companies]."  (Sturniolo Decl. Ex. 17.)  In Henry's words, "it's just a matter of time that we break through on a union."  (*Id.*)  Thus, the SEIU's ultimate goal is to pressure fast food companies to recognize voluntarily unions nationwide, rather than the SEIU having to organize them restaurant-by-restaurant.  (*Id.*).  As Henry explained, the Bill itself is part of this path to such recognition.  (*Id.*).

In support of its unionization efforts, the SEIU also spends significant sums to influence public opinion in pursuit of its political and ideological goals, including its efforts to compel the actions of fast food employers.  For example, in 2016, the SEIU's national headquarters publicly spent over $61 million on political activities and lobbying, in addition to $142 million on representational activities, including organizing efforts.  (Sturniolo Decl. Ex. 10 at 4).  In tandem with its own political and expressive activities, the SEIU's donations help fund political organizing, specific candidates' elections, public demonstrations, public-relations campaigns, and direct political speech.  (*Id.* at 206-52.)  These, in turn, advance specific political and ideological goals that the SEIU views as beneficial to its membership, advancing its attempts to organize unions in non-unionized workforces.

The Bill

*Legislative History*

The SEIU has also lobbied the City in furtherance of its unionization efforts.  The SEIU backed a package of City measures collectively referred to as the "Fast Food Worker Empowerment" and "Fair Workweek" laws.  (Plaintiffs' L.R. 56.1 Statement of Undisputed Material Facts ("SOUF") ¶¶ 16-22).  As relevant here, that package included a "first of its kind" obligation on fast food employers, and *only* fast food employers, requiring them to make donations to certain not-for-profits on employees' behalf.  (*Id.* ¶¶ 15, 23-28).

Both New York's City Council and the SEIU understood that the Bill was intended to (and would) increase the effectiveness of fast food employees' political advocacy, especially—but not exclusively—advocacy in support of unionization.  As explained by the SEIU Local 32BJ President Hector Figueroa, the Bill would enable "workers to ... build collective power to be able to ... support issues" as they see fit.  (SOUF ¶ 17).  Kyle Bragg, the Secretary-Treasurer of the SEIU 32BJ, emphasized that the deduction mechanism makes such efforts "easier for workers[.]"  (*Id.* ¶¶ 21-22).  Indeed, the Chair of the City Council's Committee on Civil Service and Labor, I. Daneek Miller, stated the City Council was "affirming the right to collective bargaining here in New York City and the right to organize[.]"  (*Id.* ¶ 10).  Per these statements, the purpose and expected effect of the Bill was to advance one particular group's political effectiveness by obligating another.  The City passed the Bill on May 30, 2017.  (*Id.* ¶ 2).

*The Registration Process And Employer's Deduction Obligations*

The Bill's central mechanism imposes an obligation on "fast food establishments" to make monetary donations at the direction of fast food employees to City-registered not-for-profit organizations.  (SOUF ¶¶ 23-28); NYCC § 20-1302.  The Bill defines each of these constituencies.  "Fast food establishments" include only those restaurants that are part of a chain with at least 30 locations nationally, whether owned in common or held independently as franchises.  (SOUF ¶¶ 23-24); NYCC § 20-1301.  "Fast food employees" work at those establishments in the City, with "job duties includ[ing] at least one of the following: customer service, cooking, food or drink preparation, delivery, security, stocking supplies or equipment, cleaning or routine maintenance."  (SOUF ¶ 25); NYCC § 20-1301.  And a "not-for-profit" is an entity registered in its own state of incorporation as a not-for-profit.  (SOUF ¶ 27); NYCC § 20-1301.

Only City-registered not-for-profits may receive the employee-directed donations made under the Bill.  (SOUF ¶ 29); NYCC § 20-1303(a).  In order to register, a not-for-profit must provide its name, physical address, email and telephone information, and a contact; proof that it is organized as a not-for-profit in its state of incorporation; its last three years of tax returns; and 500 fast food employee authorizations demonstrating that the employee wishes for the employer to make donations to the not-for-profit under the Bill.  (SOUF ¶¶ 30-32); NYCC §§ 20-1303(a), 1304.  The not-for-profit must also prove that it provided these employees with disclosures regarding its organization, mission, finances, and governance.  (SOUF ¶ 33); NYCC §§ 20-1303(a)(4), 1304.  Any not-for-profit may qualify save those that the City determines to be "labor organizations"—defined for private employers by reference to New York Labor Law Section 701 and the NLRA (29 U.S.C. § 152(5))—which are excluded from eligibility.  (SOUF ¶¶ 36-37); NYCC § 20-1310.

The Office alone determines whether an organization qualifies as a labor organization. (SOUF ¶ 35-38); NYCC § 20-1310.  Indeed, the Bill directs the DCA to enact regulations ensuring as much.  (SOUF ¶ 38); NYCC § 20-1310.  According to those regulations, the Office also must "revoke any previously-issued registration of not-for-profits that collect authorization cards or other documents related to membership in a labor organization or with respect to a showing of interest or vote for certification, decertification, or deauthorization of a labor organization, upon receiving proof that the not-for-profit is engaging in such activities."  (SOUF ¶ 39); 6 RCNY § 7-709.  The Office also has the power to investigate a not-for-profit's alleged violations of this requirement.  (SOUF ¶ 40-42); NYCC § 20-1307(e).

Once a not-for-profit has been registered, a fast food employee may direct his employer to make donations to that not-for-profit from the employee's wages.  (SOUF ¶ 26); NYCC § 20-

1302. The employer must provide copies of this request to both the not-for-profit so designated and the employee within five days of the employee's request, must provide the employees notice of their rights (and employers' obligations) under the Bill, and must calculate and remit the authorized donation no later than 15 days following the request. NYCC § 20-1302(d)-(e). The employer must coordinate with the organization to determine both how the organization wishes to receive these donations and when the organization will reimburse the employer's costs, and the employer must continue to make these donations until the employee revokes their authorization by letter to the not-for-profit. NYCC § 20-1302(c), (e). Likewise, upon request, the employer must notify the not-for-profit when the employee separates from employment. 6 RCNY § 7-707(e)(3). And the employer must keep records of any authorizations, revocations, deductions, and donations made under the Bill, as well as copies of all relevant forms and required information, for at least two years. NYCC § 20-1305(a).

*Limited Reimbursement and Penalties*

An employer is entitled to limited reimbursement for the costs incurred in complying with employees' directions and the Bill's requirements. The Bill authorizes reimbursement for only "the costs associated with deduction and remittance," but only permits reimbursement after these costs have already been incurred. (SOUF ¶ 44); NYCC § 20-1302(g). An employer may request only $0.30 reimbursement per deduction per employee, and may request reimbursements no more than twice per month. (SOUF ¶¶ 44-47); 6 RCNY § 7-707(a), (f). The Bill does not entitle an employer to interest for the period between when costs were incurred and the employer receives reimbursement for those costs. (SOUF ¶ 45); NYCC § 20-1302(g); 6 RCNY § 7-707.

If the employer's payment is untimely—or if the employer violates the Bill's provisions in any other way—it is exposed to significant administrative and civil penalties, paid out of the

employer's money.  (SOUF ¶¶ 49-50); NYCC § 20-1307.  In addition to these penalties, the Office can require the employer to pay the deduction using its own funds, and may also assess the greater of the statutory interest rate or 6% on those withheld amounts, along with an additional statutory penalty of up to $500 per violation—all paid by the employer.  (SOUF ¶¶ 49-51); NYCC § 20-1307.  If the employer deliberately withholds a payment (or otherwise willfully violates the Bill), this statutory penalty rises to a $1,000 maximum per violation, again paid by the employer.  (SOUF ¶ 49); NYCC § 20-1307.[1]

<u>Fast Food Justice Is The Only Organization Registered To Receive Payments</u>

On January 4, 2018, the Office registered a group dubbed "Fast Food Justice."  (SOUF ¶ 53).  FFJ—the *only* organization that has registered or sought registration under the Bill—has received hundreds of thousands of dollars from the SEIU Local 32BJ in the past year alone, nearly all of its funding.  (SOUF ¶¶ 59-60).  In fact, the only funding that FFJ received last tax year other than from the SEIU amounted to just $3 in investment income.  (SOUF ¶ 61).  Moreover, members of FFJ's leadership are employees or consultants of the SEIU.  The SEIU, for example, pays FFJ's executive director *for her work for Fast Food Justice*.  (SOUF ¶ 63-64).  And Kevin Doyle, a member of FFJ's Board of Directors as well as its treasurer, received $83,122 from the SEIU Local 32 BJ for "consulting services" in 2016.  (SOUF ¶¶ 65-67).  Indeed, FFJ previously even shared a mailing address with the SEIU's Local Chapter 32BJ, which, itself, was posting job opportunities to work for FFJ.  (SOUF ¶¶ 54-56, 71).  And as those job opportunities recognized, FFJ exists to "build on the success of the Fight for 15 and organize fast food workers ..."  (SOUF ¶ 72).  Indeed, FFJ is the SEIU's answer to finding a reliable way

---

[1] The Bill also prohibits any acts by an employer that are "reasonably likely to deter [an] employee from exercising or attempting to exercise any right protected under this chapter," *regardless of the employer's knowledge or intent*.  (SOUF ¶ 52); NYCC § 20-1306.

to finance a fast food workers' group.  (Sturniolo Decl. Ex. 18).  Moreover, in keeping with the SEIU's public testimony in support of the Bill, FFJ aims to advocate on a variety of political issues.  (SOUF ¶ 73).

## LEGAL STANDARD

Rule 56(c) provides that the "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.4 (1986).  "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotations and citation omitted).  Indeed, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  *Id.* (internal quotations and citation omitted).  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted."  *Id.* (internal quotations omitted).

## ARGUMENT

I.   **The Fast Food Worker Empowerment Bill Violates The First Amendment.**

The First Amendment prohibits Defendants from forcing one person to advance another's beliefs.  U.S. Const. amend. I.  The Fast Food Worker Empowerment Bill violates that prohibition because it commandeers employers—and is *intended* to commandeer employers— into repeating, associating with, paying for, and lending money in support of employees' First-Amendment-protected messages.  It requires an unwilling employer to collect First-Amendment-protected donations, transmit those donations in the employer's own name, and absorb costs in

9

doing so.  The Bill therefore violates the First Amendment's prohibitions against: (1) compelled speech by obligating employers to engage in First-Amendment-protected activity on employees' behalf; (2) compelled association by obligating employers to transmit these donations in employers' names; and (3) compelled subsidies for speech by forcing employers to bear unreimbursed costs of these donations, and make interest-free loans through advance payment of reimbursed costs for these donations.  Further, the Bill cannot withstand strict scrutiny for any of its First Amendment violations.  Accordingly, Defendants should be enjoined from implementing or enforcing the Bill.

> ### A.      The Bill Impermissibly Compels Employers' Speech.

The First Amendment protects the right to speak and not speak alike.  *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988).  Just as it protects employees' right to support specific not-for-profit groups, including through donations to those groups, it protects employers' right *not* to support them.  The Bill violates this guarantee by compelling employers to support not-for-profits by making donations on employees' behalf—requiring employers to repeat employees' messages.

The First Amendment protects a person's right to support causes of all stripes, *Riley*, 487 U.S. at 797, through personal, direct advocacy or collective advocacy—whether by forming or joining an entity created for that purpose, or by donating money to support that entity's efforts. *McCutcheon v. F.E.C.*, 134 S. Ct. 1434, 1448 (2014); *NAACP v. Alabama*, 357 U.S. 449, 460-61 (1958).  An employee's voluntary donations to a not-for-profit group of his choice—especially one engaged in political advocacy—are part of his "right to participate in the public debate through political expression and political association."  *McCutcheon*, 134 S. Ct. at 1448.  "When an individual contributes money" in support of an entity in that public debate, "he exercises both of those rights."  *Id*.  The donations employees make under the Bill to approved not-for-profits

are plainly protected as speech under the First Amendment: Defendants could not prohibit a fast food employee from donating money to support Planned Parenthood or the Red Cross.

The First Amendment also protects a person's right *not* to support causes of all stripes, as the "Bill of Rights which guards the individual's right to speak his own mind" does not leave "it open to public authorities to compel him to utter what is not in his mind." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943). A "comp[ulsion] to make" a donation, "rather than [a] prohibi[tion on] making" one, "works no less an infringement of ... constitutional rights." *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234-35 (1977) (discussing monetary contributions). Just as Defendants may not *prohibit* employees from supporting advocacy of their choosing through donations, they may not *compel* employees to do so. They could not compel a fast food employee to support a not-for-profit by requiring him to donate some portion of his wages to, for example, the National Rifle Association or the Democratic National Committee.

But an employer, no less than an employee, shares the same First Amendment rights, "and this is no less true because the speech comes from a corporation rather than an individual." *Citizens United v. F.E.C.*, 558 U.S. 310, 349 (2010) (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 777 (1978)). Defendants may no more compel employers to donate money to groups that employers do *not* support than it could compel fast food employees to do so. And an attempt to so compel would thus violate the "First Amendment's guarantee of freedom of speech," which "includes both the right to speak freely and the right to refrain from speaking at all"—including by refusing to contribute funds to support a certain message. *Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 98-99 (2d Cir. 2007) (discussing compelled student fees to support messages).

Yet the Bill compels fast food employers' speech by requiring employers to comply with employees' instructions for collecting and transmitting First-Amendment-protected donations to City-approved not-for-profit groups.[2]  NYCC § 20-1302(a).  It entitles an employee to select an amount that an employer must collect from the employee's wages and to designate a not-for-profit to which that employer must make an equivalent donation.  *Id.*  The Bill sets deadlines by when employers must make these donations, obligates employers to administer and account for them, and exposes employers to substantial civil liability and administrative penalties if an employer refuses.  NYCC §§ 20-1302(d)-(h), 20-1305, 20-1307, 20-1308.  "Here, … silence, or neutrality, is not an option for Plaintiffs."  *All. for Open Soc'y Int'l, Inc. v. USAID*, 651 F.3d 218, 234 (2d Cir. 2011), *aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013).

Indeed, the Bill's structure is carefully designed to ensure only one outcome: that fast food employers support chosen not-for-profits.  An employer's failure to make such a donation for any reason—or any other violation of the Bill—results not only in an order requiring a fast food employer to make such a donation *from its own funds*, NYCC § 20-1307(b)(2)(a), but also the "[p]ayment of a further sum as a civil penalty not exceeding $500 for each violation of this chapter," *id*. § (b)(2)(b), also paid out of the employer's money.  And this maximum penalty amount doubles to $1,000 if the employer's refusal is "willful."  *Id.*  In fact, the Bill's provisions penalizing "willful" refusal do not distinguish between employers refusing to make donations out of conscience, the principled exercise of First Amendment rights, or otherwise.  *Abood*, 431 U.S.

---

[2] That employers' donations are recouped from employees' wages is of no constitutional moment.  The City may not commandeer employers into administratively assisting employees' efforts to speak collectively any more than it can commandeer them into aiding employees' attempts to speak individually.  The City surely could not require fast food employers to print and distribute political leaflets of a fast food employee's design so long as the employee paid for the employer's efforts.

at 233-35 (focusing on importance of right not to "advance[]" certain "beliefs and ideas" with which one disagrees); *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (Government "may not compel affirmance of a belief with which the speaker disagrees"). Thus, for the Bill's penalty system, the refusal to make a required donation based on conscience or ideological disagreement does not trigger an accommodation—it triggers a punishment. *See Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*, 506 F. Supp. 147, 148 (N.D.N.Y. 1980) ("a citizen's right to form, hold, or express opinions or beliefs is entitled to an accommodation from the government whenever possible"), *rev'd on other grounds*, 650 F.2d 430, 446 (2d Cir. 1981) (listing accommodations Government should have provided). Such an arrangement can have only one explanation: the Bill is designed to force fast food employers to support employees' ideologically preferred groups, including those groups with whom the employer disagrees, one way or another.

The Bill therefore *compels* a fast food employer to make a First-Amendment-protected donation to a specified not-for-profit at an employee's direction, even against the employer's will, or be sanctioned. The Bill's donation-remittance provisions violate the First Amendment's guarantee against compelled speech.

**B.    The Bill Compels Employers' Association With Organizations And Causes With Which They Disagree.**

Defendants' requirement that employers communicate employees' chosen messages creates a second constitutional flaw: it forces employers to associate with City-approved groups chosen by employees. Just as Defendants may not compel employers to make First-Amendment-protected donations directed by employees, they cannot compel employers to identify with particular not-for-profits by making donations to them. Thus, the Bill violates the First Amendment's guarantee of freedom of association.

While the First Amendment protects a person's right to advocate for issues either directly or through cooperation with others, *Riley*, 487 U.S. at 797, it also protects the right to choose *with whom* one wishes to advocate.  And much as the First Amendment guarantees the right both to speak and *not* to speak, "[f]reedom of association … plainly presupposes a freedom not to associate."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

Donations in support of a not-for-profit implicate *both* the First Amendment's speech *and* associational protections.  *McCutcheon*, 134 S. Ct. at 1448.  By donating money to a cause, a person (or entity) necessarily associates himself (or itself) with that cause.  *Id*.  Just as prohibiting an employee's donation to a particular not-for-profit would likewise "deny the individual all ability to express his expressive and associational rights by contributing" that donation, *id*., compelling an employer to make such a donation equally infringes the same expressive and associational rights.  *Abood*, 431 U.S. at 234.  This compulsion to "support financially an organization with whose principles and demands [an employer] may disagree," *Ellis v. Bhd. Of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.*, 466 U.S. 435, 455 (1984), is—without any more—"a form of compelled ... association."  *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 310-311 (2012).

The Bill further compels employers' association with not-for-profits through multiple means.  Employers' donations to employees' selected not-for-profits will appear, at minimum, in the financial records of the fast food employer and the recipient organization, the third-party banks used to transmit donations, and in any publicly-required disclosures that either is required to make regarding not-for-profit donations.  These records associate the fast food employer with the recipient not-for-profit.  *See Buckley v. Valeo*, 424 U.S. 1, 64 (1976) ("compelled disclosure [of donors], in itself, can seriously infringe on privacy of association"); *Local 1814, Int'l*

*Longshoreman's Ass'n, AFL-CIO v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 270-71 (2d Cir. 1981) (recognizing disclosure of identities of contributors to organization implicates freedom of association); *Coalition for Secular Gov't v. Williams*, 815 F.3d 1267, 1277 (10th Cir. 2016) (agreeing with associational challenge to financial disclosure requirement for donations to issue advocacy organization).  Likewise, the Bill requires fast food employers to communicate and interact with organizations routinely with whom they may not prefer—to discern the not-for-profit's preferred mode of payment, to remit donations, to collect reimbursable costs, to inform the not-for-profit when employees are separated from employment, and so on.  These undesired meetings are quite literally forced association: a requirement to interact substantially with another private party.

These public links between an employer's donation and a not-for-profit produce an intolerable situation where employers will necessarily be forced to affiliate themselves with groups not of their choosing, and will be reasonably understood by outside observers as supporting those groups.  *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 361 (2009).  The First Amendment protects against precisely this outcome—it prohibits Defendants from forcing employers "to associate with speech with which [they] may disagree."  *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 15 (1986).

Defendants might respond that reasonable observers will understand that the Bill compels employers' affiliation with chosen not-for-profits, and thus these observers will not take those donations as genuine signs of association.  But the Supreme Court has already foreclosed that argument.  In *Pacific Gas*, a utility company included a message in its billing statement with which it disagreed only because the California Public Utilities Commission made it do so.  *Id.* at 4-6, 16-17.  Indeed, the message included a *disclaimer* that it was not the utility company's own.

*Id.* at 7.  Yet the Supreme Court concluded that this was plainly insufficient to salvage California's association-compelling law.  *Id.* at 16; *see also AMSAT Cable Ltd. v. Cablevision of Conn. Ltd. P'ship*, 6 F.3d 867, 874 (2d Cir. 1993) (describing *Pacific Gas* as holding that entities may not "be forced to associate themselves with the views of other speakers").  For that matter, the Second Circuit has foreclosed it as well—acknowledging that even if compelled fees were used to support a hundred groups spanning the ideological spectrum, such a forced donation would nonetheless violate the involuntary payor's freedom of association.  *Caroll v. Blinken*, 957 F.2d 991, 997-98 (2d Cir. 1992).  Any similar argument by Defendants ought to fare no better.

### C.    The Empowerment Bill Forces Employers To Bear Unreimbursed Costs And Make Interest-Free Loans For Reimbursed Costs To Subsidize Employees' Speech.

Even if making First-Amendment-protected donations designated by employees violated neither employers' expressive nor associational rights, the Bill *still* would violate the First Amendment by forcing employers to bear the costs of transmitting employees' speech or make an involuntary interest-free loan to not-for-profits by bearing those costs.  The First Amendment prohibits these compelled *subsidies* for speech just as it prohibits compelling the speech itself.

The First Amendment's protection against compelled subsidies for private speech backstops its protections against compelled speech and association: the "compelled funding of the speech of other private speakers or groups" is so "closely related to compelled speech and compelled association" that it, too, violates the First Amendment.  *Knox*, 567 U.S. at 309; *see generally Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557-58 (2005) (discussing both compelled-speech and compelled-subsidy prohibitions).  The rights to refuse to express support for a position by donation and to refuse to associate with a speaker by donation would mean little if the government could require a disfavored person to pay directly for a favored person's

advocacy.[3]  Hence it is a "bedrock principle that, except perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support."  *Harris v. Quinn*, 134 S. Ct. 2618, 2644 (2014); *see also Scheffer v. CSEA*, 610 F.3d 782, 796 (2d Cir. 2010) (Jacobs, C.J., concurring) ("Plaintiffs here have a right to be free from assessments used to promote views on public subjects—views that they do not choose to express, or affirmatively reject.").

As the SEIU and City officials candidly acknowledged prior to the Bill's passage, the Bill imposes obligations on employers in order to facilitate employees' (and not-for-profits') advocacy efforts.  *See* (SOUF ¶¶ 9, 12) (explaining that the Bill's purpose is to "provide a voice for those who are not currently organized within the labor movement," and to create a "new model[] of work organizing"); (Sturniolo Decl. Ex. 17) (explaining that the Bill is part of an effort to financially "pressure [employers] toward a national bargaining table" with unions).  And the Bill transfers the administrative costs of this advocacy from employees to employers.  It requires employers (rather than employees) to collect money for a donation; it requires employers (rather than employees) to monitor and account for those amounts; and it requires employers (rather than employees) to actually donate these amounts to a given not-for-profit. *See* NYCC § 20-1302.

The Bill's repayment mechanism does not cure its forced-subsidy problem.  First, the Bill provides for reimbursement for "the costs associated with deduction and remittance," but nothing else.  NYCC § 20-1302.  Employers will incur other expenses aside from processing, deduction

---

[3] A government may, however, tax certain parties to raise revenue for its own speech. *Johanns*, 544 U.S. at 562-63 ("Citizens may challenge compelled support of private speech, but have no First Amendment right not to fund government speech.").  This again highlights the Bill's constitutional shortcomings—and that the City has ways that it could achieve a legitimate interest it might advance.  What it cannot accomplish by any means, however, is obligating employers to serve as unwilling advocates for not-for-profits chosen by employees.

and remittance, of course, such as those associated with accounting for and internally monitoring payment obligations to ensure compliance with the Bill, and those resulting from the civil and administrative exposure employers face under the Bill. *Id.* §§ 20-1307, 1308.  And should employers incur legal and dispute-resolution costs, such as court costs or attorneys' fees, then these costs are also a forced subsidy for employees' speech.[4] *Johanns*, 544 U.S. at 557.  But even if the Bill *does* provide for reimbursement of all types of costs, the City's rules implementing the Bill cap compensation to employers at $0.30 per transaction, absent exceptions, with payments owed no more than twice per month.  6 RCNY § 7-707(a).  And even if certain costs are reimbursed, employers must bear these costs in advance and seek repayment of this interest-free[5] loan from not-for-profits later, which is itself an impermissible forced subsidy.  *See Amidon¸* 508 F.3d at 99 (disallowing forced contributions for "the support of an ideological cause" no matter the size of the contribution); *Galda v. Bloustein*, 686 F.2d 159, 168-69 (3d Cir. 1982) (noting that "a fee used to finance political activity cannot be exacted—even temporarily—from those unwilling to pay," even when the involuntary lender is later made whole).

Employers are therefore forced to subsidize employees' speech, whether through unreimbursed cost or an interest-free loan.  But any quantum of uncompensated costs to advance employees' speech is a forbidden speech subsidy, as is an interest-free loan of any duration.  The

---

[4] These costs are especially likely given that the Bill does not provide a mechanism for resolving a dispute between employers and not-for-profits over what expenses—or how much of a disputed expense—must be reimbursed.

[5] A not-for-profit is not required to pay interest on the costs that employers bear in advance on their behalf.  But if an employer withholds a donation to a not-for-profit, the employer is subject to the greater of the statutory interest rate or 6% on that withheld amount.  NYCC § 20-1307.  This asymmetry reveals the purpose of the Bill: to force employers to subsidize the costs of employees' speech.

First Amendment protects employers from footing the bill for the exercise of their employees' First Amendment rights, whether the costs are large or small.

### D.   The City Cannot Satisfy Strict Scrutiny For The Bill's First Amendment Flaws.

As demonstrated above, the Bill triply infringes on employers' First Amendment rights. Defendants therefore bear the burden of satisfying "the most demanding test known to constitutional law" for each infringement, *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)—strict scrutiny. *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 244 (2d Cir. 2014) (applying strict scrutiny to City law compelling speech).[6]

Under strict scrutiny, Defendants must show that the Bill was actually passed[7] to serve a compelling state interest—that is, an interest with a "high degree of necessity," *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 804 (2011), protecting "paramount" concerns, *Sherbert v. Verner*, 374 U.S. 398, 406 (1963), which are "only those interests of the highest order," *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)—and that the Bill is also "narrowly tailored to serve [that] compelling governmental interest." *Amidon*, 508 F.3d at 106. The Bill is not narrowly tailored

---

[6] In some limited circumstances, the Second Circuit has recognized that speech by licensed professionals and commercial speech are subject to somewhat more modest—though still significant—scrutiny. *Evergreen*, 740 F.3d at 245. Neither applies here: neither employers nor employees under the Bill are licensed professionals, and the commercial speech doctrine applies only where the speech "relate[s] solely to the economic interests of the speaker and its audience." *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 93-94 (2d Cir. 2010). Employees' donations to politically active not-for-profits assuredly do not relate solely to employers'—or the not-for-profits'—economic interests.

[7] Unlike the "rational basis test," where a governmental entity may defend a law based on any *conceivable* basis that could support it, strict scrutiny demands that Defendants show that the Bill was passed to serve the claimed compelling interest *in fact*. *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993); *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 108-09 (2d Cir. 2008). Defendants must therefore prove that the Bill was passed at the time to serve the interest they defend here—and not merely assert a would-be compelling interest after the fact. *Carey v. Brown*, 447 U.S. 455, 461-62 (1980) ("the justifications offered ... must be carefully scrutinized"); *Price*, 540 F.3d at 108-09.

unless there is *no* "less restrictive alternative [that] would serve" that compelling interest. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).

Public statements surrounding the Bill's enactment reveal the City's actual motive. The City's purpose was to "present a new model for workers to pool resources together and build collective power." (SOUF ¶ 17); *see also* (SOUF ¶ 15 ("This first of its kind legislation will enable fast food workers to form their own nonprofit ... and advocate for changes they need in their community.")). In other words, the point of the Bill is to increase fast food employees' ability to influence issues of public interest by commandeering fast food employers into assisting them. To this end, the Bill's intent is clearly to assist a union's desire to avoid the expense of unionizing restaurants individually.

These are not compelling interests; they are not even legitimate ones. Defendants cannot force a "speaker's opponent—not the taxpaying public—to assist in disseminating a speaker's message," *Pac. Gas*, 475 U.S. at 15, regardless of Defendants' belief in the legitimacy of that message. Even if the City honestly believed that employers' forced speech would be viewpoint-neutral—and it did not—the First Amendment does not permit Defendants to claim even a *legitimate* interest in burdening some speakers in order to benefit others, much less a *compelling* one.[8] *See id.* at 15; *Evergreen*, 740 F.3d at 249; *All. for Open Soc'y*, 651 F.3d at 235.

Further, even if Defendants could cite some compelling interest that the Bill was designed to serve, they cannot possibly show that the Bill is narrowly tailored to that end. "The

---

[8] Defendants' expectation that the Bill would support SEIU's pro-union efforts at the cost of employers is also a transparent example of *viewpoint* discrimination—which would also have to be justified under strict scrutiny. *All. for Open Soc'y*, 651 F.3d at 235 (citing cases). And as noted above, Defendants' support for SEIU would not be a legitimate interest, much less a compelling one: "[t]he government may not ... compel the endorsement of ideas that it approves." *Harris*, 134 S. Ct. at 2644.

difficulty with [the Bill] is that the [City] can serve that interest"—whatever it may be—"through means that would not violate [plaintiffs'] First Amendment rights." *Pac. Gas*, 475 U.S. at 19.

In lieu of compelling employers to speak, the City could create or designate an agency to accept employees' donations that could be collected through an option on employees' local taxes.[9]  For that matter, if Defendants merely wish to express ideological support for unions, they may themselves advocate for, or donate to, those advocating for the positions that employees favor. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("The Government can, without violating the Constitution, ... encourage certain activities it believes to be in the public interest[.]"); *Evergreen*, 740 F.3d at 250 (the City can communicate its message "through an advertising campaign").

Defendants must wrestle with yet another problem in any attempt to show that the Bill is narrowly tailored to some compelling interest: the Bill applies only to a certain class of employees *and* a certain class of employers.  Defendants must explain why the Bill's sole focus on *fast food employees*—as opposed to all employees making a certain wage or working certain hours, or who do not have bank accounts, or some other class—is narrowly tailored to that interest.  Likewise, Defendants must explain what compelling interest is served by applying the Bill to only *fast food employers*—as opposed to all employers using certain scheduling practices, or all employers paying a certain wage, or all employers with a certain percentage of employees lacking bank accounts—and how the Bill is narrowly tailored to that interest.

---

[9] And any response that such an alternative would impose costs on the City is in the nature of a confession.  Further, as the City can assist employees itself, it may not force employers to do so, for the City's direct assistance would be a less-restrictive alternative on employers' First Amendment rights.  *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2780 (2014) ("Government [can] assume the cost"); *Evergreen*, 740 F.3d at 250.

They cannot.  The Bill is designed to compel fast food employers to support the ideological advocacy efforts of the SEIU and related entities.  Indeed, the Bill reinforces its illegitimate ends by compelling an ideologically opposed fast food employer to pay a penalty for noncompliance *to the not-for-profit*, rather than to the City.  Further, instead of providing for an anonymous or independent means for fast food employers to avoid associating with recipient not-for-profits, the Bill requires fast food employers to do so in their own names.  Again, the City could easily bear the risk of this unwanted association if it wished.  And the Bill requires fast food employers—and *only* fast food employers—to either bear unreimbursed costs in administering, accounting for, and processing donations, or lend these costs to not-for-profits by bearing them immediately and seeking interest-free reimbursement later.

The First Amendment's prohibitions on compelled speech, association, and subsidy protect against the possibility that the government will force an unwilling party to support a belief that it opposes—whether through an obligation to profess those beliefs, to join with those who do, or to pay for others to do so.  The Bill was designed to make fast food employers support the SEIU's agenda against their will, and it violates each of these First Amendment guarantees.  Because of these violations, and because the Bill cannot withstand strict scrutiny, Defendants should be enjoined from implementing or enforcing the Bill.

## II.      The Fast Food Worker Empowerment Bill Is Preempted By Federal Law.

The Bill also is preempted by federal labor law and therefore invalid.  The U.S. Constitution mandates that "the Laws of the United States…shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  The Supremacy Clause therefore voids state or local laws that interfere with the acts of Congress.  *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011).  The Bill runs afoul of this mandate and is preempted by both the Labor Management Relations Act

("LMRA"), 29 U.S.C. § 186 *et seq*. and the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq*.

A.    **The NLRA Preempts The Bill Because The Bill Requires Defendants To Make A Determination About "Labor Organization" Status.**

1.    *The NLRB's Exclusive Jurisdiction.*

The Supreme Court has held that Congress gave the National Labor Relations Board exclusive jurisdiction to resolve disputes under the NLRA.  *See Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776 (A.F.L.)*, 346 U.S. 485, 490 (1953).  Congress "did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties.  It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal … ."  *Id.*  Congress entrusted the NLRB with determining whether an organization is within the broad definition of "labor organization" under the NLRA.  The Supreme Court agrees with this structure, commenting,

> [w]e see no reason to assume that the task of interpreting and applying the statutory definition of a 'labor organization' does not call for the same adjudicatory expertise that the [NLRB] must bring to bear when it determines the applicability of [Sections] 7 and 8 of the [NLRA] to substantive conduct. Indeed, analysis of the problem makes clear that the process of defining the term 'labor organization' is one which may often require the full range of [NLRB] competence.

*MEBA*, 370 U.S. at 178; *see also Local No. 207, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers Union v. Perko* ("*Perko*"), 373 U.S. 701, 706 (1963).

The NLRA defines "labor organization" as "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."  29 U.S.C. § 152(5).  Under this definition:

an incipient union which is not yet actually representing employees may, nevertheless, be accorded 2(5) status if it admits employees to membership and was formed for the purpose of representing them.  ...  Moreover, "structural formalities are not prerequisites to labor organization status."  *Yale New Haven Hospital*, 309 NLRB 363 (1992) (no constitution, bylaws, meetings or filings with the Department of Labor) …

*In Re Coinmach Laundry Corp.*, 337 NLRB 1286, 1287 (2002) (affirming Regional Director).

2.     *The Bill Infringes Impermissibly On The NLRB's Exclusive Jurisdiction.*

The Bill impermissibly intrudes on the NLRB's exclusive jurisdiction in at least three ways.  First, in purporting to exclude "labor organizations," the Bill requires the Office to "promulgate rules necessary to ensure that this law will be applied in a manner consistent with federal … law and will not affect the relationship among workers or employees and employers, and [labor organizations], except as specifically provided in this chapter."  (SOUF ¶ 38); NYCC § 20-1310; *see also* § 20-1307(e).  The very acts of *directing* a City agency to prepare such rules—as well as the act of *promulgating* such rules—require the City to interpret and define the term "labor organization" under the NLRA.  Indeed, carrying out this directive, the DCA concluded organizations "that collect authorization cards or other documents related to membership in a labor organization or with respect to a showing of interest or vote for certification, decertification, or deauthorization of a labor organization" are not eligible to receive payments under the law.  (SOUF ¶ 39); 6 RCNY § 7-709.  Defining a labor organization in this manner not only encroaches on the exclusive jurisdiction of the NLRB, it also establishes a definition far narrower than the NLRB's own standard.  *Coinmach*, 337 NLRB at 1287.

Second, to qualify for funds under the Bill, an organization must register with the City and doing so requires the Office to determine whether an applicant organization is a "labor organization."  NYCC § 20-1303(a).  The Bill states that "[t]his [law] does not authorize…remittances to labor organizations[.]"  (SOUF ¶ 36); NYCC § 1302(h).  Accordingly,

24

the only gatekeeper for excluding "labor organizations," as the Bill expressly requires, is the

DCA itself, as the entity granting or denying registration.  (SOUF ¶¶ 36-38).  As Defendants

acknowledge, "the [Bill] does not allow DCA to make any registration *decision* that is

inconsistent with federal law.  *This includes the determination of whether an applicant is a labor*

*organization.*"  Defendants' December 13, 2017 Pre-Motion Letter, at 4 (ECF Dkt. No. 16)

("Letter") (emphasis added).

Third, the Bill requires the Office's ongoing monitoring and enforcement.  The Office,

for example, is obligated to revoke registrations of organizations in accordance with the above-

referenced regulations—*i.e.,* those that collect "authorization cards or other documents related to

membership in a labor organization"—recognizing the possibility that such groups may pass

through the initial registration process.  (SOUF ¶ 39); 6 RCNY § 7-709(c).  Moreover, where

anyone seeks to challenge an organization as a labor organization excluded from the Bill's

coverage, the regulations direct them back to the DCA itself for further examination and possible

revocation.  NYCC § 20-1307(e); *see also* 6 RCNY § 7-709(b).  In other words, a ruling on the

request to re-examine or revoke an organization's registration is entirely within the discretion of

the Office itself.  This ongoing process of determining whether a registered organization is a

"labor organization" or involved in performing certain functions associated with labor

organizations, *see* NYCC § 20-1310, also interferes in the exclusive jurisdiction of the NLRB.

     3.     *Defendants' Responses Only Confirm The Conflict With Federal Law.*

In their Letter, Defendants recognize the significant problem with the Bill requiring

"labor organization" status determinations.  But the series of responses they offer to the problem

are both unsatisfactory and contradictory.  Defendants initially declare that the DCA will not

"make any registration *decision* that is inconsistent with federal law," "[t]his includes the

*determination* of whether an applicant is a labor organization," and the DCA will "comply with

this limitation on its *discretion*." Letter at 4 (emphasis added). Of course, this is no answer because the DCA, by exercising its discretion and making a "labor organization" determination, is making a determination within the exclusive jurisdiction of the NLRB. Moreover, by promulgating regulations purporting to define a "labor organization" and doing so with a narrower definition than that used by the NLRB (*see infra*), the DCA is again interpreting and determining what a "labor organization" is. And worse, it is doing so in a manner inconsistent with federal law—something Defendants concede cannot validly be done. Letter at 4.

Acknowledging that these arguments offer no satisfactory answer, Defendants then proclaim that DCA "exercises no independent judgment in making a determination of whether an entity is a 'labor organization.'" Letter at 4. Defendants suggest that the DCA will accept as authoritative specific federal sources, such as lists maintained by the Department of Labor and the registrant's tax forms. But their proclamation not to exercise any independent discretion is contrary to the Bill's directive to exclude "labor organizations," contrary to their statements described above, contrary to the Bill's requirement of promulgating regulations to define "labor organizations," and contrary to those regulations the DCA has already promulgated. Moreover, the tax forms and registration with the DOL's Office of Labor-Management Standards (as required by the LMRA) are only self-reporting mechanisms, which the NLRB has already determined do *not* define labor organization status. *See Meijer Supermarkets, Inc.*, 142 NLRB 513, 517 n.3 (1963) ("[T]he [NLRB] has held that a union's status as a labor organization is not affected by noncompliance with the Labor-Management Reporting and Disclosure Act of 1959 … nor by misrepresenting its identity"); *see also* (Sturniolo Decl. Ex. 21) (news article recognizing that the DOL is investigating whether additional not-for-profits are unlawfully failing to register). And as noted above, the NLRB has held that the statutory definition of a

"labor organization" is far broader than any self-serving characterization.  *See, e.g.,*

*Electromation, Inc.*, 309 NLRB 990, 994 (1992), *enf'd*, 35 F.2d 1148 (7th Cir. 1994) (holding

that a mere employee committee can meet the statutory definition).  In any event, the

determination to accept certain sources and not others as to what a "labor organization" is

constitutes a determination within the exclusive jurisdiction of the NLRB.

Finally, in another about face, Defendants posit in their Letter that "[s]hould an employer

feel aggrieved by *DCA's determination*, it can present proof that the registrant is, in fact, a 'labor

organization' as defined in the NLRA and seek relief under the Rules promulgated by DCA

pursuant to the Bill, in a subsequent Article 78 proceeding, or by obtaining a decision from the

NLRB."  Letter at 4 (emphasis added); *see also* NYCC at § 20-1307(f) (noting the availability of

an action pursuant to Article 78).  Of course, by their argument, Defendants concede yet again

that DCA is making a determination in the first instance about "labor organization" status and

later through requested review under procedures established by the Bill.  As for Defendants'

alternative suggestion of determining "labor organization" status through a proceeding brought

under Article 78 of the CPLR, the Supreme Court has made clear that a state court does not have

jurisdiction to do so because the determination of whether an organization is a "labor

organization," or even "arguably" one, is within the exclusive jurisdiction of the NLRB.  *MEBA*,

370 U.S. at 178; *see also Perko*, 373 U.S. at 706.  Accordingly, because the Bill impermissibly

intrudes on the NLRB's jurisdiction, it is preempted and invalid.  *Empire HealthChoice Assur.,*

*Inc. v. McVeigh*, 396 F.3d 136, 143 (2d Cir. 2005), *aff'd*, 547 U.S. 677 (2006) ("preemption …

invalidates state laws that interfere with, or are contrary to, federal law.").

### B.       The Bill Is Preempted Because It Conflicts With The LMRA And NLRA.

In addition to impinging on the NLRB's jurisdiction to determine labor organization

*status*, the Bill also is preempted because it requires *conduct* that conflicts, or arguably conflicts,

with prohibitions under the LMRA and NLRA.  As explained below, both the LMRA and NLRA bar employer payments, delivery of funds, or lending to labor organizations, their agents, or employee representatives, whereas the Bill requires such financial support.  Under the Supremacy Clause, the Bill must give way to conflicting federal law.  Indeed, under the Supreme Court's decision in *Garmon*, there does not need to be an actual conflict to give rise to federal labor law preemption.  *Garmon* preemption exists whenever the NLRA ***arguably*** prohibits certain conduct or the state purports to regulate the same conduct.  *See San Diego Bldg. Trades Council v. Garmon* ("*Garmon*")*,* 359 U.S. 236, 244-45 (1959) ("When an activity is arguably subject to § 7 or § 8 of the [NLRA], the States … must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.").

      1.     *The LMRA And NLRA's Prohibitions.*

Both the LMRA and NLRA prohibit payment of money and other support by an employer to a labor organization, its agents, or other representatives of its employees.  The LMRA provides a federal, *criminal* prohibition on such payments or support.  Under section 302:

> (a) … [i]t shall be unlawful for any employer … to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—
>
>> (1) to any representative of any of his employees who are employed in an industry affecting commerce; or
>>
>> (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; …

LMRA § 302(a); 29 U.S.C. § 186(a).  Subsection (b) imposes a parallel prohibition on receipt of such funds.  Potential penalties include fines and *incarceration*.  *See* 29 U.S.C. § 186(d).

The NLRA likewise prohibits an employer from contributing "financial or other support" to any labor organization under Section 8(a)(2), 29 U.S.C. § 158(a)(2) (emphasis added).[10]  *See also Dixie Bedding Mfg. Co. v. NLRB*, 268 F.2d 901, 906 (5th Cir. 1959) (affirming NLRB determination that a $1,350 payment for union initiation fees to organization where it did not represent a majority of the employees violated Section 8(a)(2) and 8(a)(1)).

Nor can LMRA-prohibited payments be legitimized simply by going through an "agent, intermediary, go-between or front."  *United States v. Lanni*, 466 F.2d 1102, 1108 (3d Cir. 1972); *see also United States v. McMaster*, 343 F.2d 176 (6th Cir. 1965) (affirming union representative's conviction where union representative's company received checks from the employer).[11]  The NLRA similarly prohibits union agents from taking actions the union itself cannot, including receiving improper payment and assistance from employers.  *See Longshoremen & Warehousemen Local 6 (Sunset Line & Twine Co.)*, 79 NLRB 1487, 1507 (1948) ("[NLRB] has a clear statutory mandate to apply the 'ordinary law of agency,'" and "hold[s] labor organizations responsible for conduct of their agents").

       2.     *The Bill's Requirements Are In Conflict With The LMRA And NLRA.*

The Bill requires the very type of employer payment and support the LMRA and NLRA prohibit.  *See* 29 U.S.C. § 186(a)(1)-(2); 29 U.S.C. § 158(a)(1)-(2).  First, the Bill requires "payment" of monies by the employer.  Defendants have asserted that this money belongs to the employees and thus there is no "payment."  Letter at 3.  But both the LMRA and the NLRA

---

[10] Such conduct will simultaneously violate Section 8(a)(1), 29 U.S.C. 158(a)(1), and a union will correspondingly violate the NLRA by receiving such payments, 29 U.S.C. § 158(b)(1)(A).

[11] Section 302 of the LMRA also bars payments to any "representative of any of his employees." *See United States v. Ryan*, 350 U.S. 299, 305 (1956) (rejecting a narrow reading of the term "representative" under Section 302(a)(1)); *see also* U.S. Attorneys' Manual at § 2413, available at https://www.justice.gov/usam/criminal-resource-manual-2413-outline-29-usc-186-taft-hartley-act-sec-302 (noting representative under 302(a)(1) can be either an individual or organization).

make clear that it does not matter whose money the employer is paying, so long as it is making a payment of funds.  To this end, the LMRA and NLRA expressly exempt payments made out of employee's wages to unions pursuant to a valid, agreed-upon dues checkoff.  29 U.S.C. § 186(c)(4); *see also American Geriatric Enterprises*, 235 NLRB 1532 (1978).  There would be no need for this exception if a "payment" did not include monies belonging to employees.  In any event, the Bill also requires employers to make payments *out of their own funds* in direct contravention of the LMRA and NLRA if they do not timely remit employees' monies under the Bill.  (SOUF ¶¶ 49-51); *see also* NYCC § 20-1307(a)(2).

Second, whether the Bill requires "payment" or not, it surely requires the "delivery" of funds.  Specifically, the Bill requires an employer's delivery of monies to the organization "by the method of remission that such organization requests[.]"  NYCC § 20-1302(e).  But the LMRA makes it unlawful to "deliver … any money or thing of value …"  29 U.S.C. § 186(a).

Third, the Bill also requires employers to "lend" money or thing of value.  An employer may request only $0.30 of reimbursement per transaction once every two weeks.  6 RCNY § 7-707.  The act of incurring expense subject only to a right of later reimbursement constitutes lending money or other thing of value.  *See In re Renshaw*, 222 F.3d 82, 88 (2d Cir. 2000) (explaining the definition of loan includes one party agreeing "to pay for the sum or items transferred at a later date.").  By making payments, delivering funds, and lending, employers also contribute *financial or other support*.  29 U.S.C. § 158(a)(2).

Fourth, the Bill requires that fast food employers provide the aforementioned financial or other support to entities that are prohibited or ***arguably*** prohibited from receiving such support under the NLRA.  The Bill's stated goal is to remit financial support to organizations that lack majority, recognized status that would be required to demand and *bargain*, under federal law, the

payroll deduction checkoff that the Bill requires.  The City's own council members make this clear, calling the Bill a "new model[] of … organizing."  (SOUF ¶ 12); *see also* SOUF ¶ 10 (claiming that the City is "affirming the right to collective bargaining here in New York City").

The Bill, as well as the Letter, propose that Defendants will save the Bill from running afoul of the LMRA/NLRA through their own administration of the "labor organization" exception.  But such an approach depends on the DCA's ability to identify a labor organization in the first instance.  And as explained above, Defendants cannot make this determination without impermissibly intruding on federal law.  As the Supreme Court has long recognized, a local agency like the DCA: "*might* come out with the same determination [as the NLRB], or they might come out with conflicting ones … But the power to decide a matter can hardly be made dependent on the way it is decided."  *Bethlehem Steel Co. v. N.Y. State Labor Relations Bd.*, 330 U.S. 767, 775 (1947) (emphasis added); *accord NLRB v. Comm. of Interns and Residents,* 566 F.2d 810 (2d Cir. 1977).  Indeed, an employer cannot be put in the untenable position of choosing between the City's mandates and penalties and potential federal *criminal* sanctions, especially when Defendants have already defined "labor organization" status more narrowly than federal law, and when the whole purpose of the law is to promote unionization in the fast food industry by forcing the payment of funds to support a union's corporate campaign.  29 U.S.C. § 186(d).

3.   *Fast Food Justice Exemplifies The Conflict With Federal Law.*

Fast Food Justice's registration demonstrates an employer's dilemma.  FFJ is an organization established by the SEIU, staffed by the SEIU, located within the SEIU's offices, and initially-funded exclusively by the SEIU to the tune of hundreds-of-thousands of dollars.  (SOUF at ¶¶ 55-56, 59-61, 63-72).  The SEIU even recognizes that FFJ is a mechanism to fund its Fight for $15 campaign.  (Sturniolo Decl. Ex 18).  FFJ admits "members," asks for payment

as a percentage of wages, "advocate[s] for higher standards" in fast food workplaces, seeks to "improve [members'] situation and that of other fast food workers," and exists, as the SEIU itself admits, to facilitate "the Fight for 15 and *organize fast food workers*."  (SOUF at ¶¶ 57, 72, 73); Declaration of Kshawn Clark, ECF Dkt. No. 29-1, Ex. A ¶ 5; Declaration of Christian Malloy, ECF Dkt. No. 29-2, Ex. B ¶¶ 3, 5; Declaration of Mica Mclawhorn, ECF Dkt. No. 29-3, Ex. C ¶ 6.  Accordingly, FFJ admits employee members and has, as one of its stated goals, dealing with employers over terms and conditions of employment.  The mere fact that FFJ has no established collective bargaining relationship with any employer, nor any formal registration with the DOL, has no bearing on whether it is arguably a "labor organization."  *See Roytype, Div. of Litton*, 199 NLRB 354, 354 (1972) (holding newly-created group was a labor organization where it "exists for statutory purposes, although its purposes have not yet come to fruition").  As the SEIU President Mary Kay Henry told a reporter, the Bill is part of the SEIU's planned path to secure a union, and a method to create "pressure toward a national bargaining table" with various fast food brands.  (Sturniolo Decl. Ex. 17).  Indeed, as of the date of this filing, Plaintiffs are unaware of any other organization attempting to register to receive payments under the Bill.

Fast Food Justice admits employees as members and exists, at least in part, to "organize" fast food workers—it seeks to "deal with" employers in a representative capacity under the NLRA.  29 U.S.C. § 152(5).  And it does so consistent with the very intent of passing the Bill. FFJ is at the very least arguably a labor organization, satisfying *Garmon*'s preemption standard. That FFJ adds political advocacy and education to its stated goals is insufficient to remove itself from the broad definition of a "labor organization."  *See, e.g., Electromation, Inc.*, 309 NLRB at 994 (holding that a mere employee committee can meet the statutory definition).  Many unions educate their members as well, including the SEIU itself.  (Sturniolo Decl. Ex. 19) (providing

educational resources on, *inter alia*, the Family Medical Leave Act and *Weingarten* rights); *id.* Ex. 20. Moreover, because FFJ is accepting dues from employee members to advocate on their behalf for unionization of the fast food industry and deal with employers, it is at the very least a "representative" of employees under the LMRA. LMRA § 302(a); 29 U.S.C. § 186(a)(1). Accordingly, FFJ's registration illustrates the conflict between the Bill and federal law.

    **C.**    **The NLRA Preempts The Bill Because The NLRA Intends To Leave The Area Of Dues Checkoff Unregulated (*Machinists* Preemption).**

In enacting the NLRA, Congress also intended to leave certain kinds of conduct unregulated and "controlled by the free play of economic forces." *Machinists*, 427 U.S. at 140. The Supreme Court acknowledged in *Machinists*: "Congress has been rather specific when it has come to outlaw particular economic weapons … and that Congress' decision to prohibit certain forms of economic pressure while leaving others unregulated represents an intentional balance between the uncontrolled power of management and labor to further their respective interests." *Golden State Transit Corp. v. City of Los Angeles* ("*Golden State I*"), 475 U.S. 608, 613-15 (1986) (internal citations and quotation marks omitted). Accordingly, *Machinists* preemption "prohibits state and municipal regulation of areas that have been left 'to be controlled by the free play of economic forces.'" *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 219 (1993).

As the Supreme Court has held, *Machinists* preemption bars local governments from requiring parties to commit to any specific agreement between labor and management. In *Golden State I*, the Supreme Court held that while the NLRA "requires an employer and a union to bargain in good faith, ... it does not require them to reach agreement," or agree on a particular outcome during negotiations. 475 U.S. at 616. Indeed, a requirement to reach an agreement would directly contravene the NLRA itself. 29 U.S.C. § 158(d) (providing that the duty to

bargain in good faith "does *not* compel either party to agree to a proposal or require the making of a concession") (emphasis added).  Instead, the substance of labor negotiations, as well as their results, are the crux of the area Congress intentionally left to the free play of economic forces.  *See Golden State I*, 475 U.S. at 616 (describing the NLRA as providing only "a framework for the negotiations"); *see also H.K. Porter Co. v. NLRB*, 397 U.S. 99, 103-04 (1970) (explaining the government may not become a party to labor negotiations or require the terms of an agreement).

    The Bill involves exactly the kind of local interference in labor-management relations that the *Machinists* doctrine forbids.  The Bill requires an employer to administer payroll deductions, rather than leaving such arrangements to negotiations and the "free play of economic forces."  *Machinists*, 427 U.S. at 150-51.  Despite the longstanding maxim that the NLRA does not compel acceptance of any particular proposal, here the Bill has done just that, expressly creating a labor-funding mechanism and payroll-dues checkoff.  *See NLRB v. J. P. Stevens & Co., Gulistan Div.*, 538 F.2d 1152, 1165 (5th Cir. 1976) ("Union dues checkoff is a mandatory subject of bargaining," although no agreement on dues checkoff is required).  Indeed, even at a unionized employer—*where a collective bargaining obligation actually exists*—state and local authorities may not force an employer to deduct from employee wages for payment of membership dues.  *See Teamsters Local 358 v. Des Moines Register*, 438 N.W.2d 598, 600 (Iowa 1989) ("Any state regulation requiring an employer to accept a dues checkoff provision would deprive the employer of a bargaining chip that Congress intended be available. … [And] *Machinists* preemption vests the exclusive subject matter jurisdiction in the NLRB.").  The Bill improperly places a thumb on the scale as to a substantive term of an agreement—precisely what *Machinists* preemption prohibits.

    Even assuming *arguendo* that deductions under the Bill are not a dues checkoff, the Bill

still forces employers to fund a union organization campaign.  As proposed Intervenors themselves recognize, the Bill facilitates and makes more "convenient" their ability to fund FFJ—an organization set up by the SEIU, initially funded exclusively by the SEIU, controlled by SEIU employees, and established for the purpose of collecting membership dues from payroll deductions from fast food employees to force fast food employers into unionized workforces. *See supra* at 31-32.  And as discussed above, the Bill was specifically designed, at the SEIU's behest, to raise money for the SEIU/FFJ's union campaign.  But "[p]ressuring businesses to unionize is impermissible under the NLRA, as it inserts the City directly into labor-management bargaining."  *Ass'n of Car Wash Owners Inc. v. City of New York*, No. 15-Civ-8157, 2017 WL 4508489 at *3 (S.D.N.Y. June 20, 2017) (granting plaintiffs' motion for summary judgment on preemption grounds because "the legislative history makes clear that a central purpose of [the law] is to encourage unionization," which is barred by the NLRA as an intrusion on the bargaining process); *Golden State I*, 475 U.S. at 618 (city was preempted by NLRA "from conditioning [plaintiff's] franchise renewal on the settlement of [a] labor dispute"); *Bldg. Trades Emp'rs. Educ. Ass'n v. McGowan*, 311 F.3d 501, 511 (2d Cir. 2002) (defendant's refusal to process plaintiffs' application preempted because it pressured one party to settle negotiations or reach impasse, which "skew[ed] the collective bargaining process").  Accordingly, for the reasons set forth above, *Machinists* preemption invalidates the Bill.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment, enjoin and declare the Bill unconstitutional and preempted by federal law, and order such further relief as this Court deems appropriate.

Dated: January 12, 2018

Respectfully submitted,

_/s/ Sam S. Shaulson_ .

Angelo I. Amador* not admitted
*pro hac vice*
  AAmador@restaurant.org
Restaurant Law Center
2055 L Street, NW
Washington, DC 20036
T. 202.331-5913

*Of Counsel*
*Restaurant Law Center, representing the*
*National Restaurant Association*

Sam S. Shaulson
  sam.shaulson@morganlewis.com
David I. Miller
  david.miller@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
T. 212.309.6000
F. 212.309.6001

Judd E. Stone* admitted *pro hac vice*
  judd.stone@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. 202.739.3000
F. 202.739.3001

Julia S. Sturniolo* admitted *pro hac vice*
  julia.sturniolo@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
T. 215.963.5000
F. 215.963.5001

*Counsel for Plaintiffs*
*Restaurant Law Center and*
*National Restaurant Association*