UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RESTAURANT LAW CENTER and
NATIONAL RESTAURANT
ASSOCIATION,

          Plaintiffs,

    - against -

CITY OF NEW YORK and LORELEI
SALAS, in her official capacity as
Commissioner of the NEW YORK CITY
DEPARTMENT OF CONSUMER
AFFAIRS,

          Defendants.

**MEMORANDUM
OPINION & ORDER**

17 Civ. 9128 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This case is brought by the National Restaurant Association – a foodservice trade association – and its legal arm, the Restaurant Law Center. Plaintiffs claim that a recently enacted New York City law and regulation requiring fast food employers in the City to create and administer a payroll deduction scheme – under which employees can donate a portion of their wages to certain non-profit organizations registered with the City – are unconstitutional and preempted by Federal law. The parties have cross-moved for summary judgment.

For the reasons set forth below, Plaintiffs' motion for summary judgment will be denied, and Defendants' motion for summary judgment will be granted.

# BACKGROUND

## I.  FACTUAL BACKGROUND[1]

### A.  Parties

Plaintiff National Restaurant Association (the "Association") is the "largest foodservice trade association in the world[] – supporting over 500,000 restaurant businesses." (Sturniolo Decl., Ex. 14 (Dkt No. 50-14) at 2)[2]  Plaintiff Restaurant Law Center (the "Law Center") was launched in January 2017 to "enhance the restaurant industry's legal advocacy capabilities to provide protection and advancement for the industry, including fighting overregulation at the federal, state and local level."  (Id. Ex. 15 (Dkt. No. 50-15) at 2)  The Center is a 501(c)(6) entity "affiliated with, but separate from, the [Association]."  (Id.)

Defendants are the City of New York (the "City") and Lorelei Salas, in her official capacity as the Commissioner of the New York City Department of Consumer Affairs ("Consumer Affairs").  (Cmplt. (Dkt. No. 1) ¶¶ 9, 10)

Intervenors Kshawn Clark, Christian Malloy, Mica McLawhorn, and Jordan Rodriguez are members of Fast Food Justice who work at fast food restaurants.  (Clark Decl.

---

[1]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where the non-moving party disputes the moving party's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-moving party's characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).  Unless otherwise stated, the facts cited by the Court are undisputed.

[2]  The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.

(Dkt. No. 29-1) ¶¶ 2, 3; Malloy Decl. (Dkt. No. 29-2) ¶¶ 2, 3; McLawhorn Decl. (Dkt. No. 29-3) ¶¶ 2, 3; Rodriguez Decl. (Dkt. No. 29-4) ¶¶ 2, 3)

## B.     The Deductions Law

On May 24, 2017, the New York City Council enacted the "Deductions Law," New York City Administrative Code § 20-1301, et seq. (Def. R. 56.1 Counterstmt. (Dkt. No. 59) ¶ 1)  The new law – which became effective on November 26, 2017 – requires certain fast food establishments in New York City to create and maintain a payroll deduction system by which employees can donate a portion of their wages to certain non-profit organizations registered with the New York City Department of Consumer Affairs.  (Id. ¶¶ 2-3; N.Y.C. Admin Code § 20-1302)

The Deductions Law defines a "fast food establishment" as, inter alia, a business that "has as its primary purpose serving food or drink items," and is part of a chain that has thirty or more locations nationwide. (Def. R. 56.1 Counterstmt. (Dkt. No. 59) ¶ 23; N.Y.C. Admin. Code § 20-1301)  A "fast food employee" is someone who works at a fast food establishment in the City, and whose "job duties include at least one of the following:  customer service, cooking, food or drink preparation, delivery, security, stocking supplies or equipment, cleaning or routine maintenance." (Def. R. 56.1 Counterstmt. (Dkt. No. 59) ¶ 25; N.Y.C. Admin. Code § 20-1301)

Under the Deductions Law, "a fast food employer shall, upon authorization from a fast food employee . . . deduct voluntary contributions from such fast food employee's paycheck and remit them to the not-for-profit designated by such fast food employee." N.Y.C. Admin. Code § 20-1302(a). "[N]o later than the first pay period after 15 days of receipt of the authorization," fast food employers must begin deductions from an employee's wages and "remit the deductions to the not-for-profit [designated by the employee], by the method of transmission that such organization requests." Id. § 20-1302(e). The Deductions Law also prohibits

3

retaliation against fast food employees who exercise their rights under the Deductions Law. Id. § 20-1306.

To be eligible to receive employee remittances under the Deductions Law, a non-profit organization must register with Consumer Affairs. (Def. R. 56.1 Counterstmt. (Dkt. No. 59) ¶ 29; N.Y.C. Admin. Code § 20-1303(a)) The non-profit organization must provide, inter alia, its name, a physical address, an email address, a web address (if any), a telephone number, and a "contact." (Def. R. 56.1 Counterstmt. (Dkt. No. 59) ¶ 30; N.Y.C. Admin. Code § 20-1303(a)(1)) The non-profit entity must also collect at least 500 authorizations from fast food employees to who wish to donate a part of their wages to the organization. (Def. R. 56.1 Counterstmt. (Dkt. No. 59) ¶ 32; N.Y.C. Admin. Code § 20-1303(a)(3))

Labor organizations are not eligible to receive donations pursuant to the Deductions Law. (Def. R. 56.1 Counterstmt. (Dkt. No. 59) ¶ 36; N.Y.C. Admin. Code § 20-1310(b)) Under the Deductions Law, a "labor organization" is, inter alia,

> [a] "labor organization" within the meaning of [29 U.S.C. § 152(5)], which defines a labor organization as "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work," as such definition is interpreted by the [N]ational [L]abor [R]elations [B]oard.

N.Y.C. Admin. Code § 20-1310(b)(3) (quoting 29 U.S.C. § 152(5)). The Deductions Law directs Consumer Affairs to "promulgate rules necessary to ensure that this law will be applied in a manner consistent with federal or state labor law." Id. § 20-1310(c).

The Deductions Law authorizes fast food employers to obtain reimbursement for certain costs associated with administering the payroll deduction scheme. Reimbursement is to be provided by the non-profit organization receiving the wage donations: "Upon request by a

4

fast food employer, [a] not-for-profit shall reimburse the fast food employer for the costs associated with deduction and remittance, as calculated pursuant to the rules of [Consumer Affairs]." Id. § 20-1302(g). Pursuant to rules published on November 28, 2017 (see Def. R. 56.1 Counterstmt. (Dkt. No. 59) ¶ 6; see also Implementation of Pay Deductions Law, NYC CITYWIDE ADMIN. SERVS., https://a856-cityrecord.nyc.gov/RequestDetail/20171127102 (last visited Jan. 30, 2019)), "the maximum amount per transaction per fast food employee that a fast food employer may charge a not-for-profit is $0.30. 'Transaction' . . . means the act of both deducting and remitting wages." Rules of City of N.Y. Dept. of Consumer Affairs § 7-707(a). However, fast food employers may seek an exemption from this $0.30 cap "by demonstrating to [Consumer Affairs] that the employer's actual costs exceed that maximum amount." Id. § 7-707(b). A request for reimbursement must be made in writing, must set forth how the cost was calculated, and must be based on the "actual costs . . . of making deductions from a fast food employee's paycheck and remitting those deductions to the not-for-profit the fast food employee designated." Id. § 7-707(c), (d).

Non-profit organizations and fast food employees or their representatives may file a complaint with Consumer Affairs for fast food employers' violations of the Deductions Law. (Def. R. 56.1 Counterstmt. (Dkt. No. 59) ¶ 48; N.Y.C. Admin. Code § 20-1307(b)(1)) Where a fast food employer violates the Deductions Law, Consumer Affairs may award deductions and remittances plus interest, and impose a civil penalty of $500 to $1000 per violation. N.Y.C. Admin. Code § 20-1307(b)(2)(b). Reinstatement and back pay are available remedies where an employer has retaliated against an employee seeking to exercise rights under the Deductions Law. Id. § 1307(b)(2)(a)-(c).

## II.  PROCEDURAL HISTORY

The Complaint was filed on November 21, 2017.  (Dkt. No. 1)  On January 4, 2018, Kshawn Clark, Christian Malloy, Mica McLawhorn, and Jordan Rodriguez moved to intervene.  (Dkt. No. 27)  The Court granted their motion on January 17, 2018.  (Dkt. No. 33)

Pending before the Court are the parties' cross-motions for summary judgment. (Dkt. Nos. 47, 57)

**DISCUSSION**

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  "'[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'"  Lesavoy v. Lane, 2 Civ. 10162, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create

6

a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d

159, 166 (2d Cir. 2010) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995))

(alterations in original).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for

summary judgment. . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

"[W]hen both parties move for summary judgment, asserting the absence of any genuine issues

of material fact, a court need not enter judgment for either party.  Rather, each party's motion

must be examined on its own merits, and in each case all reasonable inferences must be drawn

against the party whose motion is under consideration." Id. (internal citations omitted).

## II.     **WHETHER PLAINTIFFS HAVE STANDING**

### A.     **Legal Standard**

The Court must first determine whether Plaintiffs have standing to bring this case.

Plaintiffs bring their First Amendment challenge under 42 U.S.C. § 1983.  (Cmplt. (Dkt. No. 1)

¶¶ 53-66)  "This Circuit has restricted organizational standing under § 1983 by interpreting the

rights it secures to be personal to those purportedly injured." League of Women Voters of

Nassau Cty. v. Nassau Cty. Bd. of Supervisors, 737 F.2d 155, 160 (2d Cir. 1984); see also Nnebe

v. Daus, 644 F.3d 147, 156 (2d Cir. 2011) ("It is the law of this Circuit that an organization does

not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983.")

Accordingly, Plaintiffs must demonstrate standing in their own right, and not on a theory that

they are acting on behalf of their members.[3]

---

[3]  This standing limitation does not apply to Plaintiffs' preemption challenge, as that challenge is
brought under both this Court's "equity" jurisdiction and Section 1983.  (Cmplt. (Dkt. No. 1)
¶¶ 67-79; see Armstrong v. Exceptional Child Center, Inc., 135 S. Ct. 1378, 1384 (2015) ("[A]s
[the Supreme Court has] long recognized, if an individual claims law immunizes him from state
regulation, the court may issue an injunction upon finding the state regulatory actions

It is well established that "'[a] plaintiff must demonstrate standing for each claim and form of relief sought.'" Carver v. City of New York, 621 F.3d 221, 225 (2d Cir. 2010) (quoting Baur v. Veneman, 352 F.3d 625, 642 n.15 (2d Cir. 2003)). "Because standing is jurisdictional under Article III of the United States Constitution, it is a threshold issue in all cases[,] since putative plaintiffs lacking standing are not entitled to have their claims litigated in federal court." Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 117 (2d Cir. 1991) (internal citation omitted).

> [T]he "irreducible constitutional minimum" of standing consists of three elements. Lujan [v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)]. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. Id., at 560-561; Friends of the Earth, Inc. [v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)]. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990).

Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). The "elements are conjunctive, so that a failure of any of the three elements deprives a plaintiff of standing to maintain an action in federal court." Dickerson v. Feldman, 426 F. Supp. 2d 130, 134 (S.D.N.Y. 2006).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 136 S. Ct. at 1548 (quoting Lujan, 504 U.S. at 560). "An allegation of future injury may suffice if the threatened injury is 'certainly

---

preempted." (citing Ex parte Young, 209 U.S. 123, 155-156 (1908))); see also Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton, 841 F.3d 133, 144 (2d Cir. 2016) ("[T]he Supreme Court has consistently recognized federal jurisdiction over declaratory- and injunctive-relief actions to prohibit the enforcement of state or municipal orders alleged to violate federal law.")) Because this Court concludes – for the reasons discussed below – that the Association has standing in its own right, it is not necessary to analyze whether the Association has organizational standing for purposes of its preemption challenge under Section 1983.

impending,' or there is a "'substantial risk" that the harm will occur.'" Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 n.5 (2013)). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" Spokeo, 136 S. Ct. at 1548 (quoting Lujan, 504 U.S. at 560 n.1). "'As a general rule,' this means 'plaintiff must have personally suffered.'" In re the Bear Stearns Cos., Inc. Sec., 8 MDL 1963 (RWS), 2016 WL 4098385, at *17 (S.D.N.Y. July 25, 2016) (quoting W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 107 (2d Cir. 2008)). "Concreteness" refers to an injury that is "real, and not abstract." Spokeo, 136 S. Ct. at 1548 (internal quotation marks omitted).

An injury "'fairly can be traced to the challenged action of the defendant'" where "the exercise of the Court's remedial powers would redress the claimed injuries." Duke Power Co. v. Carolina Envtl. Study Grp., Inc., 438 U.S. 59, 74 (1978) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41, 43 (1976)).

"The party asserting jurisdiction . . . bears the burden of proof as to standing. To defend against summary judgment for lack of standing, a plaintiff 'must set forth by affidavit or other evidence specific facts' supporting standing, as is generally required under Rule 56." Nat. Res. Def. Council v. FDA, 710 F.3d 71, 79 (2d Cir. 2013) (citing and quoting Lujan, 504 U.S. at 561).

### B.    Analysis

According to Defendants, "it is questionable whether Plaintiffs have standing to bring their First Amendment claim," because organizations do not have the right to assert the rights of their members under Section 1983. (Def. Opp. (Dkt. No. 62) at 13 n.2) To the extent Plaintiffs devote resources to advising their members about the Deductions Law, that is not an injury-in-fact, because providing such advice is a core part of Plaintiffs' mission. (Id.)

Plaintiffs argue that they have standing in their own right (See Pltf. Reply (Dkt. No. 51) at 8 n.1), however, relying primarily on Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104 (2d Cir. 2017). In that case, the Second Circuit considered whether Workplace – an organization that "work[s] to advance the interests of day laborers," id. at 107 – had standing to challenge a law that prohibited stopping a motor vehicle on a public right-of-way for purposes of soliciting employment from the vehicle's occupants. Id. at 109. The Second Circuit held that Workplace had standing, finding multiple injuries-in-fact. Id. First, Workplace faced "increased difficulty in meeting with and organizing [day laborers]," as one purpose of the law was to disperse day laborers. Id. at 110. Second, the organization had "offered unrebutted testimony that it has already had to devote attention, time, and personnel to prepare its response" to the law. Id. at 110-11. Third, Workplace had "offered evidence that those responsible for enforcing the [law] are likely to confuse the conduct of [the organization's] activists with that of the day laborers." Id. at 111.

Here, the Association has offered evidence that it has diverted resources from its mission as a result of the Deductions Law. In his declaration, Keith Stephenson – the "Director of State and Local Government Affairs at the National Restaurant Association" – states that

> [t]he [Association's] purpose is to support our million-plus members in starting, developing, and growing their businesses as well as serving the public. We do so through numerous channels, including through direct outreach efforts on behalf of our members, by hosting educational and informational meetings and seminars, by lobbying state and local governments for restaurant-friendly policies, and by helping our members navigate their legal and regulatory obligations.

(Stephenson Decl. (Dkt. No. 55) ¶ 4)

Stephenson further states that

> over the last year – both before and after its enactment – one set of legislative initiatives has consumed the vast majority of my (and my subordinates') time: the New York City

10

'Fair Workplace' legislative package, which included a number of measures targeting fastfood employers specifically. This legislative package includes the [Deductions Law.]

(Id. ¶ 7)  According to Stephenson,

> [b]oth before and after its enactment, I have spent time addressing member concerns specifically related to the [Deduction Law's] obligations instead of discussing questions regarding other jurisdictions or other member business or regulatory concerns. For example, on a State and Local Government Affairs [Association] conference call on November 29, 2017, I addressed numerous questions related to the [Deductions Law] in lieu of speaking on several other planned topics.
>
> Similarly, on December 7, 2017, we hosted a meeting for our members regarding their concerns about their businesses and the regulatory environment. While we had planned to discuss a variety of topics, the New York City Fair Workweek laws, including the [Deductions Law], came up multiple times. We were required to truncate our coverage on other topics in order to address the [Deductions Law's] effects.

(Id. ¶¶ 8-9)

> Stephenson further asserts that as
>
> [a] direct consequence of our having to devote time, money, and other resources to combating the effects of the [Deductions Law,] . . . we have been unable to advocate as effectively as planned for policies in other jurisdictions that we and our members believe would help their businesses. I have been unable to attend meetings and provide strategic advice to members regarding our opposition to a 7% sales tax on restaurant meals proposed in Connecticut; our opposition to additional restaurant regulation in Vermont; our opposition to a California bill that would ban plastic straws; and other lobbying efforts throughout the country. Instead, I have had to devote myself to addressing questions and problems raised by the [Deductions Law] and its obligations on our members.

(Id. ¶ 12)  Stephenson states that

> [w]ithout these obligations, I would be devoting my time and resources to supporting our members' efforts to grow their businesses as well as to lobbying local lawmakers in other jurisdictions to adopt restaurant-friendly policies. The [Deductions Law] has significantly hindered my ability to advance these goals, both before and after its passage . . . .

(Id. ¶ 14)

This evidence is sufficient for the Association to carry its burden to demonstrate

standing. Here, as in Centro de la Comunidad Hispana, the Association has had to redirect its

time, money, and resources to educating its members and "prepar[ing] its response" to the Deductions Law, to the detriment of other priorities. See Centro de la Comunidad Hispana, 868 F.3d at 110-11.

Other cases in this Circuit support the conclusion that the Association has demonstrated standing. For example, in Nnebe v. Daus, 644 F.3d 147 (2d Cir. 2011), the New York Taxi Workers Alliance challenged New York City's policy of immediately suspending a taxi driver's license without a hearing where a driver has been charged with a felony or certain misdemeanors. Id. at 150. Although drivers are entitled to a post-deprivation hearing, "in practice taxi licenses are never reinstated unless and until the driver secures favorable termination of the charges against him." Id. The Second Circuit reversed the district court's determination that the Taxi Workers Alliance lacked standing, noting that the Alliance's executive director had testified at his deposition that "the Alliance has expended resources to assist its members who face summary suspension by providing initial counseling, explaining the suspension rules to drivers, and assisting the drivers in obtaining attorneys." Id. at 156-57. The court also noted that "'only a perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact,'" id. at 157 (quoting Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 905 (2d Cir. 1993), and that "[e]ven if only a few suspended drivers are counseled by [the Alliance] in a year, there is some perceptible opportunity cost expended by the Alliance, because the expenditure of resources that could be spent on other activities 'constitutes far more than simply a setback to [the Alliance's] abstract social interests,'" id. (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982)).

Similarly here, the Association has expended resources assisting members who must comply with the Deductions Law, and these expenditures have diverted the Association's

attention from other priorities. Even assuming arguendo that this diversion is minimal, this "opportunity cost" qualifies as an injury-in-fact.

Citing Mental Hygiene Legal Service v. Cuomo, 13 F. Supp. 3d 289 (S.D.N.Y. 2014), however, Defendants argue that litigation is a core component of the Association's mission, and thus the diversion of resources caused by the Deductions Law is not an injury-in-fact. (Def. Br. (Dkt. No. 62) at 13 n.2) In that case, plaintiff challenged portions of the New York Sex Offender Management and Treatment Act as unconstitutional under the Due Process Clause and the Equal Protection Clause. Mental Hygiene Legal Service, 13 F. Supp. 3d at 291. The plaintiff was a "state agency under a statutory mandate '[t]o initiate and take any legal action deemed necessary to safeguard the right of any patient or resident to protection from abuse or mistreatment.'" Mental Hygiene Legal Service v. Cuomo, 785 F. Supp. 2d 205, 214 (S.D.N.Y. 2011) (quoting N.Y. Mental Hyg. Law § 47.03(e)). The court found that plaintiff had not suffered an injury in fact, because "litigating cases like the instant action, as well as providing related legal services, is the core of [plaintiff's] activities." Mental Hygiene Legal Service, 13 F. Supp. 3d at 299.

Here, however, litigation is not the "core" of the Association's activities. While litigation is one tool that the Association uses to advocate on behalf of its members, as Stephenson states in his declaration, the Association's purpose is to "support our million-plus members in starting, developing, and growing their businesses as well as serving the public." (Stephenson Decl. (Dkt. No. 55) ¶ 4) The Association accomplishes this objective by "direct outreach efforts on behalf of [its] members, by hosting educational and informational meetings and seminars, by lobbying state and local governments for restaurant-friendly policies, and by

helping our members navigate their legal and regulatory obligations." (Id.) In sum, the Association's core purpose is not litigation.[4]

While the Association has carried its burden to demonstrate standing, the Center has not demonstrated that it has suffered an injury-in-fact. The only information in the record regarding the Center is its website's "About" page. This page states that the Center was created to

> enhance the restaurant industry's legal advocacy capabilities to provide protection and advancement for the industry, including fighting overregulation at the federal, state and local level. As special interest groups increasingly turn to the courts to enact their agendas, the Restaurant Law Center will give our industry another avenue to ensure the voice of America's restaurants is heard on the legal front.

(Sturniolo Decl., Ex. 15 (Dkt. No. 50-15) at 2) This page further states that the Center "is a 501(c)(6) legal entity affiliated with, but separate from, the National Restaurant Association. The Center's goal is to promote pro-business laws and regulations that allow restaurants to continue growing, creating jobs and contributing to a robust American economy." (Id.) Finally, the page states that the Center "will take on cases recommended by its Board of Directors, accepting only those which it believes will best advance the policy interests of the entire industry." (Id.) No information is provided about any of the Center's members, however, nor is there any evidence that the Deductions Law has caused the Center to divert its resources away

---

[4] The Association's "About Us" page – cited by Defendants (Def. Br. (Dkt. No. 62) at 13 n.2) – is not to the contrary. Although the "About Us" page states that the Association "represent[s] and advocate[s] for foodservice industry interests – taking on financial and regulatory obstacles before they hit our members' bottom line," it also states that the Association provides "tools and systems that help members of all sizes get significantly better operating results," as well as "offer[s] the kinds of networking, education and research resources that are only possible because of our vast, and active, membership base." (Sturniolo Decl., Ex. 14 (Dkt. No. 50-14) at 2) Accordingly, the "About Us" page confirms that the Association has purposes other than bringing litigation.

from other priorities. The Court concludes that the Center has not proffered sufficient evidence to demonstrate that it has standing.

Where "multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" Centro de la Comunidad Hispana, 868 F.3d at 109 (quoting Rumsfeld v. Forum of Acad. and Inst. Rights, Inc. ("FAIR"), 547 U.S. 47, 52 n.2 (2006)). Accordingly, the fact that the Association has standing is sufficient to permit this Court to adjudicate this case.

## III.   WHETHER FAST FOOD EMPLOYERS' FIRST AMENDMENT RIGHTS ARE VIOLATED

### A.   Whether Plaintiffs Bring a Facial or As-Applied Challenge

The parties dispute whether Plaintiffs' challenge to the Deductions Law is a facial challenge or an as-applied challenge, as well as the consequences of that distinction. Defendants argue that Plaintiffs bring a facial challenge to the law, (Def. Opp. (Dkt. No. 62) at 14 n.3), while Plaintiffs dispute that characterization, (see Pltf. Reply (Dkt. No. 51) at 9 n.2; Pltf. Reply to Intervenors (Dkt. No. 56) at 8-10).

In Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Departments, Appellate Div. of the Supreme Court of New York, 852 F.3d 178 (2d Cir. 2017), a law firm challenged the constitutionality of New York Rule of Professional Conduct 5.4 and certain New York statutes "that in combination work to prevent non-lawyers from investing in New York law firms." Id. at 182. Plaintiffs contended that these provisions violate the First and Fourteenth Amendments. Id. at 182-83. The district court dismissed the case for failure to state a claim, and the law firm appealed, arguing that the New York provisions violated its First Amendment rights to petition and to association. Id. at 184. The Second Circuit held that "'[b]ecause plaintiffs pursue this pre-enforcement appeal before they have been charged with any

15

violation of law, it constitutes a facial, rather than as-applied challenge.'" Id. at 184 (quoting

N.Y.S. Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 265 (2d Cir. 2015) (internal quotation

marks omitted)). Similarly here, Plaintiffs bring their challenge to the Deductions Law before it

has been enforced. As such, their challenge is a facial challenge.

      In a facial challenge brought under the First Amendment, "the plaintiff must

demonstrate that the challenged law either 'could never be applied in a valid manner' or that

even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it

'may inhibit the constitutionally protected speech of third parties.'" N.Y. State Club Ass'n, Inc.

v. City of N.Y., 487 U.S. 1, 11 (1988) (quoting City Council of L.A. v. Taxpayers for Vincent,

466 U.S. 789, 798 (1984)); see also Hobbs v. Cty. of Westchester, 397 F.3d 133, 154-55 (2d Cir.

2005) (same). This type of invalidation is "'manifestly, strong medicine' that 'has been

employed by the [Supreme] Court sparingly and only as a last resort.'" Nat'l Endowment for the

Arts v. Finley, 524 U.S. 569, 580 (1998) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613

(1973)).

      In disputing that they are bringing a facial challenge, Plaintiffs cite Sanitation &

Recycling Indus., Inc. v. City of New York, 107 F.3d 985 (2d Cir. 1997). (Pltf. Reply (Dkt. No.

51) at 9 n.2) In that case, the Second Circuit stated that "[t]here are only two situations where a

court may uphold a facial challenge: when plaintiff can demonstrate that the challenged law

'could never be applied in a valid manner,' or when First Amendment rights are at issue, a

subject we discuss later." Id. at 992 (quoting N.Y. State Club Ass'n, Inc., 487 U.S. at 11). As

both the later discussion in that case, see id. at 997-98, and New York State Club Ass'n make

clear, however, this qualification regarding First Amendment rights relates only to the

overbreadth doctrine. In New York State Club Ass'n, the Supreme Court stated that to prevail

on a facial attack a plaintiff must demonstrate that the challenged law either "could never be applied in a valid manner" or that even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it "may inhibit the constitutionally protected speech of third parties." N.Y. State Club Ass'n, 487 U.S. at 11 (quoting City Council of L.A., 466 U.S. at 798).

Here, Plaintiffs do not claim that the Deductions Law is overbroad, much less identify parties other than fast food employers whose speech might be affected. As such, Plaintiffs "fail to describe the instances of arguable overbreadth of the contested law," Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 n.6 (2008), and must therefore establish that there is no set of circumstances in which the Deductions Law would be constitutionally valid.

## B.     **Whether the Deductions Law Compels Speech**

### 1.     **Legal Standard**

The First Amendment "prohibits the government from telling people what they must say." FAIR, 547 U.S. at 61. Compelled speech is not limited "to the situation in which an individual must personally speak the government's message," however. Id. at 63; see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 782 (1988) ("[T]he First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say."). Indeed, the Supreme Court has "in a number of instances limited the government's ability to force one speaker to host or accommodate another speaker's message." FAIR, 547 U.S. at 63. In each of these cases, however, the Court held that speech was compelled because "the complaining speaker's own message was affected by the speech it was forced to accommodate." Id.

17

## 2. **Analysis**

Plaintiffs argue that the Deductions Law "compel[s] employers to support not-for-profits by making donations on employees' behalf – requiring employers to repeat employees' messages." (Pltf. Br. (Dkt. No. 48) at 18) According to Plaintiffs, it is of "no constitutional moment" that the donations come from employees' wages – "[t]he City may not commandeer employers into administratively assisting employees' efforts to speak collectively any more than it can commandeer them into aiding employees' attempts to speak individually." (Id. at 20 n.2) As an example, Plaintiffs assert that "[t]he City surely could not require fast food employers to print and distribute political leaflets of a fast food employee's design so long as the employee paid for the employer's efforts." (Id.)

Defendants respond that the Deductions Law regulates conduct, not speech. The law requires fast food employers to "administratively forward charitable deductions by their employees to a registered not-for-profit [and thus] regulates what employees must 'do' and not what they must 'say.'" (Def. Br. (Dkt. No. 62) at 15)

According to Plaintiffs, however, the act of disseminating others' speech is necessarily speech itself. (See Pltf. Br. (Dkt. No. 48) at 21 ("The [Deductions Law] therefore compels a fast food employer to make a First-Amendment-protected donation to a specified not-for-profit at an employee's direction . . . .") (emphasis in original)); Pltf. Reply (Dkt. No. 51) at 11 ("The [Deductions Law] requires what all agree is First-Amendment-protected speech – the contribution of money to an ideological or political not-for-profit – and obligates employers to perform it at employees' direction, subject only to purported recompense. . . . [M]oney donations to ideological or political not-for-profits are equally speech – and thus employers are equally entitled to refuse to distribute employees' message."))

Plaintiffs' assertion is overbroad. Under the First Amendment, an entity's mere transmission of others' speech does not necessarily constitute speech of that entity. For example, in U.S. Telecom Ass'n v. FCC, 825 F.3d 674 (D.C. Cir. 2016), the Federal Communications Commission promulgated an order – the "2015 Open Internet Order" – that "reclassified broadband service as a telecommunications service, subject to common carrier regulation under Title II of the Communications Act. The Commission also exercised its statutory authority to forbear from applying many of Title II's provisions to broadband service and promulgated five rules to promote internet openness." Id. at 689. Plaintiffs – mostly "broadband providers and their associations," id. – challenged the FCC's order, arguing, inter alia, that some of the internet rules violated the First Amendment. Id. One plaintiff argued that the rules "violate[d] the First Amendment by forcing broadband providers to transmit speech with which they might disagree." Id. at 740.

In holding that the FCC's internet rules did not violate the First Amendment, the D.C. Circuit noted that "[c]ommon carriers have long been subject to nondiscrimination and equal access obligations akin to those imposed by the rules without raising any First Amendment question. Those obligations affect a common carrier's neutral transmission of others' speech, not a carrier's communication of its own message." Id. (emphasis in original). The D.C. Circuit further ruled that "the communicative intent of the individual speakers who use such transmission networks does not transform the networks themselves into speakers." Id. at 742. This logic applies with equal force here – fast food employers' "transmission" of employees' speech does not necessarily demonstrate that the employers themselves are speaking.

Plaintiffs reject this analysis, analogizing the act of a fast food employer directing deducted employee wages to a non-profit organization to the act of a non-profit organization

donating supporters' contributions to a political action committee. Plaintiffs argue that

"[n]umerous not-for-profits are intermediaries, donating money contributed by individuals to

other not-for-profits, who use these received donations to support causes often designated by

original donors. But per Defendants, such intermediary nonprofits are not engaged in First-

Amendment-protected speech." (Pltf. Reply (Dkt. No. 51) at 10 (citation omitted))  Similarly,

Plaintiffs argue that "if Defendants' intermediaries-do-not-count theory is correct, then a PAC

does not engage in protected speech when it receives an individual's donation and passes it on to

a candidate consistent with that PAC's vision."  (Id. (citations omitted))

      In Plaintiffs' examples, however, both the non-profit and the political action

committee have discretion to determine how the donations they receive will be allocated.  The

D.C. Circuit in U.S. Telecom Ass'n noted the significance of such discretion in deciding whether

broadband providers' First Amendment interests were violated, and it contrasted broadband

providers with other types of content distributors that do have discretion regarding the content

they publish, such as newspapers and cable television companies:

> To be sure, in certain situations, entities that serve as conduits for speech
> produced by others receive First Amendment protection.  In those circumstances,
> however, the entities are not engaged in indiscriminate, neutral transmission of
> any and all users' speech, as is characteristic of common carriage.  For instance,
> both newspapers and "cable television companies use a portion of their available
> space to reprint (or retransmit) the communications of others, while at the same
> time providing some original content." City of L.A. v. Preferred
> Communications, Inc., 476 U.S. 488, 494 (1986) (internal quotation marks
> omitted).  Through both types of actions – creating "original programming" and
> choosing "which stations or programs to include in [their] repertoire" –
> newspapers and cable companies "seek[] to communicate messages on a wide
> variety of topics and in a wide variety of formats." Id.
>
> In selecting which speech to transmit, newspapers and cable companies engage in
> editorial discretion.  Newspapers have a finite amount of space on their pages and
> cannot "proceed to infinite expansion of . . . column space." Miami Herald
> Publishing Co. v. Tornillo, 418 U.S. 241, 257 (1974).  Accordingly, they pick
> which articles and editorials to print, both with respect to original content and

material produced by others. Those decisions "constitute the exercise of editorial control and judgment." Id. at 258. Similarly, cable operators necessarily make decisions about which programming to make available to subscribers on a system's channel space. As with newspapers, the "editorial discretion" a cable operator exercises in choosing "which stations or programs to include in its repertoire" means that operators "engage in and transmit speech." Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 636 (1994) (internal quotation marks omitted). The Supreme Court therefore applied intermediate First Amendment scrutiny to (but ultimately upheld) must-carry rules constraining the discretion of a cable company concerning which programming to carry on its channel menu. See id. at 661-62, 114 S.Ct. 2445.

In contrast to newspapers and cable companies, the exercise of editorial discretion is entirely absent with respect to broadband providers subject to the Order. Unlike with the printed page and cable technology, broadband providers face no such constraints limiting the range of potential content they can make available to subscribers. Broadband providers thus are not required to make, nor have they traditionally made, editorial decisions about which speech to transmit. In that regard, the role of broadband providers is analogous to that of telephone companies: they act as neutral, indiscriminate platforms for transmission of speech of any and all users.

U.S. Telecom Ass'n, 825 F.3d at 742-43 (internal citation omitted).

This same distinction applies here. Under the Deductions Law, although fast food employers serve as an intermediary for their employees' speech by administering a payroll deduction scheme, they have no discretion as to the recipient of their employees' donations – they merely follow their employees' instructions. Given these circumstances, the employers' mere act of sending a check to an employee's designated non-profit recipient is not speech.

Bailey v. Callaghan, 715 F.3d 956 (6th Cir. 2013) is instructive on this point. In Bailey, a Michigan statute prohibited public school employers from collecting union dues through payroll deductions. Id.at 957-58. Plaintiffs argued that the schools' payroll-deduction process is a "'nonpublic forum,' from which the unions cannot be excluded." Id. at 959. The Sixth Circuit rejected the notion that "a payroll deduction – the ministerial act of deducting a particular sum from an employee's paycheck – is itself expressive activity. The administrative

21

process in which that deduction occurs, therefore, is not a forum of any kind." Id. The Sixth Circuit went on to hold that the Michigan statute did not violate the First Amendment, because the First Amendment "'does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining funds for expression.'" Id. at 958 (quoting Ysursa v. Pocatello Educ. Ass'n, 555 U.S. 353, 355 (2009)). Similarly here, the act of "deducting a particular sum from an employee's paycheck" is a mere "ministerial act," not speech.

Finally, Plaintiffs cite to cases holding that political contributions are speech. (See Pltf. Br. (Dkt. No. 48) at 18-20) Those cases are not persuasive here, because they address individuals or corporations donating their own money. See McCutcheon v. FEC, 572 U.S. 185, 227 (2014) (plurality opinion) (invalidating campaign finance contribution restrictions); Abood v. Detroit Bd. of Educ., 431 U.S. 209, 211-12, 233-37 (1977) (collection of "service charge" from non-union employees equal to union dues was unconstitutional as to the portion of the charge unrelated to collective bargaining activities); Citizens United v. FEC, 558 U.S. 310, 320-21, 371-72 (2010) (invalidating restriction on corporations and unions using general treasury funds for "electioneering communications"); Amidon v. Student Ass'n of State Univ. of N.Y. at Albany, 508 F.3d 94, 95-98, 101-02 (2d Cir. 2007) (advisory student referendum to determine how to allocate funds collected from mandatory student activity fee at a state university violated the First Amendment).

Although this Court has concluded that the payroll deductions at issue here do not constitute employer speech, that does not end the inquiry. As the Supreme Court has stated, "compelled-speech cases are not limited to the situation in which an individual must personally speak the government's message. We have also in a number of instances limited the government's ability to force one speaker to host or accommodate another speaker's message."

FAIR, 547 U.S. at 63. Critical to a First Amendment violation in these cases, however, is a finding that "the complaining speaker's own message was affected by the speech it was forced to accommodate." Id. Here, Plaintiffs have not produced evidence sufficient to create a genuine issue of material fact as to whether the speech of fast food employers is affected by the Deductions Law.

In FAIR, the Supreme Court analyzed the constitutionality of the Solomon Amendment, which "denies federal funding to an institution of higher education that 'has a policy or practice . . . that either prohibits, or in effect prevents' the military 'from gaining access to campuses, or access to students . . . on campuses, for purposes of military recruiting in a manner that is at least equal in quality and scope to the access to campuses and to students that is provided to any other employer.'" Id. at 55 (quoting 10 U.S.C. § 983(b)). FAIR – an association of law schools and law faculties – wanted to "restrict military recruiting on their campuses because they object to the policy Congress has adopted with respect to homosexuals in the military." Id. at 52. The Solomon Amendment thus forced these institutions to "choose between enforcing their nondiscrimination against military recruiters in this way and continuing to receive specified federal funding." Id. FAIR sued to invalidate the Solomon Amendment under the First Amendment. The Supreme Court held that "accommodating the military's message does not affect the law schools' speech, because the schools are not speaking when they host interviews and recruiting receptions. . . . [A school's] accommodation of a military recruiter's message is not compelled speech because the accommodation does not sufficiently interfere with any message of the school." Id. at 64.

Here, the Deductions Law likewise does not interfere with fast food employers' ability to communicate their own message. Fast food employers are free to donate to causes they

support, and to indicate their disagreement with the policies of organizations that their employees donate to.

Because the Deductions Law does not interfere with fast food employers' speech, Pacific Gas & Elec. Co. v. Public Utilities Comm'n, 475 U.S. 1 (1986) – cited by Plaintiffs (see Pltf. Opp. (Dkt. No. 51) at 11) – is not persuasive here. In Pacific Gas, a California utility company distributed a newsletter with the bills it sent to its customers each month. Id. at 1. The newsletter was designed such that it would not result in any additional postage cost. Id. at 5-6 (quoting App. to Juris. Statement at A-2). California's Public Utilities Commission ruled that an intervenor in a ratemaking proceeding before the Commission – Toward Utility Rate Normalization ("TURN") – could use this "extra space" in the monthly billing envelopes up to four times a year to distribute its own message, as long as it stated "that its messages are not those of [Pacific Gas.]" Id. at 6. The Supreme Court held that the Commission's ruling violated Pacific Gas's First Amendment rights. In a plurality opinion, four justices held that this requirement violated the First Amendment because the access to the extra space was not "content neutral," as "[t]wo of the acknowledged purposes of the access order are to offer the public a greater variety of views in appellant's billing envelope, and to assist groups (such as TURN) that challenge appellant in the Commission's ratemaking proceedings in raising funds." Id. at 12-13. Further, "[s]uch one-sidedness impermissibly burdens appellant's own expression." Id. at 13.

As the Supreme Court explained,

> because access is awarded only to those who disagree with appellant's views and who are hostile to appellant's interests, appellant must contend with the fact that whenever it speaks out on a given issue, it may be forced – at TURN's discretion – to help disseminate hostile views. Appellant "might well conclude" that, under these circumstances, "the safe course is to avoid controversy," thereby reducing the free flow of information and ideas that the First Amendment seeks to promote. [Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241, 257 (1974).]

Id. at 14. Accordingly, "when the state agency ordered [Pacific Gas] to send a third-party newsletter four times a year, it interfered with the utility's ability to communicate its own message in its newsletter." FAIR, 547 U.S. at 64.

Here, there is no similar risk that fast food employers would choose not to "speak out" at all. Moreover, fast food employers are not required to distribute a message they oppose alongside their own messages – rather, they are only required to perform the "ministerial act" of administering payroll deductions.[5]

## C. Whether Fast Food Employers Are Compelled to Associate with Non-Profits

### 1. Legal Standard

"[T]he . . . 'freedom of association' protected by the First Amendment has been generally understood to encompass two quite different types of associational activity: 'choices to enter into and maintain certain intimate human relationships,' and 'associat[ion] for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion.'" Jacoby & Meyers, 852 F.3d at 187-88 (quoting Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18 (1984)). These rights are commonly called "intimate association" and "expressive association," respectively. See Sanitation & Recycling Industry, Inc. v. City of N.Y., 107 F.3d 985, 995-96 (2d Cir. 1997) ("The United States Constitution affords protection to two distinct types of association, 'intimate

---

[5] Plaintiffs have not argued that the Deductions Law compels them to engage in expressive conduct; their challenge to the statute is founded solely on a theory of compelled speech. (See Pltf. Reply (Dkt. No. 56) at 10 ("As Plaintiffs showed in their opening brief, donations to political and ideological groups are protected *as speech* – not as conduct, expressive or otherwise, under the First Amendment.") (emphasis in original)) Even if Plaintiffs' challenge had been premised on a theory of compelled expressive conduct, however, this Court would hold that the Deductions Law does not compel fast food employers to engage in any expressive conduct. See Bailey, 715 F.3d at 959 (payroll deduction is a ministerial act and not expressive activity).

association' and 'expressive association.'"); see also FAIR, 547 U.S. at 68 (The First
Amendment protects the right to "associate for the purpose of speaking, which [the Supreme
Court has] termed a 'right of expressive association.'" (quoting Boy Scouts of Am. v. Dale, 530
U.S. 640, 644 (2000))).

Here, fast food employers' expressive associational interests are implicated.
However, the Supreme Court has only found forced association where "actual association
threatened to distort the groups' intended messages." Wash. State Grange , 552 U.S. at 457 n.9
(emphasis in original). In Wash. State Grange, the Supreme Court noted that it was not aware of
any "case in which the mere impression of association was held to place a severe burden on a
group's First Amendment rights." Id. (emphasis in original).

### 2. Analysis

Plaintiffs claim that the Deductions Law compels them to associate with non-
profit organizations in three ways. First, it compels fast food employers to "identify with
particular not-for-profits by making donations to them." (Pltf. Br. (Dkt. No. 48) at 21) Second,
"[e]mployers' donations to employees' selected not-for-profits will appear, at minimum, in the
financial records of the fast food employer and the recipient organization, the third-party banks
used to transmit donations, and in any publicly-required disclosures that either is required to
make regarding not-for-profit donations." (Id. at 22) Third, the Deductions Law requires fast
food employers to communicate and interact, on a routine basis, with organizations that fast food
employers may prefer not to associate with.[6] (Id. at 23) Plaintiffs contend that "[t]hese

---

[6] For example, the effect of the Deductions Law is to require fast food employers to
communicate with non-profit organizations about the non-profit's "preferred mode of payment,
to remit donations, to collect reimbursable costs, to inform the not-for-profit when employees are
separated from employment, and so on." (Id. at 23)

26

undesired [encounters] are quite literally forced association: a requirement to interact substantially with another private party." (Id.)

Defendants argue that fast food employers do not have a right to avoid the "'mere impression of association'"; rather, they must demonstrate that "'actual association threaten[s] to distort the[ir] intended messages.'" (Def. Reply (Dkt. No. 63) at 10-11 (quoting Wash. State Grange, 552 U.S. at 457 n.9) (emphasis in Wash. State Grange)) Intervenors argue that because there is no violation of fast food employers' speech rights, there is no associational violation: "[w]here, as here, an employer is not actually engaged in protected expression with which the law interferes[,] . . . there can be no infringement." (Intervenors Br. (Dkt. No. 66) at 22))

As to Plaintiffs' first argument, their associational rights are not violated, because the requirement that fast food employers set up a payroll deduction system does not implicate constitutionally protected speech. As discussed above, Plaintiffs do not have a freestanding right of association – rather, Plaintiffs have a right of association "'for the purpose of engaging in those activities protected by the First Amendment.'" Jacoby & Meyers, 852 F.3d at 187-88 (quoting Roberts, 468 U.S. at 618).

As to Plaintiffs' second argument, Plaintiffs have not offered evidence suggesting that the transactions at issue would be disclosed in a way that would associate fast food employers with non-profits, much less associate them in a way that "threaten[s] to distort [the food employers'] intended messages." Wash State Grange, 552 U.S. at 457 n.9. In other words, there is no reason to believe that any disclosure of the payroll deductions would lead others to believe that the fast food employers were associating themselves with the non-profits designated by their employees, or that employers would be perceived as expressing a message of support for these non-profits. Any risk of confusion on this score appears quite minimal. See FAIR, 547

U.S. at 65 (where Solomon Amendment required law schools to afford military recruiters access to campus, law schools argued they might be perceived as sending a message of not disapproving of the military policies; Supreme Court stated that "[w]e have held that high school students can appreciate the difference between speech a school sponsors and speech the school permits because legally required to do so, pursuant to an equal access policy. Surely students have not lost that ability by the time they get to law school." (citations omitted))

As to Plaintiffs' final complaint – concerning the administrative interactions fast food employers will be required to have with non-profits as a result of the Deductions Law – as discussed earlier, these interactions will not have a significant effect on fast food employers' ability to express their own messages. In FAIR, for example, FAIR argued that "the Solomon Amendment violates law schools' freedom of expressive association. According to FAIR, law schools' ability to express their message that discrimination on the basis of sexual orientation is wrong is significantly affected by the presence of military recruiters on campus and the schools' obligation to assist them." Id. at 68.

In rejecting this argument, the Supreme Court concluded that the Solomon Amendment did not significantly affect the law schools' associational rights:

> To comply with the statute, law schools must allow military recruiters on campus and assist them in whatever way the school chooses to assist other employers. Law schools therefore "associate" with military recruiters in the sense that they interact with them. But recruiters are not part of the law school. Recruiters are, by definition, outsiders who come onto campus for the limited purpose of trying to hire students – not to become members of the school's expressive association. This distinction is critical. Unlike the public accommodations law in [Boy Scouts of America v. Dale, 530 U.S. 640 (2000)], the Solomon Amendment does not force a law school "'to accept members it does not desire.'" [Id.] at 648 (quoting Roberts, 468 U.S. at 623). The law schools say that allowing military recruiters equal access impairs their own expression by requiring them to associate with the recruiters, but just as saying conduct is undertaken for expressive purposes cannot make it symbolic speech, . . . so too a speaker cannot "erect a shield" against laws

requiring access "simply by asserting" that mere association "would impair its
message." [Dale, 530 U.S. at 653.]

Id. at 69 (emphasis in original).

The administrative interactions that fast food employers will have with non-
profits as a result of the Deductions Law appear less intrusive than the interactions at issue in
FAIR. Although Plaintiffs complain that fast food employers will have to interact with non-
profits "to discern the not-for-profit's preferred mode of payment, to remit donations, to collect
reimbursable costs, to inform the not-for-profit when employees are separated from employment,
and so on," (Pltf. Br. (Dkt. No. 48) at 23), these administrative interactions present little risk of
interfering with fast food employers' intended messages. In FAIR – given that military
recruiters conducted interviews on campus – the law schools arguably could have been seen as
endorsing the military's position on a variety of issues. The Supreme Court concluded that no
associational rights were violated in FAIR, however, and that is a fortiori true here.

Ysursa v. Pocatello Educ. Ass'n, 555 U.S. 353 (2009) – cited by Plaintiffs – is not
to the contrary. (See Pltf. Br. (Dkt. No. 48) at 23; Pltf. Reply (Dkt. No. 51) at 14) In Ysursa,
public employees in Idaho were permitted to have a portion of their wages deducted by their
employer and remitted to pay union dues, but were not allowed to have an amount deducted and
remitted to a union's political action committee. See Ysursa, 555 U.S. at 355. "A group of
unions representing Idaho public employees challenged this restriction." Id. The Supreme Court
rejected the challenge, holding that while "[t]he First Amendment prohibits government from
'abridging the freedom of speech'; it does not confer an affirmative right to use government
payroll mechanisms for the purpose of obtaining funds for expression.'" Id. After holding that
the law did not abridge unions' First Amendment rights, the Court found that the law passed
rational basis review, as it was "justified by the State's interest in avoiding the reality or

29

appearance of government favoritism or entanglement with partisan politics." Id. at 359. The Supreme Court concluded that "[t]he ban on such deductions plainly serves the State's interest in separating public employment from political activities." Id. at 361.

Plaintiffs read Ysursa to hold that, "[b]y necessity, deduction schemes associate employers with recipient organizations and viewpoints." (Pltf. Reply (Dkt. No. 51) at 14) Ysursa contains no such language and articulates no such finding, however. Acknowledging that Ysursa speaks of the State's interest in "avoiding the reality or appearance of government favoritism or entanglement with partisan politics," Ysursa, 555 U.S. at 359, and even assuming arguendo that the mere impression of association is sufficient to create a First Amendment violation, contra Wash. State Grange, 552 U.S. at 457 n.9 (stating that Supreme Court is "aware of no case in which the mere impression of association was held to place a severe burden on a group's First Amendment rights") (emphasis in original), Plaintiffs have not submitted sufficient evidence to create a genuine issue of material fact as to whether fast food employers' interactions with non-profits pursuant to the Deductions Law will lead to misimpressions as to their messages. A speaker cannot "erect [a First Amendment] shield" against a law simply by asserting that mere association would impair the speaker's message. See FAIR, 547 U.S. at 69. Plaintiffs' bare assertion that payroll deductions to benefit certain non-profits would "associate" fast food employers with those non-profits – without more – is insufficient to demonstrate a First Amendment violation.

### D. Whether Fast Food Employers Are Required to Subsidize Employees' Speech

#### 1. Legal Standard

It is a "bedrock principle that, except perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does

not wish to support." Harris v. Quinn, 134 S. Ct. 2618, 2644 (2014). This principle is violated

even where the subsidy is later refunded. See Knox v. Serv. Emps. Int'l Union, Local 1000, 567

U.S. 298, 317 (2012) ("the First Amendment does not permit a union to extract a loan from

unwilling nonmembers even if the money is later paid back in full"); Ellis v. Bhd. of Ry., Airline

& S.S. Clerks, Freight Handlers, Exp. & Station Emps., 466 U.S. 435, 444 (1984) ("By exacting

and using full dues, then refunding months later the portion that it was not allowed to exact in the

first place, the union effectively charges the employees for activities that are outside the scope of

the statutory authorization. The cost to the employee is, of course, much less than if the money

was never returned, but this is a difference of degree only. The harm would be reduced were the

union to pay interest on the amount refunded, but respondents did not do so. Even then the union

obtains an involuntary loan for purposes to which the employee objects.").

### 2.    **Analysis**

Plaintiffs contend that the Deductions Law compels fast food employers to

subsidize their employees' speech in two ways. According to Plaintiffs, the Deductions Law

does not fully reimburse employers for their expenses in administering the payroll deduction

scheme:

> Employers will incur other expenses aside from processing, deduction and
> remittance, of course, such as those associated with accounting for and internally
> monitoring payment obligations to ensure compliance with the [Deductions Law],
> and those resulting from the civil and administrative exposure employers face
> under the [Deductions Law]. . . . And should employers incur legal and dispute-
> resolution costs, such as court costs or attorneys' fees, then these costs are also a
> forced subsidy for employees' speech.

(Pltf. Br. (Dkt. No. 48) at 25-26 (internal citations omitted)) Plaintiffs also contend that there is

a delay between payments fast food employers make and reimbursement from the non-profits,

and that this delay amounts to an interest-free loan subsidizing employees' speech. (Id. at 26)

Defendants argue that the Deductions Law does not compel any subsidy, and note that Plaintiffs have cited no authority for their argument that "incurring administrative costs to comply with a law constitutes a compelled subsidy within the meaning of the First Amendment." (Def. Reply (Dkt. No. 63) at 11)

As discussed above, Plaintiffs' challenge to the Deductions Law is a facial challenge. As such, Plaintiffs must show that the "challenged law either 'could never be applied in a valid manner' or that even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it 'may inhibit the constitutionally protected speech of third parties.'" N.Y. State Club Ass'n, 487 U.S. at 11 (quoting City Council of L.A., 466 U.S. at 798).[7] Plaintiffs have made no such showing here.

Beginning with the costs of internal monitoring and accounting, the Deductions Law states that fast food employers may seek reimbursement for "costs associated with deduction and remittance, as calculated pursuant to the rules of the office." N.Y.C. Admin. Code § 20-1302(g). The applicable regulation provides that "[c]osts associated with deductions and remittances shall be calculated based on the actual costs to a fast food employer of making deductions from a fast food employee's paycheck and remitting those deductions to the not-for-profit the fast food employee designated." Rules of City of N.Y. Dept. of Consumer Affairs § 7-707(d). "Actual costs" is not a defined term. Moreover, the regulation provides that "the maximum amount per transaction per fast food employee that a fast food employer may charge a not-for-profit is $0.30." Id. § 7-707(a). Fast food employers may seek an exemption from this

---

[7] As noted above, the overbreadth doctrine is not implicated here, because only fast food employers are required to comply with the Deductions Law, and Plaintiffs have not identified any other party whose speech may be affected.

cap "by demonstrating to [Consumer Affairs] that the employer's actual costs exceed that maximum amount." Id. § 7-707(b).

As an initial matter, it is not clear from the record before this Court that the Deductions Law and associated regulations will be implemented in a way that prevents fast food employers from seeking reimbursement from non-profits for the employers' internal monitoring and accounting costs. Given that the term "actual costs" is not defined, it is not clear that costs associated with internal monitoring will be unrecoverable. And there is no evidence suggesting that Consumer Affairs is interpreting "actual costs" in a fashion that would deny reimbursement for internal monitoring and accounting costs.

In any event, Plaintiffs have cited no case in which a court has found that internal monitoring or compliance costs converted what was an otherwise valid law into a law providing for a compelled subsidy. Indeed, the Supreme Court has distinguished such administrative expenses from those "of a monetary nature," such as dues paid to a union.

In FAIR, for example, the Supreme Court rejected the Third Circuit's holding that the Solomon Amendment violated the First Amendment as a compelled subsidy, because it "put[] demands on the law schools' employees and resources, [and thus] compelled [the schools] to subsidize the military's recruiting message." Forum for Acad. and Inst. Rights v. Rumsfeld, 390 F.3d 219, 240 (3d Cir. 2004). In reversing, the Supreme Court noted that it did "not consider the law schools' assistance to raise the issue of subsidizing Government speech as that concept has been used in [it] cases. The accommodations the law schools must provide to military recruiters are minimal, are not of a monetary nature, and are extended to all employers recruiting on campus, not just the Government." FAIR, 547 U.S. at 61 n.4 (citing Johanns v. Livestock Mktg. Assn., 544 U.S. 550, 559 (2005)).

The monitoring and accounting costs about which Plaintiffs complain are likewise not "of a monetary nature." Instead, they "put demands on the [fast food employers'] employees and resources." And once fast food employers are reimbursed for the "actual costs" of administering the payroll deduction program, the remaining uncompensated expenses may in fact be "minimal." In any event, Plaintiffs offer only speculation in asserting that the uncompensated costs of fast food employers are significant enough to raise a First Amendment issue.

Plaintiffs argue, however, that "[t]he additional money employers must spend on legal compliance, accounting, training, and communications are prototypical examples of monetary support for another private party's speech: the very definition of a subsidy." (Pltf. Reply to Intervenors (Dkt. No. 56) at 17) But the cases Plaintiffs cite in support of this argument (see id.) say nothing of the sort.

In Johanns v. Livestock Marketing Association, 544 U.S. 550 (2005), for example, the Secretary of Agriculture – acting pursuant to the Beef Promotion and Research Act of 1985 – imposed a "$1-per-head assessment (or 'checkoff') on all sales or importation of cattle and a comparable assessment on imported beef products. . . . [T]he assessment [was] to be used to fund beef-related projects, including promotional campaigns." Id. at 554. Two associations representing members who had to pay this assessment challenged it on First Amendment grounds. The Supreme Court held that the assessment did not violate the First Amendment, because the promotional campaigns were government speech. See id. at 560-62. In short, Johanns turned on an assessment that was used to fund the government's promotional campaign for beef; beef producers' compliance costs in collecting the assessment were not at issue.

Similarly, in Harris v. Quinn, 134 S. Ct. 2618 (2014), Illinois required personal homecare assistants to either join a union or to pay a "fair share" of the union dues for the costs

of collective bargaining. See id. at 2625. Because the homecare assistants were not "full-fledged" state employees, id. at 2638, the Court held that Illinois could not force those who did not want to join the union to pay dues. See id. at 2643-44. In sum, the speech at issue in Harris involved homecare assistants' union dues – it did not involve "legal compliance, accounting, training, [or] communications" costs.

Plaintiffs also argue that the costs fast food employers will incur to resolve disputes about their compliance with the Deductions Law constitute a compelled subsidy. (See Pltf. Br. (Dkt. No. 48) at 25-26 ("Employers will incur other expenses aside from processing, deduction and remittance, of course, such as . . . those resulting from the civil and administrative exposure employers face under the [Deductions Law.]")). Plaintiffs cite no case that supports this compelled subsidy theory, however, and the Court rejects it.

Finally, Plaintiffs argue that the Deductions Law compels fast food employers to provide an interest-free loan to non-profits, because there will be a delay between the time that fast food employers incur costs and when they receive reimbursement from the non-profits. (See Pltf. Br. (Dkt. No. 48) at 26-27) This compelled subsidy theory has never been applied to the sort of administrative expenses at issue here, however, and the cases cited by Plaintiffs (see Pltf. Br. (Dkt. No. 48) at 26) are not on point.[8]

As FAIR demonstrates, incidental administrative costs do not rise to the level of an impermissible compelled subsidy. See FAIR, 547 U.S. at 61 n.4 (accommodations that law

---

[8] In Amidon v. Student Ass'n of the State Univ. of N.Y. at Albany, 508 F.3d 94 (2d Cir. 2007), the Second Circuit held that a university could not lawfully charge students a mandatory student activity fee, and then allocate that money in a viewpoint-discriminatory manner. Id. at 106. In Galda v. Bloustein, 686 F.2d 159 (3d Cir. 1982), the Third Circuit held that making a mandatory fee refundable does not cure a First Amendment violation. Id. at 169. Neither Amidon nor Galda addresses incidental administrative expenses of the sort at issue here.

schools had to provide military recruiters were "minimal" and therefore permissible). Given that incidental administrative expense is permissible, there is no reason to believe that the Deduction Law's mechanism for reimbursement of these incidental expenses is impermissible. Assuming arguendo that a compelled subsidy could exist where fast food employers are required to spend substantial sums of money to comply with the Deductions Law and there is a substantial lag time between these expenditures and reimbursement, there is no such evidence before this Court. Plaintiffs have not provided evidence of the costs fast food employers face under the Deductions Law; the timing of payments fast food employers must make in complying with the Deductions Law; or the delays fast food employers face in obtaining reimbursement. In this regard, it is worth noting that the Deductions Law allows for frequent reimbursement – up to once every two weeks. Rules of City of N.Y. Dept. of Consumer Affairs § 7-707(f).

The Court concludes that Plaintiffs have not demonstrated that the reimbursement scheme at issue results in a compelled subsidy.

### E. Whether the Deductions Law Is Rationally Related to a Legitimate State Interest

Because no First Amendment interests are implicated, rational basis review applies. The Deductions Law and its accompanying regulations will survive rational basis review if they are "rationally related to a legitimate government interest." Jacoby & Meyers, 852 F.3d 191. This test is easily satisfied here.

The Deductions Law states that it is designed to "provid[e] fast food employees the ability to make voluntary contributions to not-for-profit organizations of their choice through payroll deductions." Local Laws of the City of New York, No. 98, Preamble (2017), available at Sturniolo Decl., Ex. 1 (Dkt. No. 50-1) at 2. Defendants assert that the City has a legitimate interest is encouraging donations to non-profit organizations, and that the Deductions Law is

36

rationally related to this interest, because it makes such donations by fast food employees easier to make, and it assists workers who do not have access to banking services in contributing to non-profits. (See Def. Br. (Dkt. No. 62) at 35-37 (citing Stitelman Decl., Ex. A (Dkt. No. 61-1) at 14, 46-47))

Where, as here, "there are plausible reasons for [a legislative body's] action, [the court's] inquiry is at an end. It is, of course, 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision.'" U.S. R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 179 (1980).[9]

## IV.  WHETHER THE DEDUCTIONS LAW IS PREEMPTED

In addition to its First Amendment challenge, Plaintiffs contend that the Deductions Law is preempted by the National Labor Relations Act ("NLRA") and the Labor Management Relations Act ("LMRA"). (See Pltf. Br. (Dkt. No. 48) at 30-43) According to Plaintiffs, the National Labor Relations Board ("NLRB") has exclusive jurisdiction to determine what is a labor organization, and the Deductions Law impermissibly gives that responsibility to Consumer Affairs. (See id. at 31-32) Plaintiffs further contend that the registration of non-profits as eligible to receive employee remittances under the Deductions Law conflicts with the LMRA and NLRA. (See id. at 35-41) Finally, Plaintiffs argue that the Deductions Law is preempted under so-called Machinists preemption, which forbids states and localities from infringing on the labor-management bargaining process. (Id. at 41-43)

---

[9] Accordingly, Plaintiffs' arguments regarding the Deduction Law's legislative history (see Pltf. Br. (Dkt. No. 48) at 12-13, 25, 27-30) are irrelevant. Plaintiffs concede as much. (Id. at 27 n.7 (under the rational basis test, "a governmental entity may defend a law based on any conceivable basis that could support it" (emphasis in original)))

## A. Whether the Deductions Law Is Preempted by the NLRA or Is in Conflict with the NLRA and the LMRA

### 1. Plaintiffs' As-Applied and Facial Challenges

As discussed above, labor organizations are not eligible to receive donations under the Deductions Law. (Def. R. 56.1 Counterstmt. (Dkt. No. 59) ¶ 36; N.Y.C. Admin. Code § 20-1310(b)) The Deductions Law defines a "labor organization" as, inter alia,

> a "labor organization" within the meaning of [29 U.S.C. § 152(5)], which defines a labor organization as "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work," as such definition is interpreted by the [N]ational [L]abor [R]elations [B]oard.

N.Y.C. Admin. Code § 20-1310(b)(3) (quoting 29 U.S.C. § 152(5)). The Deductions Law directs Consumer Affairs to "promulgate rules necessary to ensure that [the Deductions Law] will be applied in a manner consistent with federal or state labor law." Id. § 20-1310(c).

Reading Plaintiffs' summary judgment motion generously, Plaintiffs bring two types of preemption challenges. First, Plaintiffs assert a facial challenge to the Deductions Law, arguing that Consumer Affairs cannot validly determine whether an organization seeking registration is or is not a labor organization. (See Pltf. Br. (Dkt. No. 48) at 31-39) Second, Plaintiffs bring an as-applied challenge, contending that the registration of Fast Food Justice under the Deductions Law is preempted, because Fast Food Justice is arguably a labor organization. (Id. at 39-41)

### 2. Legal Standard

Section 7 of the NLRA states that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose

38

of collective bargaining or other mutual aid or protection," as well as the right to refrain from these activities except where "such right may be affected by an agreement requiring membership in a labor organization as a condition of employment." 29 U.S.C. § 157. Section 8 of the NLRA, inter alia, states that certain activities by employers and labor organizations are "unfair labor practices." 29 U.S.C. § 158(a), (b). While the NLRA does not have an express preemption provision, in San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959), the Supreme Court held that "[w]hen an activity is arguably subject to [Section 7 or Section 8 of the NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board." Id. at 245.

The Supreme Court has emphasized, however, that

> [t]he precondition for pre-emption, that the conduct be "arguably" protected or prohibited, is not without substance. It is not satisfied by a conclusory assertion of pre-emption . . . . If the word "arguably" is to mean anything, it must mean that the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor. That is, a party asserting pre-emption must advance an interpretation of the Act that is not plainly contrary to its language and that has not been "authoritatively rejected" by the courts or the Board. The party must then put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation.

Int'l Longshoremen's Ass'n, AFL-CIO v. Davis, 476 U.S. 380, 394 (1986) (citation omitted).

"The first step in establishing Garmon preemption is to identify which provision of sections 7 or 8 is alleged to protect or prohibit the conduct regulated." Healthcare Ass'n of N.Y. State, Inc. v. Pataki, 471 F.3d 87, 96 (2d Cir. 2006). Here, Plaintiffs assert that the Deductions Law conflicts with Section 8(a)(2) of the NLRA (see Pltf. Br. (Dkt. No. 48) at 36-39), which states that "[i]t shall be an unfair labor practice for an employer . . . to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." 29 U.S.C. § 158(a)(2). The NLRA defines a "labor organization" as "any

organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5).

Here, it is at least "arguable" that Consumer Affairs' registration of a labor organization under the Deductions Law would be unlawful under Section 8(a)(2) of the NLRA. Although the "financial or other support" that is "contributed" to organizations under the Deductions Law is the employee's and not the employer's funds, fast food employers may provide "other support" in the form of assistance in administering the payroll deduction scheme. See Upper Great Lakes Pilots, 311 NLRB 131, 132 (1993) (finding that a company violated Section 8(a)(2) where it provided "clerical assistance and support to the Union").[10] Accordingly, to the extent that organizations found eligible for remittances are in fact labor organizations, the Deductions Law requires conduct arguably prohibited by the NLRA.

In Marine Engineers Beneficial Association v. Interlake Steamship Co., 370 U.S. 173 (1962), the Supreme Court applied Garmon preemption to the determination of whether an organization is a labor organization. In doing so, the Supreme Court noted that it saw

---

[10] Amici argue that even if Fast Food Justice were a labor organization, the Deductions Law does not require any conduct prohibited by Section 8, as that section "only requires employers not to interfere [with employee's Section 7 rights]; it does not require the kind of enhancement of employee rights required by the [Deductions Law]. Therefore, it should be clear that the prohibited or arguably prohibited prong of Garmon analysis does not apply to the [Deductions Law,] because that law does not augment the prohibition or penalization of activity even arguably prohibited by [Section] 8." (Amicus Br. (Dkt. No. 38) at 10)

Defendants appear to assume, however, that payments under the Deductions Law would arguably be impermissible if made to a labor organization. (See Def. Br. (Dkt. No. 62) at 27 ("Notably, [Section 8(a)(2) is] implicated only if a fast food establishment is required to interact with an entity that is a labor organization.").

no reason to assume that the task of interpreting and applying the statutory definition of a "labor organization" does not call for the same adjudicatory expertise that the Board must bring to bear when it determines the applicability of [sections] 7 and 8 of the Act to substantive conduct. Indeed, analysis of the problem makes clear that the process of defining the term "labor organization" is one which may often require the full range of Board competence.

Id. at 178. The Court went on to rule

that the task of determining what is a "labor organization" in the context of [section] 8(b) must in any doubtful case begin with the National Labor Relations Board, and . . . the only workable way to assure this result is for the courts to concede that a union is a "labor organization" for [section] 8(b) purposes whenever a reasonably arguable case is made to that effect.

Id. at 182.[11]

### 3.  Whether the NLRB Has "Exclusive" Jurisdiction

Here, Plaintiffs argue that the NLRB has "exclusive jurisdiction" to decide whether an organization is a labor organization. (See Pltf. Br. (Dkt. No. 48) at 31-35). As Marine Engineers demonstrates, however, the NLRB has "exclusive" jurisdiction only when there is an arguable violation of the NLRA. Accordingly, in the context of the instant case, the NLRB has exclusive jurisdiction when it is "reasonably arguable" that Consumer Affairs has registered a labor organization as eligible to receive remittances from fast food employees pursuant to the Deductions Law. Conversely, when it is not "reasonably arguable" that an

---

[11]  Although Marine Engineers addresses only Section 8(b), the decision contemplates applying the same reasoning to Section 8(a)(2). As the Court stated,

[t]he considerations involved in answering these questions are largely of a kind most wisely entrusted initially to the agency charged with the day-to-day administration of the [NLRA] as a whole. The term "labor organization" appears in a number of sections of the Act. Section 8(a)(2), for example, forbids employers to "dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it."

Id. at 180 (quoting 29 U.S.C. § 158(a)(2)).

organization receiving remittances pursuant to the Deductions Law is a labor organization, Garmon does not forbid Consumer Affairs from registering that organization under the Deductions Law.

Chamber of Commerce v. City of Seattle, 890 F.3d 769 (9th Cir. 2018) is instructive on this point. In that case, the Ninth Circuit considered a Seattle ordinance that "authorize[d] a collective-bargaining process between 'driver coordinators,'" such as Uber or Lyft, "and independent contractors who work as for-hire drivers." Id. at 775. The ordinance permitted "independent-contractor drivers, represented by an entity denominated an 'exclusive driver representative,' and driver coordinators to agree on the 'nature and amount of payments to be made by, or withheld from, the driver coordinator to or by the drivers.'" Id. (quoting Seattle Municipal Code § 6.310.735(H)(1)). As with the Deductions Law, application of the Seattle ordinance is predicated on an NLRA definition; the ordinance provides that it does "'not apply to drivers who are employees under 29 U.S.C. § 152(3).'" Id. (quoting Seattle Ordinance 124968 § 6). The Chamber of Commerce argued that the ordinance was preempted by Garmon, because it "requires local officials and state courts to decide whether for-hire drivers are employees under the NLRA.'" Id. at 794. The Ninth Circuit rejected the Chamber's preemption argument, holding that the Chamber had not proffered evidence that the Uber and Lyft drivers were employees, and thus had not demonstrated that it was "reasonably arguable" that the drivers were employees under the NLRA. See id. at 794-95.

Similarly here, for this Court to find preemption, Plaintiffs must proffer evidence demonstrating that (1) Consumer Affairs will be required to resolve arguable questions as to whether an organization is a labor organization; or (2) Consumer Affairs has registered an

organization to receive remittances under the Deductions Law where it is "reasonably arguable" that the organization is a "labor organization."

### 4. Whether the Deductions Law is Preempted

#### a. Facial Challenge

To sustain a facial challenge here, Plaintiffs must show that every application of the Deductions Law will present – or is likely to present – Consumer Affairs with a determination as to labor organization status that is arguable.

Plaintiffs have not met this standard. In enacting the Deductions Law, the City Council took steps to make the "labor organization" determination as clear as possible. As noted above, the Deductions Law explicitly incorporates the federal definition of "labor organization" and the Board's interpretation of that term: it defines a "labor organization" as, inter alia, "a 'labor organization' within the meaning of subsection (5) of section 152 of title 29 of the United States code . . . as such definition is interpreted by the [N]ational [L]abor [R]elations [B]oard." N.Y.C. Admin. Code § 20-1310(b)(3). Moreover, the Deductions Law directs Consumer Affairs to "promulgate rules necessary to ensure that this law will be applied in a manner consistent with federal or state labor law." Id. § 20-1310(c). Finally, Consumer Affairs consults a variety of federal sources in determining whether an entity is a "labor organization." For example, when Consumer Affairs receives a registration application under the Deductions Law, it checks the NLRB's website to determine whether the Board has made a determination as to whether the organization is a labor organization, and whether the organization appears in the Board's lists of affiliated or unaffiliated unions. (Maxwell Decl. (Dkt. No. 60) ¶¶ 14-16) Consumer Affairs also examines the organization's IRS Form 990 to see whether it was formed under Internal Revenue Code Section 501(c)(5) (id. ¶ 17) – which exempts "[l]abor, agricultural, or horticultural organizations" from taxation. 26 U.S.C. § 501(c)(5). If any of these sources

indicate that the organization is a labor organization, Consumer Affairs will deny the registration application. (Id. ¶ 18)

Given the extent to which the Deductions Law and Consumer Affairs incorporate and utilize federal law, standards, interpretations, and reasoning, Plaintiffs have not met their burden to demonstrate that it is inevitable – or even likely – that the Deductions Law will require Consumer Affairs to decide arguable questions of whether an organization is a labor organization.

Plaintiffs contend, however, that "registering and remitting payments to arguable 'labor organizations' was the purpose of the [Deductions Law]." (Pltf. Reply (Dkt. No. 51) at 26) In support of this argument, Plaintiffs assert that

> [t]he City does not dispute that the [Service Employees International Union ("SEIU")] lobbied for the [Deductions Law]. Nor can there be a dispute that the City and SEIU co-drafted the [Deductions Law]; nearly 100 pages of email correspondence reveal the collaboration of the City and SEIU to design the Bill for the benefit of the SEIU and to further its union organizing efforts. Indeed, the Bill also expressly deters not-for-profits other than [Fast Food Justice] from receiving payments under the Bill by refusing registration unless the organization can provide "facially valid" written authorizations from at least 500 fast food employees, echoing the very "showing of support" the NLRB requires for a union itself.

(Id. at 26-27 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 49) ¶¶ 16-22; Saltsman Decl., Ex. 1 (Dkt. No. 54-1))

The plain language of the Deductions Law refutes Plaintiffs' argument, however. As discussed above, the Deductions Law explicitly excludes labor organizations from receiving remittances. Moreover, in adopting well-established federal law and standards concerning the "labor organization" determination, the City Council has taken steps to prevent the erroneous registration of a labor organization.

Finally, as discussed below, Fast Food Justice is not arguably a "labor organization." And even assuming that the City's motive in enacting the Deductions Law was to promote organizations such as Fast Food Justice, such a motive is not impermissible, because the registration of Fast Food Justice and similar organizations under the Deductions Law does not arguably or actually conflict with federal law.

### b. As-Applied Challenge

In addition to their facial challenge, Plaintiffs argue that Fast Food Justice – which has registered under the Deductions Law (Pltf. R. 56.1 Stmt. (Dkt. No. 49) ¶ 53) – is at least arguably a labor organization. (Pltf. Br. (Dkt. No. 48) at 39-41; Pltf. Reply (Dkt. No. 51) 27-29; Pltf. Reply to Intervenors (Dkt. No. 56) at 25-30)

### i. Legal Standard

The NLRA defines a "labor organization" as "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5).

In NLRB v. Cabot Carbon Co., 360 U.S. 203 (1959), the Supreme Court held that "Congress, by adopting the broad term 'dealing' and rejecting the more limited term 'bargaining collectively,' did not intend that the broad term 'dealing with' should be limited to and mean only 'bargaining with.'" Id. at 211. The Board has consistently held, however, that "dealing with" requires a pattern of negotiation with management. For example, in E.I. du Pont de Nemours & Co., 311 NLRB 893 (1993), the Board contrasted the terms "bargaining" and "dealing":

The term "bargaining" connotes a process by which two parties must seek to compromise their differences and arrive at an agreement. By contrast, the concept of "dealing" does not require that the two sides seek to compromise their differences. It involves only a bilateral mechanism between two parties. That "bilateral mechanism" ordinarily entails a pattern or practice in which a group of employees, over time, makes proposals to management, management responds to these proposals by acceptance or rejection by word or deed, and compromise is not required. If the evidence establishes such a pattern or practice, or that the group exists for a purpose of following such a pattern or practice, the element of dealing is present. However, if there are only isolated instances in which the group makes ad hoc proposals to management followed by a management response of acceptance or rejection by word or deed, the element of dealing is missing.

Id. at 894.

The Board's interpretation of such terms in the NLRA is entitled to deference under Chevron. See Holly Farms Corp. v. NLRB, 517 U.S. 392, 400, 408-09 (1996) (applying Chevron deference to Board adjudication); Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 891-92, (1984) (upholding the NLRB's interpretation of the term "employee" under 29 U.S.C. § 152(3), and noting that the NLRD's "construction of that term is entitled to considerable deference, and we will uphold any interpretation that is reasonably defensible," id. at 891). The NLRB's interpretation of "dealing with" – which is broader than "bargaining" but which still requires some sort of a "bilateral mechanism" between employees and management – is a reasonable interpretation of that term.

### ii. Whether Fast Food Justice Is Arguably a Labor Organization

Plaintiffs argue that Fast Food Justice is "an organization established by the SEIU, staffed by the SEIU, located within the SEIU's offices, and initially funded exclusively by the SEIU to the tune of hundreds-of-thousands of dollars." (Pltf. Br. (Dkt. No. 48) at 39 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 49) ¶¶ 55-56, 59-61, 63-72)) Plaintiffs further argue that "the SEIU even recognizes that [Fast Food Justice] is a mechanism to fund its Fight for $15 campaign," (id.

(citing Sturniolo Decl., Ex. 18 (Dkt. No. 50-18)); that Fast Food Justice admits "members"; asks for payments as a percentage of wages; "'advocate[s] for higher standards' in fast food workplaces, seeks to 'improve [members'] situation and that of other fast wood workers,' and exists, as the SEIU itself admits, to facilitate 'the Fight for 15 and <u>organize fast food workers,</u>'" (<u>id.</u> at 39-40 (quoting Pltf. R. 56.1 Stmt. (Dkt. No. 49) ¶¶ 57, 72, 73; Clark Decl. (Dkt. No. 29-1) ¶ 5; McLawhorn Decl. (Dkt. No. 29-3) ¶¶ 3, 5) (alterations and emphasis in original).

Plaintiffs also quote SEIU President Mary Kay Henry, who has stated that the Deductions Law is a part of "creat[ing] 'pressure toward a national bargaining table' with various fast food brands." (<u>Id.</u> at 40 (quoting Sturniolo Decl., Ex. 17 (Dkt. No. 50-17) at 3)) According to Plaintiffs, Fast Food Justice exists in part to "organize" fast food workers; "[Fast Food Justice] admits employee members"; and Fast Food Justice "has, as one of its stated goals, dealing with employers over terms and conditions of employment." (<u>Id.</u> at 40) Because Fast Food Justice seeks to "deal with" employers on behalf of fast food employees, Fast Food Justice "is at the very least arguably a labor organization, satisfying <u>Garmon</u>'s preemption standard." (<u>Id.</u>)

In response, Defendants and Intervenors argue that Fast Food Justice is not a "labor organization," because it does not "deal with" employers on behalf of fast food employees. According to Defendants and Intervenors, Fast Food Justice has not, for example, submitted proposals to fast food employers concerning the terms and conditions of fast food employees' employment. (<u>See</u> Intervenors Opp. (Dkt. No. 66) at 40; Def. Reply (Dkt. No. 63) at 19-20)

A Fast Food Justice flyer submitted to the Court states that

> together we will[] [e]ducate our coworkers about wage increases, fair and stable scheduling laws, and paid sick leave, so that we know our rights and can protect

47

> them in our workplaces[;] [f]ight for more improvements in the fast-food industry
> so fast-food jobs can be good jobs[; and] [u]nite for positive changes in our
> communities – including affordable housing and transit, just immigration reform,
> fair policing and criminal justice reform.

(Sturniolo Decl., Ex. 13 (Dkt. No. 50-13) at 3)  The flyer also states that "Fast Food Justice is

building a united voice for the 60,000 fast-food workers in New York City.  Together we can

transform our lives as fast-food workers and build power for working people and our

communities." (Id.)  A job posting for a "Communications Associate" position at Fast Food

Justice states that the Associate "will be part of an innovative project to build on the success of

the Fight for 15 and organize fast food workers to build power and win workplace and

community improvements for fast food workers across the state." (Sturniolo Decl., Ex. 12 (Dkt.

No. 50-12) at 2-3)  Finally, Tsedeye Gebreselassie, chair of Fast Food Justice's board, has stated

that "[w]hat's important about the [Deductions Law] is it provides for a way for fast-food

workers to help sustain a nonprofit organization that's dedicated to advocating for issues that

members say is important to them." (Sturniolo Decl., Ex. 18 (Dkt. No. 50-18) at 4)

   The record demonstrates that Fast Food Justice seeks to educate its members

concerning their wage, benefit, and other rights in the fast food workplace, and to organize their

members so that they can effectively advocate for improvements in the fast food workplace.

Contrary to Plaintiffs' arguments (Pltf. Br. (Dkt. No. 48) at 39-40), however, "organizing"

workers or "advocating" for workers is not the same as "dealing with" employers over the terms

and conditions of employment.  There is no evidence that Fast Food Justice has engaged in a

"pattern or practice" of submitting proposals to fast food employers concerning the terms and

conditions of employment, or that it "exists for a purpose of following such a pattern or

practice." See E.I. du Pont de Nemours & Co., 311 NLRB at 894.  Plaintiffs have offered only

speculation that Fast Food Justice will make such proposals to fast food employers in the future.

Plaintiffs contend that

> [Fast Food Justice's] public-facing materials . . . demonstrate the group's involvement in work stoppages for the purpose of raising wages, with striking workers holding signs stating "15 and union rights," referencing a demand for $15 an hour. This conduct is, itself, "dealing with" employers and proves that [Fast Food Justice], as a group committed to winning "workplace" improvements, has as at least part of its purpose, to arguably deal with employers.

(See Pltf. Reply to Intervenors (Dkt. No. 56) at 27 (citing Sturniolo Decl., Ex. 5 (Dkt. No. 53)))

As amici argue, however, although Fast Food Justice "may use political advocacy for new public laws to help employees achieve better benefits and working conditions," and "even assuming [that] such advocacy may facilitate organizational campaigns by actual unions, [P]laintiffs cannot demonstrate that [Fast Food Justice] itself has attempted or plans to attempt 'dealing with employers' as a labor organization." (Amicus Br. (Dkt. No. 38) at 14)

Plaintiffs' reliance on Porto Mills, Inc., 149 NLRB 1454 (1964), is misplaced. (See Pltf. Reply to Intervenors (Dkt. No. 56) at 27) In that case, a union began an organizational campaign at Porto Mills, a clothing manufacturer with plants in Puerto Rico. Id. at 1458-59. The Comite – an anti-union organization whose mission was to "bar the establishment of the Union in the plant" – successfully demanded that a pro-union employee at Porto Mills be fired. Id. at 1471. The Trial Examiner found that the Comite's "primary objective" was to "combat labor organizations," id. at 1471, and that "the Comite by striking, picketing, and demanding that the Company oust [the employee] from the plant was attempting to deal with, and evidenced that it existed for the purpose of dealing with, the Company concerning labor disputes, grievances, and working conditions." Id. Accordingly, the Trial Examiner concluded that the Comite was a labor organization that had attempted to cause unlawful discrimination against the fired employee. Id. at 1470-71.

The facts here are not comparable. While the Comite – in demanding that Porto Mills terminate the pro-union employee – had engaged in conduct directed at management, there is no evidence that any of Fast Food Justice's conduct is directed at fast food employers.

Plaintiffs' argument that the Deductions Law requires Fast Food Justice to "deal with" employers is likewise unpersuasive. According to Plaintiffs, the Deductions Law requires Fast Food Justice to "deal with" employers regarding:

(1) "deduction authorization forms";

(2) "when such authorizations are revoked";

(3) "in connection with certain recordkeeping obligations";

(4) "over the method of transmitting funds";

(5) "regarding the method and amount of reimbursement for the employer's processing fees";

(6) "to discuss the timing and frequency of such reimbursement"; and

(7) "whether the employer must provide employee contact information."

(Pltf. Resp. to Amici (Dkt. No. 74) at 15 (citations omitted)) None of these contacts concern "grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work," however. 29 U.S.C. § 152(5). Accordingly, Fast Food Justice is not – as a result of these contacts – arguably a labor organization.

Finally, Plaintiffs cite SEIU Local 32BJ's most recent Form LM-2 – an annual labor organization disclosure form – that identifies Fast Food Justice as a "labor organization." (See Pltf. Notice of New Facts (Dkt. No. 80) at 2; Sturniolo Decl., Ex. 1 (Dkt. No. 81-1) at 115) The Form LM-2 elsewhere identifies Fast Food Justice as a "community organization," however, (see Sturniolo Decl., Ex. 1 (Dkt. No. 81-1) at 115), and Local 32BJ's previous LM-2 form does not identify Fast Food Justice as a labor organization. (See Sturniolo Decl., Ex. 8 (Dkt. No. 50-

8) at 134 (identifying Fast Food Justice as a "community organization") In any event, the fact that Local 32BJ has once characterized Fast Food Justice as a labor organization carries little weight here.

The Court concludes that Plaintiffs have not demonstrated that Fast Food Justice is arguably a "labor organization."

### iii. Fast Food Justice Is Not Arguably an Agent or *Alter Ego* of SEIU or Local 32BJ

Plaintiffs argue that Fast Food Justice is "at least arguably an agent or alter ego of the SEIU." (Pltf. Reply to Intervenors (Dkt. No. 56) at 28) According to Plaintiffs, "[Fast Food Justice] was created by the SEIU, funded by the SEIU, staffed by the SEIU, . . . the SEIU directly cut paychecks to at least one officer of [Fast Food Justice,] and . . . [Fast Food Justice] was physically located in the SEIU offices." (Id. (citing Pltf. R. 56.1. Stmt. (Dkt. No. 49) ¶¶ 54-73)) Plaintiffs further contend that "the SEIU . . . created, staffed, and funded the only entity that is registered under the [Deductions Law,]" and that "the SEIU has not just acquiesced in [Fast Food Justice's] conduct, it has established [Fast Food Justice] to receive money under the [Deductions Law] to carry out the SEIU's own union campaign." (Id. at 29)

Intervenors argue, however, that there is no evidence that (1) "the funds received by [Fast Food Justice] are controlled by SEIU or any other union" (Intervenors Br. (Dkt. No. 66) at 41) or that (2) "SEIU, SEIU Local 32BJ, or any of their officers have veto power or any other type of controlling authority over [Fast Food Justice's] financial, programmatic, or operational decisions." (Id. at 42)

Even if Fast Food Justice is not a "labor organization," it would be improper for fast food employers to "pay, lend, or deliver . . . any money or other thing of value" to Fast Food Justice as an agent or alter-ego of SEIU or Local 32BJ, or to "contribute financial or other

51

support" to Fast Food Justice as an agent or <u>alter ego</u> of SEIU or Local 32BJ. <u>See</u> 29 U.S.C. § 158(a)(2); 29 U.S.C. § 186(a)(1)-(2); <u>United States v. Lanni</u>, 466 F.2d 1102, 1108 (3d Cir. 1972) ("[T]he broad and unequivocal language of § 302 [(29 U.S.C. § 186)] clearly reaches the conduct for which appellants were convicted. Read together subsections (a) and (b) express an intention to forbid indirect union official-management bribery, be it through the middleman of the officials or of management.").

The NLRA provides that "[i]n determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. § 152(13).[12] Under NLRB precedent, "the Board has a clear statutory mandate to apply the 'ordinary law of agency.'" <u>Int'l Longshoremen's & Warehousemen's Union, C.I.O.</u>, 79 NLRB 1487, 1507 (1948). Moreover,

> the [NLRA] . . . envisages that the Board shall . . . hold labor organizations responsible for conduct of their agents which is proscribed by Section 8(b) of the statute, just as it has always held employers responsible for the acts of their agents which were violative of Section 8(a). For this purpose we are to treat labor organizations as legal entities, like corporations, which act, and can only act, through their duly appointed agents, as distinguished from their individual members.

<u>Id.</u> at 1507-08.

Under ordinary agency principles, "an agency relationship 'results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act.'" <u>N.Y. Marine & Gen. Ins. Co. v.</u>

---

[12] "The term 'person' includes one or more individuals, labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in cases under title 11, or receivers." 29 U.S.C. § 152(1).

Tradeline (L.L.C.), 266 F.3d 112, 121 (2d Cir. 2001) (quoting Meese v. Miller, 79 A.D.2d 237, 242 (4th Dep't 1981)).[13] "An agent must have authority, whether apparent, actual or implied, to bind his principal." Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 122 (2d Cir. 1998) "Actual authority arises from a direct manifestation of consent from the principal to the agent." Meisel v. Grunberg, 651 F. Supp. 2d 98, 110 (S.D.N.Y. 2009). Further, "[t]he consent for actual authority may be either express or implied from 'the parties' words and conduct as construed in light of the surrounding circumstances.'" Cromer Fin. Ltd. v. Berger, 245 F. Supp. 2d 552, 560 (S.D.N.Y. 2003) (quoting Riverside Research Inst. v. KMGA, Inc., 108 A.D.2d 365, 489 (1st Dep't 1985), aff'd, 68 N.Y.2d 689 (1986)). Finally, "[a]pparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." RESTATEMENT (THIRD) OF AGENCY, § 2.03; see also F.D.I.C. v. Providence Coll., 115 F.3d 136, 140 (2d Cir. 1997) ("'[T]he existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentations of the agent because of some misleading conduct on the part of the principal – not the agent.'" (quoting Ford v. Unity Hospital, 32 N.Y.2d 464, 473 (1973))); California Saw & Knife Works, 320 NLRB 224, 250 (1995) ("Apparent authority is created through a manifestation by the principal to a third party that supplies a reasonable basis for the latter to believe that the principal has authorized the alleged agent to do the acts in question.")

---

[13] Although the New York Marine court was applying New York agency law, "[t]here is no discernable difference between federal common law principles of agency and New York agency law." Meisel v. Grunberg, 651 F. Supp. 2d 98, 110 n.5 (S.D.N.Y. 2009).

There is no evidence here that SEIU or Local 32BJ has given actual or implied authority to Fast Food Justice to act on its behalf.[14] Fast Food Justice is a 501(c)(3) corporation with its own corporate structure, governance, and bylaws. (See Sturniolo Decl., Ex. 7 (Dkt. No. 50-7)) Those bylaws provide that Fast Food Justice's board shall have no fewer than three directors (id. Art. III.2); that directors serve three-year terms and are elected by a majority of the existing board (id. Art. II.4); that a majority of the board constitutes a quorum (id. Art. III.5); and that a majority of the board where a quorum is present is necessary to make decisions (id.). The bylaws further provide that Fast Food Justice's officers are elected by the board and may be removed by a majority vote of the board. (Id. Art. V.2)

Fast Food Justice currently has three directors. Kevin Doyle was paid $83,122 for consulting services he provided to Local 32BJ in 2016. (Turner Decl., Ex. I (Dkt. No. 68-9) ¶ 10(b); Pltf. R. 56.1 Stmt. (Dkt. No. 49) ¶ 67 (citing Sturniolo Decl., Ex. 8 (Dkt. No. 50-8) at 96, 122)) Doyle also serves as the treasurer of the Fast Food Workers Committee – "a self-identified Union that received $3,608,523 from the SEIU International in 2016." (Pltf. R. 56.1

---

[14] It is not clear whether Plaintiffs contend that Fast Food Justice is an alter ego of SEIU, of Local 32BJ, or both. Plaintiffs sometimes reference both "SEIU International" and "Local 32BJ" (see, e.g., Pltf. Reply to Intervenors (Dkt. No. 56) at 29 n.13 ("Ana Maria Archila is the Co-Executive Director of the Center for Popular Democracy, which received nearly $340,000 in one year from the SEIU International and Local 32BJ."), but sometimes refer to both the International and the Local as "SEIU." (Compare id. at 28 ("[T]he SEIU directly cut paychecks to at least one officer of [Fast Food Justice], and . . . [Fast Food Justice] was physically located in the SEIU offices."); with Pltf. R. 56.1 Stmt. (Dkt. No. 49) ¶ 64 (Weintraub received compensation from SEIU)); and id. ¶ 55 (Fast Food Justice and Local 32BJ's mailing address are the same)). SEIU and Local 32BJ are not the same organization, however, and courts do not automatically assume that a local branch is an agent of an international union. See, e.g., Gaglio v. Metro-N. Commuter Ry., 95 Civ. 2070 (LLS), 1996 WL 164691, at *4 (S.D.N.Y. Apr. 9, 1996) (analyzing whether local union was agent of international union); Rodonich v. House Wreckers Union Local 95 of Laborers' Int'l Union of N. Am., 624 F. Supp. 678, 684-85 (S.D.N.Y. 1985) (same).

54

Stmt. (Dkt. No. 49) ¶ 68 (citing Sturniolo Decl., Ex. 10 (Dkt. No. 50-10) at 137; id. Ex. 11 (Dkt. No. 50-11) at 2)

Fast Food Justice's remaining two directors – Tsedeye Gebreselassie and Ana Maria Archila – have not received compensation directly from Local 32BJ. Gebreselassie is an attorney at the National Employment Law Project. (Turner Decl., Ex. I (Dkt. No. 68-9) ¶ 10(a)) In 2016, SEIU donated $145,000 to this organization and its "Action Fund." (Sturniolo Decl., Ex. 10 (Dkt. No. 50-10) at 196, 234, 249, 263, 268) Director Archila is the Co-Executive Director of the Center for Popular Democracy. (Turner Decl., Ex. I (Dkt. No. 68-9) ¶ 2) In 2016, this organization received $288,205 from SEIU and $50,000 from Local 32BJ. (Sturniolo Decl., Ex. 10 (Dkt. No. 50-10) at 216, 257; id. Ex. 8 (Dkt. No. 50-8) at 114, 133)

Finally, Fast Food Justice's Executive Director, Autumn Weintraub, received compensation from SEIU for "services she provided to [Fast Food Justice] as its Executive Director." (Pltf. R. 56.1 Stmt. (Dkt. No. 49) ¶ 63-64 (citing Sturniolo Decl., Ex. 9 (Dkt. No. 50-9) at 26 ("Autumn Weintraub is employed by Service Employees International Union (SEIU), an unrelated organization. She received total compensation of 23,098 consisting of 15,418 base compensation and 7,680 other compensation, from SEIU for services provided to [Fast Food Justice] as its Executive Director.")))

While Plaintiffs have demonstrated that SEIU and Local 32BJ were instrumental in creating and providing financial support to Fast Food Justice, these ties do not demonstrate that SEIU or Local 32BJ either sought or actually has the ability to control Fast Food Justice's actions. Itel Containers International Corp. v. Atlanttrafik Express Service Ltd., 909 F.2d 698 (2d Cir. 1990) is instructive as to the application of agency principles in such circumstances.

In <u>Itel Containers</u>, SCL – a company that sold and leased cargo containers and related equipment – purchased a shipping line, and then incorporated several new, related entities to operate that shipping line. <u>Itel Containers</u>, 909 F.2d at 700. The first such entity – Elliott Maritime – was wholly owned by Arthur William Elliot, "a business associate of SCL, who signed undated instruments by which his shares could be transferred to SCL upon its request." <u>Id.</u> ACS Ltd. was a wholly owned subsidiary of Elliott Maritime that served as a holding company, and ACS Inc. was a wholly owned subsidiary of ACS Ltd. that actually operated the shipping line. <u>Id.</u> "SCL advanced AES Ltd. $3 million to purchase" the shipping line, and this money was eventually paid back. <u>Id.</u> "SCL thereafter made loans to AES Ltd. to finance its operations." <u>Id.</u> Other companies who previously did business with the shipping line SCL purchased tried to persuade SCL to guarantee AES Ltd.'s obligations, but SCL refused. <u>Id.</u> at 700-01. Eventually the shipping line went under, SCL refused to provide financial support, and AES Ltd. went into liquidation. <u>Id.</u> at 701. Companies that had done business with AES Ltd. then sued SCL, claiming that AES Ltd. had acted as SCL's agent.

The Second Circuit held that AES Ltd. had not acted as SCL's agent:

> Plaintiffs point to various activities of SCL that might perhaps have been thought by others to establish an agency relationship in some respect. There was no evidence, however, that SCL actually authorized AES Ltd. to act as its agent or that it in any way led AES Ltd. to believe AES Ltd. was so authorized. SCL made clear from the start its intention to utilize the corporate form for AES Ltd. so as to limit SCL's liability. SCL did provide financing to AES Ltd., but AES Ltd. was meant to, and did, operate independently. SCL chose not to be a shareholder, and no SCL employee sat on AES Ltd.'s Board of Directors. The record simply would not have supported a finding that SCL authorized AES Ltd. to act on its behalf.

<u>Id.</u> at 702-03.

Similarly here, although Local 32BJ provided virtually all of Fast Food Justice's funding through at least June 2017 – and likely throughout 2017 (<u>see</u> Sturniolo Decl., Ex. 1 (Dkt.

No. 81-1) at 115 (Local 32BJ donated a total of $1.2 million to Fast Food Justice in 2017)) –
there is no evidence that either Local 32BJ or the SEIU authorized Fast Food Justice to act as its
agent, or led Fast Food Justice to believe it was authorized to act as its agent. Moreover, Fast
Food Justice utilized the corporate form as a 501(c)(3) entity, and although Local 32BJ provided
funding, Fast Food Justice was "meant to, and did, operate independently." Itel Containers, 909
F.2d at 703. None of Fast Food Justice's board members are employed by Local 32BJ or SEIU,
although one board member was paid as a contractor. In sum, the record does not support a
finding that Fast Food Justice is authorized to act on Local 32BJ or SEIU's behalf, nor does it
demonstrate that the union entities have the level of control over Fast Food Justice necessary to
demonstrate an agency relationship.

Plaintiffs have likewise not demonstrated that Fast Food Justice has apparent
authority to act on SEIU or Local 32BJ's behalf. There is, for example, no evidence that SEIU
or Local 32BJ engaged in conduct that would cause third parties to reasonably believe that Fast
Food Justice has authority to act on behalf of SEIU or Local 32BJ.

That Fast Food Justice and these labor unions may share similar goals is not
sufficient to demonstrate an agency relationship. BE & K Construction Co. v. United
Brotherhood of Carpenters & Joiners of America, AFL-CIO, 90 F.3d 1318 (8th Cir. 1996)
illustrates this point. In that case, BE & K alleged that two unions – Paperworkers and
Carpenters – had violated federal labor law and tortiously interfered with its contractual
relations. Id. at 1321. BE & K had been hired by Potlatch, a paper manufacturing company, to
install equipment at a mill. Id. Paperworkers represented Potlatch's employees. Id. At a
meeting between Potlatch managers and Paperworkers representatives, Paperworkers expressed
concern about management's decision to hire BE & K, arguing that hiring BE & K might attract

the attention of Carpenters – which "had organized a national publicity campaign to expose disputed labor practices of BE & K and other non-union construction contractors." Id. at 1322. Potlatch subsequently cancelled its contract with BK & E, and the latter sued the two unions for "engag[ing] in unlawful secondary boycott activity in violation of § 303(a) of the [LMRA], 29 U.S.C. § 187(a), by using threats and coercion to force Potlatch to cease doing business with BE & K." Id. at 1323. BE & K also brought a claim for tortious interference. Id. A jury found in favor of BE & K. Id. at 1324.

On appeal, Carpenters argued that there was no evidence that it was involved in the meeting between Potlatch and Paperworkers. See id. at 1326. BE & K contended, however, "that the cooperation of the Paperworkers with the Carpenters' national publicity campaign forged an agency relationship between the two unions and that the individual Paperworkers representatives who spoke at the October 24 mutual interest meeting did so as agents of the Carpenters." Id. In support of

> its agency theory, BE & K relie[d] on evidence describing the Carpenters'
> publicity campaign against BE & K. That evidence showed that the publicity
> campaign was directed by the Special Programs Department of the Carpenters,
> which is based in Washington but has field representatives across the country. A
> written manual described how representatives should conduct campaign activities
> and included a section on soliciting the assistance of Paperworkers representatives
> in locations where BE & K was working or bidding. The evidence also indicated
> that the two unions formed a national solidarity committee consisting of five or
> six representatives of each union and that that committee determined that the
> publicity campaign against BE & K was a top priority issue. In addition, the two
> unions jointly published various handbills and leaflets related to the BE & K
> campaign.

Id.

Despite this evidence, the Eighth Circuit held that there was no agency relationship:

> Even when all possible inferences from this evidence are drawn in favor of BE & K, it is insufficient to show that the Paperworker representatives at the Potlatch meeting were acting as agents of the Carpenters. The sort of cooperation in the spirit of labor solidarity undertaken in the campaign does not transform one union into the agent of another.

Id. at 1327.

Similarly here, the fact that Fast Food Justice, SEIU, and Local 32BJ may share similar goals does not demonstrate that Fast Food Justice is the unions' agent. A labor union and a non-profit organization soliciting donations from fast food workers may pursue similar goals, but that circumstance does not make one the agent of the other.

Plaintiffs also contend that Fast Food Justice is an alter ego of SEIU or Local 32BJ. (Pltf. Reply to Intervenors (Dkt. No. 56) at 28-30; see also Pltf. Br. (Dkt. No. 48) at 37) The NLRB has "found alter ego status where . . . two enterprises have 'substantially identical' management, business purpose, operation, equipment, customers, and supervision, as well as ownership." Johnstown Corp., 313 NLRB 170, 170 (1993); see also Crawford Door Sales Co., 226 NLRB 1144, 1144 (1976) (same); Marquis Printing Corp., 213 NLRB 394, 401 (1974) (finding alter ego status where "[t]he two corporations [were] substantially identical as to stockholders, officers, directors, management, operations, equipment, and customers").

Analysis of these factors here does not support a finding that Fast Food Justice is the alter ego of SEIU or Local 32BJ. As to management, Plaintiffs have submitted evidence that Fast Food Justice's Executive Director, Autumn Weintraub, receives compensation from SEIU for "services she provide[s] to [Fast Food Justice] as its Executive Director." (Pltf. R. 56.1 Stmt. (Dkt. No. 49) ¶ 63 (citing Sturniolo Decl., Ex. 9 (Dkt. No. 50-9) at 26) Moreover, there is evidence that one of Fast Food Justice's board members – Kevin Doyle – was paid $83,122 for consulting services he provided to SEIU. (Turner Decl., Ex. I (Dkt. No. 68-9) ¶ 10(b); Pltf. R. 56.1 Stmt. (Dkt. No. 49) ¶ 67) There is no evidence that Fast Food Justice and SEIU or Local

32BJ share management, officers, directors, operations, or equipment, however. Fast Food Justice and the unions also do not share a common "business purpose." As labor organizations, the unions' "business purpose" is to "deal with" employers; as discussed above, Fast Food Justice has no such purpose.[15]

Plaintiffs have not demonstrated that Fast Food Justice is an agent or <u>alter ego</u> of SEIU or Local 32JB.

## 5. Whether the Deductions Law Presents an Actual Conflict with the NLRA or LMRA

### a. NLRA

As discussed above, the Deductions Law does not require or allow conduct that is even arguably prohibited by the NLRA. <u>A fortiori</u>, there is no actual conflict between the Deductions Law and the NLRA.

### b. LMRA

Plaintiffs contend that the Deductions Law violates the LMRA. (See Pltf. Br. (Dkt. No. 48) at 35-41) Section 302(a) of the LMRA states that

> [i]t shall be unlawful for any employer . . . to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value–

---

[15]  Johnson Tech., Inc., No. 7-CA-45747, 2004 WL 1772499 (NLRB Div. Jud. Aug. 4, 2004) and Iowa Packing Co., 125 NLRB 1408 (1960) – cited by Plaintiffs (see Pltf. Reply to Intervenors (Dkt. No. 56) at 29-30) – are not to the contrary. In both cases, the Board found that there was no real separation between the two labor organizations at issue in each case. In Johnson Tech., one labor organization was "a mere organizing tactic of an already existing labor organization," 2004 WL 1772499 at *1, while in Iowa Packing the alleged "independent, autonomous [labor] organization" was in reality a mere "façade," 125 NLRB at 1409-10. Here, Fast Food Justice is a separate, duly incorporated 501(c)(3) entity with its own bylaws and directors. Moreover, the payroll deductions at issue are transmitted to Fast Food Justice. Accordingly, the evidence does not demonstrate that Fast Food Justice is "part of" Local 32BJ or the SEIU. Moreover, neither the "manner in which Fast Food Justice was organized" nor the way its "affairs are being conducted" suggests that it is merely a front for Local 32BJ or SEIU. See id. at 1409-10.

> (1) to any representative of any of his employees who are
> employed in an industry affecting commerce; or
>
> (2) to any labor organization, or any officer or employee thereof,
> which represents, seeks to represent, or would admit to
> membership, any of the employees of such employer who are
> employed in an industry affecting commerce.

29 U.S.C. § 186(a)(1)-(2). The LMRA provides an exception for "money deducted from the

wages of employees in payment of membership dues in a labor organization." Id. § 186(c)(4).

Finally, the LMRA's definition of "labor organization" is the same as that set forth in the NLRA.

Id. § 142(3).

As discussed above, Plaintiffs have not demonstrated that it is inevitable or likely

that Consumer Affairs will register labor organizations under the Deductions Law. Nor have

Plaintiffs shown that Fast Food Justice is arguably a labor organization. Accordingly, Plaintiffs

have no shown that there is an actual conflict between the Deductions Law and LMRA

§ 186(a)(2).

Plaintiffs argue, however, that Fast Food Justice is a "representative" of

employees under LMRA § 186(a)(1). (See Pltf. Br. (Dkt. No. 48) at 37 n.11, 41; Pltf. Reply to

Intervenors (Dkt. No. 56) at 28) The LMRA provides that "representative" has the same

meaning as under the NLRA, 29 U.S.C. § 142(3), and the NLRA provides simply that "[t]he

term 'representatives' includes any individual or labor organization." 29 U.S.C. § 152(4). While

the NLRA does not define "individual," the use of "individual" throughout the definitions

section makes clear that an "individual" refers to a natural person. See 29 U.S.C. § 152(1) ("The

term 'person' includes one or more individuals, labor organizations, partnerships, associations,

corporations, legal representatives, trustees, trustees in cases under Title 11, or receivers.");

§ 152(3) ("The term 'employee' shall include any employee, and shall not be limited to the

61

employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice . . . ."); § 152(11) ("The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees . . . ."). Because Fast Food Justice is not an "individual," it could only be a "representative" if it is a labor organization. As discussed above, because it is not arguable that Fast Food Justice is a labor organization, there is no conflict with LMRA § 182(a)(1).

Even if the term "individual" included a legal entity such as Fast Food Justice, the Supreme Court has held that "in using the term 'representative' Congress intended that it include any person authorized by the employees to act for them in dealings with their employers." United States v. Ryan, 350 U.S. 299, 302 (1956). As discussed above, there is no evidence that Fast Food Justice "deals with" employers, and thus Fast Food Justice is not a representative of fast food employees.

There is no actual conflict between the Deductions Law and the LMRA.

## B.    Whether the Deductions Law is Preempted by *Machinists*

### 1.    Legal Standard

"One form of implied preemption under the NLRA, known as Machinists preemption, forbids states and localities from intruding upon 'the [labor-management] bargaining process.'" Concerned Home Care Providers, Inc. v. Cuomo, 783 F.3d 77, 84 (2d Cir. 2015) (quoting Lodge 76 Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Emp't Relations Comm'n ("Machinists"), 427 U.S. 132, 149 (1976)). Machinists preemption relies "on the understanding that in providing in the NLRA a framework for self-organization and collective bargaining, Congress determined both how much the conduct of unions and

62

employers should be regulated, and how much it should be left unregulated." Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 751 (1985). "Sections 7 and 8 of the NLRA guarantee employees the right to organize and engage in other forms of protected concerted action, and identify forms of unfair labor practices. The remaining aspects of the bargaining process are left 'to be controlled by the free play of economic forces.'" Concerned Home Care Providers, 783 F.3d at 84 (quoting Machinists, 427 U.S. at 140). "For a state to 'define what economic sanctions might be permitted negotiating parties in an ideal or balanced state of collective bargaining' is therefore 'denying one party to an economic contest a weapon that Congress meant him to have available.'" Id. (quoting Machinists, 427 U.S. at 150).

Machinists preemption focuses on the process by which parties may reach agreement, not the substantive terms of that agreement. "The framework established in the NLRA was merely a means to allow the parties to reach such agreement fairly." Metro. Life, 471 U.S. at 752. "The statute's concern with 'establishing an equitable process for determining terms and conditions of employment' does not extend to the 'particular substantive terms of the bargain that is struck.'" Concerned Home Care Providers, 783 F.3d at 85 (quoting Metro. Life, 471 U.S. at 753) (emphasis in original). Moreover, "the [Supreme] Court has recognized that it 'cannot declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions; obviously, much of this is left to the States.'" Metro. Life, 471 U.S. at 757 (quoting Motor Coach Emps. v. Lockridge, 403 U.S. 274, 289 (1971)).

### 2. Analysis

Plaintiffs argue that the Deductions Law "involves exactly the kind of local interference in labor-management relations that the Machinists doctrine forbids. The

63

[Deductions Law] requires an employer to administer payroll deductions, rather than leaving such arrangements to negotiations and the 'free play of economic forces.'" (Pltf. Br. (Dkt. No. 48) at 42 (citing Machinists, 427 U.S. at 150-51))

Plaintiffs also analogize to union dues checkoff provisions (see id. at 42-43), noting that numerous courts have held that union dues checkoffs are a mandatory subject of bargaining that Congress has chosen to leave unregulated. See NLRB v. J.P. Stevens & Co., 538 F.2d 1152, 1165 (5th Cir. 1976) ("Union dues checkoff is a mandatory subject of bargaining."); Teamsters Local 358 v. Des Moines Register, 438 N.W.2d 598, 600 (Iowa 1989) ("An employer's acceptance of a dues checkoff provision is one such area that Congress intentionally left unregulated."); see also 29 U.S.C. § 158(d) (obligation to bargain collectively "does not compel either party to agree to a proposal or require the making of a concession"). Given that the Deductions Law prohibits labor organizations from registering to receive payroll remittances, however, Plaintiffs' argument that the remittances at issue here are actually union dues (see Pltf. Br. (Dkt. No. 48) at 42) is unpersuasive.

Finally, Plaintiffs argue that the Deductions Law "forces employers to fund a union organization campaign." (Id. at 43) According to Plaintiffs, the Deductions Law makes it more "convenient" for employees to fund Fast Food Justice, and the Deductions Law "was specifically designed, at the SEIU's behest, to raise money for the SEIU/[Fast Food Justice's] union campaign." (Id.) Plaintiffs further argue that the legislative history of the Deductions Law makes clear that its purpose is to create a "funding source for an ongoing union organizing campaign." (Pltf. Reply (Dkt. No. 51) at 31)

Defendants and Intervenors respond that "Machinists preemption is centrally concerned with the mechanics of the collective-bargaining process," (Def. Br. (Dkt. No. 62) at

39), and that nothing in the Deductions Law addresses these mechanics. (See id. at 39-40; see also Intervenors Opp. (Dkt. No. 66) at 34-36).

As to the legislative history of the Deductions Law, it appears that the law was passed with the intent to facilitate donations by fast food employees to organizations that would promote causes important to them. For example, Daneek Miller – chair of the City Council's Committee on Civil Service and Labor (Sturniolo Decl., Ex. 4 (Dkt. No. 50-4) at 4) – stated that the Deductions Law

> certainly seeks to lend a, and provide a voice for those who are currently not organized within the labor movement and particularly, all the work that has been done for those in the fast food industry, but it was not without concern throughout the entire labor movement; we wanna keep this movement strong.

(Id. at 5-6)[16]

Similarly, City Council member Julissa Ferreras-Copland (Pltf. R. 56.1 Stmt (Dkt. No. 49) ¶ 14), stated that the Deductions Law is a "first of its kind legislation [that] will enable

---

[16] Plaintiffs also point to another statement from Miller addressing the importance of the right to collective bargaining:

> And before we vote, I do [want to] take the privilege to affirm the resolutions, our commitment to these resolutions, which is the commitment to the right to collective bargaining, and one would think that in these times, and particularly in New York State, as state of such union density and activity, that it would not be necessary, but if we just look to our left and right and look at the 28 states throughout the country that have adopted right-to-work laws and its impact on its workers, certainly we wanna take a proactive, stay ahead of the curve position, and so we are affirming the right to collective bargaining here in New York City and the right to organize.

(Pltf. R. 56.1 Stmt. (Dkt. No. 49) ¶ 10 (quoting Sturniolo Decl., Ex. 4 (Dkt. No.50-4) at 16) Miller's remarks are not directed at the Deductions Law, however. Instead, Miller is addressing two City Council resolutions "affirming the right to collectively bargain." (See Sturniolo Decl., Ex. 4 (Dkt. No.50-4) at 16 ("So that is my piece on the two resolutions. . . ."); Turner Decl., Ex. F (Dkt. No. 68-6) ("Resolution affirming the right to collectively bargain for workers in the City of New York"); id. Ex. G ("Resolution urging Congress to vote against proposed 'right-to-work' legislation"))

fast food workers to form their own nonprofit, to educate their coworkers about their rights on the job and advocate for changes they need in their community." (Id. ¶ 15 (quoting Sturniolo Decl., Ex. 5 (Dkt. No. 50-5) at 7)

Even assuming arguendo that the Deductions Law was passed with the intent to promote the labor movement, the Deductions Law does not, as Plaintiffs claim, "force fast food employers into unionized workforces." (Pltf. Br. (Dkt. No. 48) at 43) The Deductions Law does not provide employees with an "economic weapon" to collectively bargain; does not deny employers any "economic weapon"; and does not otherwise "'frustrate effective implementation of the [NLRA's] processes.'" Machinists, 427 U.S. at 148 (quoting R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 380 (1969)). Although Plaintiffs argue that "[t]he [Deductions Law] improperly places a thumb on the scale as to a substantive term of an agreement – precisely what Machinists preemption prohibits," (Pltf. Br. (Dkt. No. 48) at 42), Machinists preemption does not prevent local or state governments from setting substantive terms of agreements. See Metro. Life, 471 U.S. at 727, 753 (Massachusetts statute required that minimum mental health care benefits be provided to Massachusetts residents who are insured under certain insurance policies; Court held that the law was not preempted, as "[t]he NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment, and not with particular substantive terms of the bargain that is struck").

As discussed above, Machinists preemption addresses the mechanics of the collective bargaining process. Indeed, "the Supreme Court has never applied Machinists preemption to a state law that does not regulate the mechanics of labor dispute resolution." Concerned Home Care Providers, 783 F.3d at 86, and "state action is only preempted if it regulates the use of economic weapons that are recognized and protected under the NLRA[,]

such that the state or local government has entered 'into the substantive aspects of the bargaining process to an extent Congress has not countenanced.'" Rondout Elec., Inc. v. N.Y. State Dep't of Labor, 335 F.3d 162, 167 (2d Cir. 2003) (quoting Machinists, 427 U.S. at 149 (internal quotation omitted)). Because the Deductions Law does not regulate or interfere with the collective bargaining process, it is not preempted under Machinists.

The cases cited by Plaintiffs (see Pltf. Br. (Dkt. No. 48) at 43) are not to the contrary. In each case, the laws or conduct at issue penalized employers who did not reach a collective bargaining agreement. For example, in Association of Car Wash Owners Inc. v. City of New York, 15 Civ. 8157 (AKH), 2017 WL 4508489 (S.D.N.Y. June 20, 2017), reconsidered on other grounds, 15 Civ. 8157 (AKH), 2017 WL 4350578 (S.D.N.Y. Aug. 31, 2017),

> Local Law 62, a New York City ordinance, require[d] car wash companies, as a pre-condition for an operating license, to post a $150,000 surety bond in favor of employees, but reduce[d] that requirement to $30,000 if the company either enters into a collective bargaining agreement or an active monitoring agreement that meet certain conditions to assure expeditious adjudications of wage disputes and timely payments of wages.

Id. at *1. This ordinance "explicitly encourage[d] unionization . . . by imposing a penalty that requires a fivefold increase in the amount of a surety bond required for car washing companies that are not parties to a collective bargaining agreement or, alternatively, an independent monitoring scheme and large security deposits." Id. at *3. By contrast, the Deductions Law imposes no penalty on fast food employers who do not permit unionization, nor does it otherwise encourage employers to permit unionization.

Similarly, in Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608 (1986), Los Angeles denied a taxicab company's application to renew its operating license, with "a possibility of reopening the issue" if the taxicab company settled a labor dispute with drivers within a week. See id. at 609-10. The Supreme Court held that this tactic was an impermissible

attempt to "restrict a transportation employer's ability to resist a strike," id. at 618, as "'[f]ederal law intended to leave the employer and the union free to use their economic weapons against one another.'" Id. (quoting Belknap, Inc. v. Hale, 463 U.S. 491, 500 (1983)). Again, the Deductions Law does not deny employers any economic weapon, nor is any penalty imposed on employers who do not reach a collective bargaining agreement.

Building Trades Employers' Education Association v. McGowan, 311 F.3d 501 (2d Cir. 2002) – also cited by Plaintiffs (Pltf. Br. (Dkt. No. 48) at 43) – does not support their position. In that case, the Second Circuit – relying on Golden State – held that the New York Labor Department's refusal to process an application for an apprenticeship program until collective bargaining negotiations were completed, see id. at 507, "threaten[ed] to skew the collective bargaining process by placing economic pressure on plaintiffs. . . . [P]laintiffs are being pressured to settle negotiations or to reach impasse." Id. at 511. Here, by contrast, the Deductions Law does not pressure fast food employers to reach a collective bargaining agreement, or even to collectively bargain.

Plaintiffs' reliance on Chamber of Commerce v. Brown, 554 U.S. 60 (2008), is likewise misplaced. (See Pltf. Reply (Dkt. No. 51) at 31) That case addressed a California statute that prohibited several classes of employers that received state funds from using those funds to assist, promote, or deter union organizing. Id. at 62. The Court held that the statute was preempted under Machinists. Under 29 U.S.C. § 158(c),

> [t]he expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

Id. at 67. The Court found that this "express protection of free debate forcefully buttresses the pre-emption analysis in this case," and noted that while "[u]nder Machinists, congressional intent

to shield a zone of activity from regulation is usually found only "implicit[ly] in the structure of the Act," id. at 68 (quoting Livadas v. Bradshaw, 512 U.S. 107, 117, n. 11 (1994)), Brown involved both an "implicit and explicit" intention to protect non-coercive speech. Id. As the Court held,

> California's policy judgment that partisan employer speech necessarily "interfere[s] with an employee's choice about whether to join or to be represented by a labor union," is the same policy judgment that the [Board] advanced under the Wagner Act, and that Congress renounced in the Taft-Hartley Act. To the extent [the challenged provisions] actually further the express goal of [the California statute], the provisions are unequivocally pre-empted.

Id. at 69 (quoting 2000 Cal. Stats., ch. 872, § 1). Unlike in Brown, however, Congress has not explicitly spoken on the subject of payroll deductions for non-profits, and there is no reason implicit in the NLRA that Congress intentionally left the issue of payroll deductions to non-profits unregulated.

Finally, Plaintiffs attempt to frame the Deductions Law as "requiring parties to commit to [a] specific agreement between labor and management." (Pltf. Br. (Dkt. No. 48) at 41) Plaintiffs argue that "the substance of labor negotiations, as well as their results, are the crux of the area Congress intentionally left to the free play of economic forces." (Id. at 42) No agreement between labor and management is at issue here, however. In any event,

> the mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption, for "there is nothing in the NLRA . . . which expressly forecloses all state regulatory power with respect to those issues . . . that may be the subject of collective bargaining."

Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 21-22 (1987) (quoting Malone v. White Motor Corp., 435 U.S. 497, 504-505 (1978)).

## CONCLUSION

Because the Deductions Law does not compel speech, association, or subsidies from fast food employers, and is not preempted by federal labor law, Plaintiffs' motion for

summary judgment is denied, and Defendants' motion for summary judgment is granted. The

Clerk of Court is directed to terminate the motions (Dkt. Nos. 47, 57), terminate Restaurant Law

Center as a Plaintiff, and close this case.

Dated: New York, New York
       February 6, 2019

SO ORDERED.

Paul G. Gardephe

Paul G. Gardephe
United States District Judge